Case No. 25-4013

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

———————————

ZACHARY SZYMAKOWSKI, an individual, and JOHANNA A. URIBE, on behalf of FELIPE A. URIBE, a minor, on behalf of themselves and a proposed class of similarly situated F-1 students,

*Plaintiffs and Appellees,*

v.

UTAH HIGH SCHOOL ACTIVITIES ASSOCIATION, INC., a Utah nonprofit corporation; ROBERT CUFF, an individual; MARILYN RICHARDS, an individual; AMBER SHILL, an individual; BURKE STAHELI, an individual; DAVID WARREN, an individual; DAVID LUND, an individual; ZACK MCKEE, an individual; PAUL SWEAT, an individual; LUKE RASMUSSEN, an individual; JERRE HOLMES, an individual; JASON SMITH, an individual; MIKE MEES, an individual; DEVIN SMITH, an individual; BRYAN DURST, an individual; and BRENT STRATE, an individual,

*Defendants and Appellants.*

———————————

## APPELLANTS' OPENING BRIEF

On Interlocutory Appeal from the United States District Court for the District of Utah

The Honorable Robert J. Shelby

District Court Case No. 2:24-cv-00751

Oral Argument Requested

———————————

D. Craig Parry (7274)
Chaunceton Bird (16402)
Daniel J. Nelson (19030)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
*cparry@parrbrown.com*
*cbird@parrbrown.com*
*djnelson@parrbrown.com*

Mark O. Van Wagoner (3323)
**SAVAGE, YEATES & WALDRON**
2455 E. Parleys Way Suite 200
Salt Lake City, Utah 84109
Telephone: (801) 631-1872
*movw@comcast.net*

*Attorneys for Appellants*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................VI

STATEMENT OF RELATED CASES ............................................ VI

GLOSSARY ...................................................................... VII

INTRODUCTION ..................................................................1

JURISDICTIONAL STATEMENT ..................................................4

STATEMENT OF THE ISSUES ....................................................4

    *Issues, Preservation, and Applicable Standards of Review* ..................4

STATEMENT OF THE CASE ......................................................5

    *Factual Background* ........................................................6

    *Procedural Background* ....................................................12

    *Legal Background: Dissimilarly Circumstanced Visa Holders* ..........13

SUMMARY OF THE ARGUMENTS ................................................21

ARGUMENT .....................................................................22

I.   THE F-1 VISA RULE IS PROPERLY SUBJECT TO RATIONAL BASIS REVIEW. ....23

    A.   Rational Basis Review is Appropriate Because The F-1 Visa Rule Does Not Affect A Fundamental Right Or Discriminate Against A Suspect Class. ........................................................23

    B.   The Supreme Court Has Never Held That All Classifications Based On Alienage Are Inherently Invalid Or Suspect. ................26

    C.   Supreme Court Precedent Does Not Support An Application Of Strict Scrutiny Review To Laws Disparately Affecting Nonimmigrant Visa Holders Or Holders Of Specific Visas. ..................28

    D.    This Court Should Follow The Fifth, Sixth, And Eleventh Circuits And Find That Rational Basis Is The Appropriate Standard To Review The F-1 Visa Rule. .................................................................................... 35

II.  THE TRIAL COURT ERRED WHEN IT CONCLUDED THAT THE NOTICE OF ALLOCATION OF FAULT WAS TIMELY AND SUFFICIENT. ...............................43

CONCLUSION ...........................................................................................54

STATEMENT OF REASONS WHY ORAL ARGUMENT IS NECESSARY .............................54

CERTIFICATE OF COMPLIANCE .....................................................................55

ADDENDUM 1 - THE DISTRICT COURT'S ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER

ADDENDUM 2 - THE DISTRICT COURT'S ORDER ON THE MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF AUTHORITIES

**Cases**

*Albach v Odle*, 531 F.2d 983 (10th Cir. 1976) ........................................ 24

*Ambach v. Norwick*, 441 US 68 (1979) ................................................ 27

*Application of Griffiths*, 413 U.S. 717 (1973) ............................... 28, 29, 37

*Arizona v. United States*, 567 U.S. 387 (2012).................................. 47, 50

*Armour v. City of Indianapolis*, 566 U.S. 673 (2012) ............................. 24

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005).......................... 44

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)................. 47

*Capron v. Office of Att'y General of Massachusetts*, 944 F.3d 9 (1st Cir. 2019) .. 49

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)...................... 24, 25

*Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012) ........................... 35, 40–42

*DeCanas v. Bica*, 424 U.S. 351 (1976)............................................ 47–49

*Demore v. Kim*, 538 U.S. 510 (2003) ............................................... 11

*Elkins v. Moreno*, 435 U.S. 647 (1978) ......................................... 48, 52

*Epperson v. Arkansas*, 393 U.S. 97 (1968)..................................... 44, 49

*Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019)................................ 38

*Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572 (1976) ...................................................................... 28

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993).................................. 23, 24

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)................. 50

*Foley v. Connelie*, 435 U.S. 291 (1978) ........................................ 26, 29

*Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88 (1992)...................... 47, 50

*Graham v. Richardson*, 403 U.S. 365 (1971) ................................... 26–37

*Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707 (1985).. 45, 50

*Hines*, 312 U.S. ..................................................................... 53

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)....................................... 16

*Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450 (1988)................................. 24, 43

*Landon v. Plasencia*, 459 U.S. 21 (1982)........................................... 16

*League of United Latin American Citizens (LULAC) v. Bredesen*, 500 F.3d 523 (6th Cir. 2007).................................................................. 37, 38

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005)........................... 35–37, 53

*Lyng v. Castillo*, 477 U.S. 635 (1986) ......................................... 25, 31

*Mathews v. Diaz*, 426 U.S. 67 (1976)................................. 15, 17, 26, 39

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ................................ 44, 45

*Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480 (10th Cir. 1998) ..... 5

*Nyquist v. Mauclet*, 432 U.S. 1 (1977)......................................... 28, 29

*Oklahoma Educ. Ass'n v. Alcoholic Beverage L. Enf't Comm'n*, 889 F.2d 929 (10th Cir. 1989) ............................................................................................... 5

*Plyler v. Doe*, 457 U.S. 202 (1982) .......................................................... 13, 24, 41

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236 (1959) ........................................................................................... 48

*Sanchez v. Mayorkas*, 593 U.S. 409 (2021) .................................................. 11

*Sugarman v. Dougall*, 413 U.S. 634 (1973) .................................................. 28

*Sugarman v. Dougall*, 413 U.S. 634, 644 (1973) ........................................... 34

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948) .......................... 31, 32

*Toll v. Moreno*, 458 U.S. 1 (1982) ................................................ 27, 51, 52, 53

*United States v. Carolene Prods. Co.*,304 U.S. 144 (1938) .............................. 24

*United States v. Virginia*, 518 U.S. 515 (1996) ............................................. 24

*Van Staden v. St. Martin*, 664 F.3d 56 (5th Cir. 2011) ................................... 37

*West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358 (10th Cir. 2000) .......... 44

*Wyeth v. Levine*, 555 U.S. 555 (2009) ........................................................ 44

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................ 29, 32, 33

*Yin v. Diaz*, No. 1:24-21129-CIV, 2025 WL 950952 (S.D. Fla. Mar. 28, 2025) . 38, 39

## Statutes

8 U.S.C. § 1101(a)(15) ........................................................................ 11, 2, 14

8 U.S.C. § 1101(a)(15)(F)(1) ....................................................................... 52

8 U.S.C. § 1101(a)(15)(F)(i) ............................................................... 9, 18, 41

8 U.S.C. § 1101(a)(15)(M)(i) ....................................................................... 10

8 U.S.C. § 1101(a)(20) ................................................................................ 11

8 U.S.C. § 1184 ......................................................................................... 14

8 U.S.C. § 1227(a)(1)(C) ............................................................................. 14

8 U.S.C. §§ 1101–1107 ......................................................................... 10, 19

8 U.S.C. §§ 1101(a)(15)(F), (H), (J) ...................................................... 11, 19, 20

8 U.S.C.A. § 1101(a)(15)(B) ......................................................................... 9

8 U.S.C.A. § 1101(a)(15)(E) ......................................................................... 9

8 U.S.C.A. § 1101(a)(15)(F) ........................................................................ 10

8 U.S.C.A. § 1101(a)(15)(L) ......................................................................... 9

8 U.S.C.A. § 1611 ...................................................................................... 30

10 U.S.C. § 3253 ....................................................................................... 15

26 U.S.C. § 3306(c)(8) ............................................................................... 15

28 U.S.C. § 1292(a)(1) ................................................................................. 4

28 U.S.C. § 1331 ......................................................................................... 4

## Rules

10th Cir. R. 32(B) .................................................................... 55

Rule 32 of the Federal Rules of Appellate Procedure ........................... 55

Rule 28 of the Federal Rules of Appellate Procedure ........................... 55

## Regulations

8 C.F.R. 214.2(f)(9) ................................................................ 10

8 C.F.R. 214.2(m)(13)–(14); (m)(17); (f)(9); (f)(15)............................ 10

8 C.F.R. § 214(f)(6)(i).............................................................. 51

8 C.F.R. § 214.2 .................................................................... 11

8 C.F.R. § 214.2(f)(5)(i)........................................................... 41

8 C.F.R. § 214.2(f)(6)(i)........................................................... 20

8 C.F.R. § 214.2(f)(6)(i)(E)....................................................... 53

8 C.F.R. § 214.2(j)(1)(v)........................................................... 11

8 C.F.R. § 214.2(l)(15)(ii).......................................................... 9

8 C.F.R. § 214.6(h)(iv)............................................................. 9

8 C.F.R. § 241.1(a)(3) .............................................................. 14

8 CFR 214.2(f)(9)(ii)............................................................... 10

22 C.F.R. § 41.61(b) ................................................................ 46

22 C.F.R. § 41.61(b)(1)(iv) ........................................................ 41

22 C.F.R. § 62.23(g) ................................................................ 11

22 C.F.R. § 62.25(c) and (h) ....................................................... 46

22 C.F.R. § 62.25(h) ....................................................... 21, 46, 49, 51

## Other Authorities

*Graduated Application of Const. Prot. for Aliens: The Real Meaning of Zadvydas v. Davis*, 2001 Sup. Ct. Rev. 47 (2001) ............................................. 16

Immigr. Proc. Handbook § 1:1 ...................................................... 9

Immigr. Proc. Handbook § 2:2 ...................................................... 41

Immigr. Proc. Handbook § 2:6 ...................................................... 19

Immigr. Proc. Handbook § 3:1 ...................................................... 11

IRS Pub. 519, 2003 WL 23305933 (I.R.S.)........................................... 15

DUCivR 9-1 ......................................................................... 23

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

**GLOSSARY**

| | |
|---|---|
| **Appellants** | UHSAA, UHSAA's Executive Director Robert Cuff, and 2024 members of UHSAA's Board: Marilyn Richards, Amber Shill, Burke Staheli, David Warren, David Lund, Zack Mckee, Paul Sweat, Luke Rasmussen, Jerre Holmes, Jason Smith, Mike Mees, Devin Smith, Bryan Durst, and Brent Strate. |
| **Appellees** | Zachary Szymakowski and Felipe Uribe, including Johanna Uribe, suing on Felipe Uribe's behalf. |
| **B Visa** | The most common visa status, which allows short visits for business and pleasure but does not permit separate employment or academic studies. 8 U.S.C.A. § 1101(a)(15)(B); General requirements, Immigr. Proc. Handbook § 1:1. No derivative status is provided to family members. *Id.* |
| **E/L/TN Visas** | The E visa category is for business affiliates who require extended visits in order to work in a trade between the United States and a foreign state or that represents a major investment in the U.S. 8 U.S.C.A. § 1101(a)(15)(E). The L nonimmigrant visa permits international companies to bring foreign employees to the United States. 8 U.S.C.A. § 1101(a)(15)(L). Spouses, but not other family members, of E and L nonimmigrants can be employed in the U.S. during their stay. Id. §§ 4:6, 5:5; see 8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. § 214.2(l)(15)(ii). A TN visa holder may remain in the country if he or she maintains sponsored employment but may not change employers unless the new employer is willing to sponsor the alien. 8 C.F.R. § 214.6(h)(iv); (i). |
| **F-1 Student** | A nonimmigrant alien who is a bona fide student qualified to pursue a full course of study in the United States pursuant to an F-1 Visa. |
| **F-1 Visa** | A type of F nonimmigrant visa that permits foreign students to enter the United States temporarily and solely for the purpose of pursuing a course of study. *See* 8 U.S.C. § 1101(a)(15)(F)(i); *Policy Manual*, U.S. Citizenship & |

Immigr. Servs., vol. 2, pt. F, ch. 2 (2024). These students can range from elementary school students to persons engaged in postdoctoral studies. *See* 8 U.S.C.A. § 1101(a)(15)(F). (Students in vocational or nonacademic programs may be admitted only in the M visa category. 8 U.S.C. § 1101(a)(15)(M)(i)). Holders of F-1 visas may seek employment only under narrowly defined circumstances, but their dependents may not. 8 C.F.R. 214.2(m)(13)–(14); (m)(17); (f)(9); (f)(15). An F-1 Student may be authorized to work off-campus on a part-time basis after having been in F-1 status for one full academic year. 8 CFR 214.2(f)(9)(ii). An F-1 student may engage in on-campus employment only if it will not displace U.S. residents. 8 C.F.R. 214.2(f)(9).

**F-1 Visa Rule**    The portion of the Student Visa Eligibility Rule—defined below—that restricts F-1 Students who are attending a high school from participating in certain varsity interscholastic competition. [App. 219.] The F-1 Visa Rule was enacted to deter high schools from recruiting F-1 Students for the purpose of gaining an unfair advantage in interscholastic competition. *On its face, the F-1 Visa Rule applies only to F-1 Students*. Appellees have challenged the constitutionality of only the F-1 Visa Rule and not the entire Student Visa Eligibility Rule.

**H2-B Visa**    The H-2B visa is used by U.S. companies to temporarily employ foreign nationals in instances where U.S. workers are unavailable and requires companies to intend to employ aliens temporarily, and the companies must seek a "labor certification" from the U.S. Department of Labor. *Id.* § 7:1. The H-2B workers' family members may enter the U.S. in the H-4 visa category but may not accept employment in the United States. *Id.* § 7:4.

**INA**    The Immigration and Nationality Act. 8 U.S.C. §§ 1101–1107.

**J-1 Visa**    The J-1 visa category is used by foreign students, scholars, experts, medical interns, and industrial and business trainees to enter the U.S. as "exchange visitors" in a U.S.

government-approved exchange program. *General requirements*, Immigr. Proc. Handbook § 3:1. Restrictions are placed on the length of stay. High school students on a J-1 Visa are admitted for a one-year period. *Id.* § 3.2. J-1 students in secondary schools cannot accept full-time or part-time employment, but those in colleges and universities generally can. 22 C.F.R. § 62.23(g); (i). With certain exceptions, the spouse and minor children can accept employment with USCIS authorization. 8 C.F.R. § 214.2(j)(1)(v).

**January Order**  The district court's order on Motion for Preliminary Injunction (Memorandum Decision and Order, Jan. 2, 2025, Judge Robert J. Shelby (Dist. Ct. ECF No. 118)). [App. 1496–1530.]

**LPR**  "Lawful permanent resident," meaning any alien having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws. *See* 8 U.S.C. § 1101(a)(20). LPRs are in many ways indistinguishable from citizens in that they "compete for most jobs in the private and public sectors without obtaining job-specific authorization . . . are taxed on their worldwide income . . . [under certain circumstances] must register under the Selective Service Act of 1948 . . . and contribute in myriad other ways to our society." *Demore v. Kim*, 538 U.S. 510, 544 (2003) (citations omitted) (internal quotation marks omitted). If they choose, LPRs "may apply for full membership in the national polity through naturalization." *Id.*

**Nonimmigrant**  Aliens who are lawfully admitted into the United States on a "designated, temporary basis." *Sanchez v. Mayorkas*, 593 U.S. 409, 411 (2021); 8 U.S.C. § 1101(a)(15). Unlike LPRs, they express no intention of abandoning their foreign country of residence. 8 U.S.C. §§ 1101(a)(15)(F), (H), (J).

**O/P Visas**  The O and P visa categories are for persons of "extraordinary" ability in the sciences, arts, education, business, or athletics, and other entertainers and athletes

who intend to work in their area of extraordinary ability. *Id*. §§ 9:1, 9:5. They are admitted only to perform services in "specific, identified" events (i.e., they may not freelance in the open market). *Id*. § 9:4. Other family members cannot engage in employment in the U.S. unless they are independently qualified. *Id*. § 9:8.

| | |
|---|---|
| **October Order** | The district court's order on the Motion for Temporary Restraining Order (Memorandum Decision and Order, Oct. 17, 2024, Judge Tena Campbell (Dist. Ct. ECF No. 69)). [App. 607–44.] |
| **Student Visa Eligibility Rule** | The rule in UHSAA's 2024–2025 Handbook at *Interps & Guidelines 1.9.3*, including its three subsections: "A. Foreign Exchange Students with J-1 Visas"; "B. International Students with F-1 Visas"; and "C. International Students with Visas Other than J-1 or F-1 Visas." [App. 219–20.] |
| **Szymakowski** | Zachary Szymakowski. Plaintiff below, Appellee before this Court. Szymakowski is an F-1 Student attending Juan Diego High School as a senior during the 2024–2025 academic year. |
| **UHSAA** | Utah High School Activities Association. Defendant below, Appellant before this Court. |
| **Uribe** | Johanna Uribe, on behalf of her minor son, Felipe Uribe. Plaintiff below, Appellee before this Court. Felipe Uribe is an F-1 Student attending St. Joseph's Catholic High School as a junior during the 2024–2025 academic year. |

## INTRODUCTION

This case arises out of the myopic emphasis on winning, the furious scramble for the best players, and the rampant undue influence that has found its way into high school sports. Unlike college or club sports, high school sports prohibit the recruiting of players. However, unscrupulous coaches discovered foreign sports academies of high-school-aged athletes with head-turning talent. They realized that of the numerous visas available for foreign citizens to study in the U.S., one could be used to recruit and direct foreign-born athletes to a specific school—the F-1 Visa. The recruited F-1 athletes did not enter the U.S. to pursue a course of study as contemplated by the F-1 Visa; rather, they came to win state championships and showcase their skills for colleges. The F-1 Visa Rule was directed to address the abuse unique to this single visa classification.

Rational basis review is the proper standard of review of the constitutionality of a rule that neither discriminates against a suspect class nor affects a fundamental right. The F-1 Visa Rule challenged by Appellees does neither. It regulates the privilege to compete at the varsity level in high school athletics, which is manifestly not a fundamental right found in the Constitution. And while the rule affects one subset of one type of aliens—nonimmigrants present in the U.S. under an F-1 Visa— F-1 Visa Students are not an insular minority with obvious, immutable, and distinguishing characteristics that define them as a discrete group. Their status was

1

conferred on them not by biology but by the U.S. government. Their status was not fixed at birth but rather the result of their choice.

Appellees would urge this Court to take a quixotic view of aliens: That, regardless of their legal status, every alien legally present in the U.S. is similarly circumstanced and indistinguishable for purposes of Equal Protection analysis. But such is not the case. Neither the Supreme Court nor any one of the ten circuit courts has so held.[1] Three circuit courts have held directly to the contrary, and Supreme Court precedent is contrary to the view that aliens are a homogenous class for purposes of the Fifth and Fourteenth Amendments. Instead, they are described as *a heterogeneous multitude of persons*. A quick review of the 22 visa classifications of 8 USC § 1101(a)(15) exposes the fallacy of Appellees' position. The federal government has established scores of visa statuses, each with its own requirements for entry, maintenance, and length of stay; each with its own privileges, rights, and prohibitions. Pursuant to those conferred legal statuses, the federal and state governments have enacted a panoply of laws and regulations disparately affecting classes of aliens and their family members in matters of access to public benefits, employment, education, taxation, military service, and a host of other arenas. If the lower court's and Appellees' argument is accepted, all of these laws disparately

---

[1] Not even the Second Circuit, on which the lower court relied, has gone that far, as explained later in this brief.

2

impacting aliens based on their visa status would be struck down as unconstitutional. Such cannot be the case. Appellees err in equating nonimmigrant F-1 Visa holders with all aliens and in suggesting that a rule affecting F-1 Students, who are all non-citizen aliens, is a rule disparately impacting a suspect class based on immutable characteristics. The F-1 Visa Rule, like scores of state and federal laws, classifies based on visa status, not biology.

Appellees' and the lower courts' analysis of preemption is likewise flawed in its sweeping conclusion that merely because the F-1 Visa Rule affects immigrants, it is preempted by the federal government's immigration enactments. But this is not the case. State statutes and regulations affecting immigrants are legion, and the Supreme Court has specifically held that federal law does not preempt states from acting in the field of immigration. Nor is there any federal law explicitly excluding state action that affects F-1 Visa Students' opportunity to participate in varsity high school athletics. Indeed, unlike the J-1 Visa that specifically provides a conditional right to participate in extracurricular activities, the F-1 Visa regulations are entirely silent on that issue. F-1 Visa Students are permitted entry into the country for the limited purpose of participating in a "full course of study," which does not include high school athletics. Accordingly, there is also no conflict with federal law. The F-1 Visa Rule does not regulate who may enter this country and on what terms—

matters preempted by federal law—but rather it simply places conditions on a privilege provided by the state but not bestowed by federal law.

### JURISDICTIONAL STATEMENT

This Court and the district court have jurisdiction under 28 U.S.C. § 1331 because Appellees bring claims under Article VI, Clause 2 of and the Fourteenth Amendment to the Constitution of the United States [App. 1243–47].

The district court granted a preliminary injunction in favor of Appellees on January 2, 2025. [App. 1496–1530.] This Court has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1).

### STATEMENT OF THE ISSUES

#### *Issues, Preservation, and Applicable Standards of Review*

**Issue 1.**    Whether the district court erred in holding that the F-1 Visa Rule is subject to strict scrutiny [App. 1514–20], even though the F-1 Visa Rule does not inhibit the exercise of a fundamental right or discriminate against a suspect class. Rather, the F-1 Visa Rule affects the eligibility to participate in varsity interscholastic athletics for a subset of a subclass of aliens: nonimmigrants attending a high school on an F-1 Visa.

Appellants preserved this issue in their briefing [App. 66–69; 820–29] and at oral arguments [App. 450–568; 1249–1483]. The district court ruled on this issue in its October Order [App. 617–32] and its January Order [App. 1514–23].

This Court reviews *de novo* the district court's determination of the appropriate level of review applicable to a challenge brought under the Equal Protection Clause. *Oklahoma Educ. Ass'n v. Alcoholic Beverage L. Enf't Comm'n, 889 F.2d 929, 932 (10th Cir. 1989).*

**Issue 2.**    Whether the district court erred in holding that the F-1 Visa Rule violates the Supremacy Clause [App. 1523–27], even though federal regulations are silent on F-1 Student participation in extracurricular activities and do not evidence a congressional intent to exclude state rulemaking in that area, and even though the F-1 Visa Rule can be enforced without conflicting with federal regulations or infringing on federal immigration powers.

Appellants preserved this issue in their briefing [App. 829–31] and at oral arguments [App. 564–67; 1249–1483]. The district court ruled on this issue in its October Order [App. 637–38] and its January Order [App. 1523–27].

This Court reviews *de novo* the district court's preemption determination. *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998).

### STATEMENT OF THE CASE

Appellees challenge the constitutionality of the F-1 Visa Rule, which restricts F-1 Students' competition in varsity athletics in Utah high schools. The district court entered a preliminary injunction enjoining the enforcement of the F-1 Visa Rule on

the basis that it violated the Equal Protection Clause and the Supremacy Clause of the U.S. Constitution.

### *Factual Background*

#### *UHSAA and Its Board of Trustees*

UHSAA was established nearly one hundred years ago by local boards of education and private school governing boards in the State of Utah. [App. 183; 393.] UHSAA consists of all Utah local district boards of education and their participating schools, as well as various charter and private high schools. [App. 393.] A board of trustees, executive committee, and regional boards of managers operate UHSAA to administer and supervise interscholastic athletics and activities. [App. 194.] UHSAA's Board of Trustees is made up of athletic directors, principals, superintendents, and local school board members. [App. 194–97.]

UHSAA promulgates and implements rules designed to further its stated purpose to: "Create, administer, maintain and protect the unique type of athletic competition which has existed in high schools in the State of Utah, based on genuine competition between member high schools and suited to the greatest involvement of students. It should stress participation, fairness, competitive balance and foster in the public a belief that the competitions are fair and honest." [App. 193.] Eligibility rules—developed and refined over many years—govern student eligibility based on factors such as age, years of participation, academic progress, enrollment, and school

transfers. [App. 205–23.] The rationale for such rules is set forth in UHSAA's By-

Laws:

> The right to and need for an education is paramount and superior to any
> privilege a student may enjoy to participate in interscholastic activities.
> However, because many activities are high-profile in high school, they
> can become over-emphasized and the target of manipulation by several
> different interested groups. . . . [Eligibility rules] protect individual
> students from the effects of over-emphasis on activities and athletic
> competition, which may interfere with the more important regular
> progression of the student's education . . . .

[App. 208.]

Certain eligibility rules, like the F-1 Visa Rule, seek to deter the recurring

problems of recruiting and undue influence in high school sports. [App. 220.] As set

forth in UHSAA's By-Laws:

> The Undue Influence and Recruiting Rules are an integral part of the
> Association's ability to create, administer and maintain the valuable
> and unique form of competition it offers. This unique form of
> competition is a carefully constructed system that promotes competitive
> balance and serves the mission and purpose of education-based sports
> and activities. . . . Other sporting organizations exist which promote
> free player movement, unrestrained recruiting . . . [and] are primarily
> designed to promote athletic development of the individual and provide
> a showcase for the athletic talents of those individuals. These
> organizations do not share the primary purposes of the Association . . .

[App. 220.]

*Origins of the F-1 Visa Rule*

Recently, a growing number of Utah high schools have begun aggressively recruiting international students to play on their athletic teams. [App. 1500–05.] These schools target high-performing, high-school-aged athletes and prey upon their dreams of competing in the United States and receiving athletic scholarships to colleges and universities in the U.S. [App. 397–98.] By enticing top international talent, the schools gain an unfair advantage over schools that fill their rosters with students who live within their boundaries. [App. 399–400.]

It is not only fair play and competition that suffer, but also the recruited F-1 Students themselves. [App. 394–423; 540–41; 1500–03.] UHSAA learned of allegations of mistreatment of F-1 Students by coaches and administrators [App. 1500–01]; grade inflation to maintain athletic eligibility of F-1 Students [App. 1500–01]; the submission of false information to UHSAA regarding F-1 Students' academic eligibility [App. 1502]; inadequate and unsupervised living conditions for F-1 Students [App. 1502]; and other concerning problems one would expect when young men and women are being recruited for their athletic abilities with little care for them as students [App. 1500–03].

In January 2024, UHSAA received a letter from basketball coaches at several UHSAA member schools alleging that a Utah private high school was aggressively recruiting students from foreign countries for its varsity basketball team—which

included 15 players from 12 countries and a starting lineup of players from Brazil, France, Serbia, Burundi East Africa, and Las Vegas. [App. 1501.]

UHSAA commenced a statewide investigation into the recruitment and mistreatment of F-1 Students that revealed additional evidence that schools were recruiting international students for varsity athletics and failing to care for those students when they arrived in the United States. [App. 1501–04.] The investigation confirmed reports of significant recruiting of F-1 Students [App. 398–99], including through various international sports clubs and "handlers" or agents (from Brazil, Tahiti, and Chile, among other countries) touting connections with, and scholarship opportunities at, Utah high schools [App. 397–99]. During the 2023–2024 school year, for example, 37 of 38 students on one school's boys' soccer team were F-1 Students. [App. 398.]

*The Student Visa Eligibility Rule*

In spring 2024, UHSAA began studying ways to restore fair competition among its member schools and deter mistreatment of F-1 Students. [App. 399–406; 1503–04.] UHSAA contacted high school activities associations in neighboring states about their eligibility rules for F-1 Students. [App. 95.] This information was provided to its Constitution and Bylaws Committee, which drafted and approved the Student Visa Eligibility Rule. [App. 400–04; 413–14; 1504.] After receiving public comments, during a public meeting on May 1, 2024, UHSAA's Board approved the

9

Student Visa Eligibility Rule, which was distributed to every UHSAA member school for a vote and was subsequently enacted by a 128 to 9 vote, with 19 schools not responding. [App. 400–04; 413–14; 1504.] The rule became effective for the 2024–2024 school year [App. 1504]. *See generally* Handbook, *Interps & Guidelines 1.9.3.* [App. 219–20.]

The Student Visa Eligibility Rule has three parts to address three categories of visas: J-1, F-1, and all others. [App. 218–20.] Section "A" addresses foreign exchange students attending school with a J-1 visa. [App. 218.] To be eligible to play varsity high school sports, a J-1 student must meet UHSAA's eligibility requirements for all students, as directed by federal regulations for J-1 visa holders [App. 218.] No additional eligibility requirements apply to J-1 students. [App. 218.] In fact, J-1 visa students have fewer eligibility restrictions than local students in that they are not subject to the requirement that transfer students sit out for half a year of varsity competition. [App. 218.]

The F-1 Visa Rule is Section "B" of the Student Visa Eligibility Rule [App. 219], which reads as follows:

> An international student with an F-1 visa issued by the U.S. Immigration and Naturalization Service is a student who attends high school in the U.S. An international student with an F-1 visa is only eligible for non-varsity level competition unless the following condition is met: a member school may choose to compete with an [F-1] student at the varsity level, but the member school is not eligible for post-season competition. Such member school must declare the use of

10

an [F-1] student at the varsity level prior to the competition start date
for that given sport and receive approval from the UHSAA.

[App. 219.] The rule gives schools have three choices: (1) play the F-1 Student at
the junior varsity level; (2) play the F-1 Student at the varsity level and not
participate in post-season competition; or (3) compete as an "independent" school.
[App. 219.]

Section "C" of the Student Visa Eligibility Rule addresses international
students with visas other than F-1 or J-1 visas. [App. 219–20.] Like students
attending high school on J-1 visas, students with visas other than F-1 Visas are not
subject to any rule beyond the eligibility requirements applicable to all other
students. [App. 219–20.]

The F-1 Visa Rule's restrictions apply only to F-1 Students because of their
unique circumstances: They are the only international students who can choose
which high school to attend and, in the case of attending a private school, can stay
and compete in athletics for multiple years [App. 1504 n.49]. *See Policy Manual*,
U.S. Citizenship & Immigr. Servs., vol. 2, pt. D, ch. 3 (2024); 8 C.F.R. § 214.2.
Thus, they are the only international students subject to being recruited. The F-1
Visa Rule was tailored to address that reality. [App. 398; 554–57; 1357–58.]

### *Procedural Background*

Szymakowski initiated this lawsuit on October 7, 2024, by filing a putative class action Complaint. [App. 1507.] In his Complaint, as amended, he sought to enjoin enforcement of the F-1 Visa Rule, alleging that it violates the Fourteenth Amendment's Equal Protection Clause and Title VI of the Civil Rights Act. [App. 1226–48.] Szymakowski also moved for a temporary restraining order ("TRO") to enjoin UHSAA from enforcing the F-1 Visa Rule against him for the remainder of the football season. [App. 1–22.]

The District Court heard evidence and oral argument concerning the motion for TRO on October 16, 2024, [App. 450–567] and entered an order the next day granting Szymakowski's motion and enjoining UHSAA from enforcing the F-1 Visa Rule as to Szymakowski for the remainder of the football season [App. 607–44]. On November 1, 2024, his school's football season ended, rendering the TRO moot. [App. 1509.] Szymakowski then amended his Complaint and added Uribe as a plaintiff. [App. 1509.]

Appellees filed a motion for preliminary injunction. [App. 645–73.] The court heard evidence and oral argument on November 27, 2024, [App. 1249–1483] and entered its order granting the motion on January 2, 2025. [App. 1496–1530.] In its Equal Protection analysis, the court followed the Second Circuit (and not the Fifth, Sixth, and Eleventh Circuits), and held that the F-1 Visa Rule was subject to strict

12

scrutiny on the basis that it discriminated against aliens, notwithstanding the rule's classification on the basis of visa status—*not* the basis of alienage. [App. 1514–20.] The court held that the F-1 Visa Rule failed strict scrutiny analysis. [App. 1514–20.]

The court also held that the F-1 Visa Rule "violates the Supremacy Clause because it discriminates against lawfully admitted F-1 students and imposes burdens beyond those Congress contemplated," [App. 1525] notwithstanding that (1) no federal law precludes the state from enacting eligibility requirements for high school athletics, (2) the Supreme Court has held that federal immigration law does not preempt states from acting in the field of regulating aliens, and (3) there is no conflict with federal law such that the state law precludes the accomplishment and execution of the full purposes and objectives of Congress.

Appellants filed a notice of interlocutory appeal on January 30, 2025.

### *Legal Background: Dissimilarly Circumstanced Visa Holders*

*Persons Dissimilar in Fact or Circumstances Need Not Be Treated as Though They Were the Same*

"The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike. But so too, the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (internal citations and quotation marks omitted). "The initial discretion to determine what is 'different' and what is 'the same' resides

in the legislatures of the States." *Id.* State actors therefore "have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Id.*

Aliens are not homogeneously similarly circumstanced. Federal statutes and regulations make this clear by distinguishing among the various permissions under which aliens enter this country.

*The INA and Federal Regulations Distinguish Between Aliens Who are Legal Permanent Residents and Aliens Who are Nonimmigrants*

At the highest level, the INA distinguishes between two types of legal aliens: lawful permanent residents (LPRs) and nonimmigrants. LPRs are in many ways indistinguishable from citizens, while nonimmigrants are aliens who are lawfully admitted into the United States on a designated, temporary basis. *See* Glossary.

The INA describes many types of nonimmigrants, including aliens visiting the United States temporarily, working in the United States temporarily, and studying in the United States temporarily, like F-1 Students. 8 U.S.C. § 1101(a)(15). Each type of nonimmigrant has a specific corresponding visa authorizing the temporary stay and dictating the terms of that stay. If a nonimmigrant fails to comply with the terms of the visa, or if the visa expires, the nonimmigrant may be deported. *See* 8 U.S.C. § 1227(a)(1)(C); 8 C.F.R. § 241.1(a)(3); *see also* 8 U.S.C. § 1184 (explaining

the manner in which the Attorney General's discretion pertains to various nonimmigrant alien categories). Generally speaking, and in contrast with LPRs, nonimmigrants do not qualify for any federal public benefits (*see Mathews v. Diaz*, 426 U.S. 67, 83 (1976); *see also* 26 U.S.C. § 3306(c)(8)), are not required to register for the Selective Service (10 U.S.C. § 3253), are prohibited from serving in the military (*id.*), and are taxed only on their U.S.-sourced income (*see* IRS Pub. 519, 2003 WL 23305933 (I.R.S.)). Thus, while nonimmigrants are subject to many more legal restrictions than LPRs, they do not bear all of the same societal responsibilities as LPRs and citizens.

The distinctions between LPRs and nonimmigrants are well-summarized by one commentator:

> Since the 1920s, U.S. law has been characterized by administrative practices that clarify from the time of admission whether an alien is being admitted for permanent residence purposes or only for a temporary stay. Aliens are admitted either as immigrants, otherwise called lawful permanent residents (LPRs), or as nonimmigrants allowed to enter for a temporary purpose. Lawful permanent residents—green card holders—have wide access to the private employment market and are generally as protected as citizens in their rights to enter into contracts and acquire property, rights that have been bolstered by numerous Supreme Court rulings . . . Lawful permanent residents are also subject to some obligations quite comparable to those imposed on citizens. . . . They can acquire citizenship through naturalization on fairly easy terms that have scarcely changed in 200 years . . . [and] for the last forty years at least, LPRs have almost never been expelled on grounds other than conviction for a crime. . . .

Nonimmigrants—aliens admitted temporarily—have more restricted entitlements than LPRs. The exact shape of their privileges varies depending on the category of nonimmigrant admission, and in fact is closely linked to the purposes of the specific nonimmigrant category. . . . All receive documentation that either sets forth a specific date on which their right to remain terminates, or else, in a minority of cases, specifies that the status continues only so long as some other identifiable relationship (such as enrollment in a designated school) persists. . . . [Connections with society] are established under a formal understanding of temporariness, and deportation . . . is regularly invoked by INS for persons in these categories, usually for overstaying the admission period or otherwise transgressing the conditions imposed at the time of admission.

*Graduated Application of Const. Prot. for Aliens: The Real Meaning of Zadvydas v. Davis*, 2001 Sup. Ct. Rev. 47, 93–96 (2001).

The Supreme Court recognizes an "ascending scale of rights" as an alien "increases his identity with our society." *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950). "Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization." *Id.*; *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (once an alien "begins to develop the ties that go with permanent residence his constitutional status changes accordingly"). As the *Mathews* Court stated:

The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed,

16

to the conclusion that all aliens must be placed in a single homogeneous legal classification. For a host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other; and *the class of aliens is itself a heterogeneous multitude of persons* with a wide-ranging variety of ties to this country.

426 U.S. at 78, 79 (emphasis added).

*The INA and Federal Regulations Distinguish Among Nonimmigrant Aliens in the Burdens, Rights, and Restrictions Applicable to the Numerous Nonimmigrant Visas*

Under the broader category of nonimmigrant aliens lies a panoply of diverse classifications and subclassifications,[2] each with its own permissions and restrictions, including travel and tourism visas like the B-Visa, work visas such as E/L/TN Visas and H2-B Visa, education visas such as F-1 Visa, J-1 Visa and M-Visa, and performance and extraordinary ability visas such as the O/P Visas. *See* Glossary, *supra*. Holders and dependents of these nonimmigrant visas are subject to disparate treatment based on their visa status. For example, holders of B-Visas cannot work or study in the U.S. Holders of E/L/TN/H2-B/O/P Visas can work under specific terms and conditions. Spouses of E/L Visa holders can work in the U.S. but their children cannot. Spouses of H2-B/O/P Visa holders cannot work while in the

---

[2] *See Directory of Visa Categories*, U.S. DEPARTMENT OF STATE—BUREAU OF CONSULAR AFFAIRS, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/all-visa-categories.html (last visited Apr. 30, 2025) (listing dozens of visa categories for the "many different purposes of temporary travel and . . . related nonimmigrant visa categories").

U.S. unless they separately qualify under their own visa. Holders of an F-1 Visa may seek narrowly circumscribed employment opportunities, but their dependents may not. Secondary school students on a J-1 Visa cannot work but those in college or university can, as can their dependents with USCIS authorization. *See* Glossary, *supra*.

*Federal Regulations Set Clear and Specific Burdens, Rights, and Restrictions Applicable to F-1 Visa Holders*

For a nonimmigrant to be admitted on an F-1 Visa, they must be: "[A]n alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study . . . at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States . . . ." 8 USC § 1101(a)(15)(F)(i). Most F-1 students come to the United States to take part in the higher education system. In 2023, about 90% of all F-1 students were enrolled in an associate, bachelor's, master's, or doctoral program.[3]

---

[3] Homeland Security Investigations, *SEVIS by the Numbers: Annual Report on International Student Trends*, U.S. Immigration and Customs Enforcement, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ice.gov/doclib/sevis/btn/24_0510_hsi_sevp-cy23-sevis-btn.pdf (last visited Apr. 30, 2025).

F-1 Visa status carries with it a number of restrictions unique to F-1 Students: The student must be enrolled in an "academic" course of study, not at a technical or vocational school. Immigr. Proc. Handbook § 2:6. The student must be enrolled in a school approved for the attendance of foreign students. *Id.* § 2:7. An F-1 Student may not pursue a course of study at a public elementary school or in a publicly funded adult education program. *Policy Manual*, U.S. Citizenship & Immigr. Servs., vol. 2, pt. F, ch. 2 (2024). They cannot be granted F-1 status to attend a public secondary school unless the student reimburses the school and intends to remain at the school in such status for no more than a year. *Id.* at ch. 3. F-1 Students attending a private elementary school may not transfer into a publicly funded elementary school. *Id.* The F-1 Student must demonstrate that he or she can fund their own participation in the selected academic program.[4] The student is expected to pay for his or her studies without resort to employment. *Policy Manual*, U.S. Citizenship & Immigr. Servs., vol. 2, pt. F, ch. 2. In order to obtain an F-1 Visa, the student must establish a bona fide nonimmigration intent by demonstrating that they are maintaining a residence abroad to which they intend to depart upon completion of

---

[4] *Financial Ability*, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, https://studyinthestates.dhs.gov/students/prepare/financial-ability#:~:text=Prospective%20F%2D1%20or%20M,officer%20asks%20to%20review%20it. (last visited Apr. 30, 2025).

their studies. *Id.* F-1 Visa regulations are silent as to the right of F-1 Students to participate in extracurricular activities, including sports.[5]

*Federal Regulations that Permit J-1 Students to Participate in Extracurricular Activities Expressly Restrict Recruiting*

By contrast, the federal government expressly provides J-1 Visa holders the opportunity to participate in extracurricular activities, including sports, subject to certain requirements. These requirements include rules specifically intended to prevent recruiting:

> Student extra-curricular activities. Exchange students may participate in school sanctioned and sponsored extra-curricular activities, including athletics, if such participation is:
>
> (1) Authorized by the local school district in which the student is enrolled; and
>
> (2) Authorized by the state authority responsible for determination of athletic eligibility, if applicable. *Sponsors shall not knowingly be party to a placement (inclusive of direct placements) based on athletic abilities, whether initiated by a student, a natural or host family, a school, or any other interested party.*
>
> (3) Any placement in which either the student or the sending organization in the foreign country is party to an arrangement with any other party, including receiving school personnel, whereby the student

---

[5] The phrase "a full course of study" may not be interpreted to include all that might be associated with the education, or in this case, the "high school experience." 8 C.F.R. § 214.2(f)(6)(i). "Full course of study" refers to a full class load, as distinguished from a part-time student. *Id.* It has nothing to do with fully participating in all the activities a school may offer. With respect to high school students, "a full course of study" means "class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress toward graduation." *Id.* § 214.2(f)(6)(i)(E).

will attend a particular school or live with a particular host family *must be reported to the particular school and the National Federation of State High School Associations prior to the first day of class*.

22 C.F.R. § 62.25(h) (emphasis added).[6]

## SUMMARY OF THE ARGUMENTS

### *Equal Protection Clause*

The district court made reversible error by holding that the F-1 Visa Rule was subject to strict scrutiny after concluding that laws affecting nonimmigrant aliens should be subjected to the same level of scrutiny as laws affecting immigrant aliens. [App. 1515–20.] The district court erred in so holding because the F-1 Visa Rule neither affects a fundamental right nor discriminates against a suspect class. Rather, the F-1 Visa Rule regulates participation in certain extracurricular activities (post-season high school varsity sports), access to which is not a fundamental right, and applies to F-1 Students, a subset of nonimmigrant aliens that are not a suspect class. Because the rule's classification neither burdens a fundamental right nor targets a suspect class, rational basis review applies. This Court should therefore reverse the district court's holding and remand with instructions to apply rational basis review to the F-1 Visa Rule in its analysis of the rule's constitutionality under the Equal Protection Clause.

---

[6] In Utah, the state authority responsible for determining athletic eligibility is the UHSAA.

*Supremacy Clause*

The trial court made further reversible error by holding that the F-1 Visa Rule violated the Supremacy Clause by imposing burdens beyond those contemplated by Congress. [App. 1523–32.] This holding was erroneous because the F-1 Visa Rule can be enforced without impairing federal superintendence over immigration. The F-1 Visa Rule in no way limits students from pursuing a full course of study, as defined under the relevant regulations. Thus, the full purposes and objectives of Congress are undisturbed, and the F-1 Visa Rule is not subject to conflict preemption. This Court should therefore reverse the district court because the F-1 Visa Rules does not violate the Supremacy Clause.

## ARGUMENT

The district court erred in holding that the F-1 Visa Rule is subject to strict scrutiny. The F-1 Visa Rule regulates eligibility for competition in varsity interscholastic athletics for a subclass of aliens: nonimmigrants attending school on an F-1 Visa. The F-1 Visa Rule, therefore, does not inhibit the exercise of fundamental rights or discriminate against a suspect class. The district court also erred in holding that the F-1 Visa Rule violates the Supremacy Clause. Federal regulations are silent on the topic of F-1 Student participation in extracurricular activities and do not evidence a congressional intent to preempt state rulemaking in

that area, and the F-1 Visa Rule can be enforced without conflicting with federal regulations or infringing on federal immigration powers.

## I.    THE F-1 VISA RULE IS PROPERLY SUBJECT TO RATIONAL BASIS REVIEW.

### A.    Rational Basis Review is Appropriate Because the F-1 Visa Rule Does Not Affect a Fundamental Right or Discriminate Against a Suspect Class.

The F-1 Visa Rule neither affects a fundamental right nor discriminates against a suspect class; therefore, rational basis review is the correct standard of review.

"Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). "This standard of review is a paradigm of judicial restraint. The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no

matter how unwisely [courts] may think a political branch has acted." *Id.* (internal citations and quotations omitted).

The applicable standard of review depends on whether a classification inhibits the exercise of a fundamental right or discriminates against a suspect class, a quasi-suspect class, or a non-suspect class. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985). Strict scrutiny applies if the classification inhibits the exercise of a fundamental right or discriminates against a suspect class. *United States v. Virginia*, 518 U.S. 515, 532–34 (1996). Intermediate scrutiny is appropriate when a classification discriminates against a quasi-suspect class, such as gender or children born out of wedlock. 473 U.S. at 440–41. A classification that neither burdens a fundamental right nor targets a suspect class is subject to rational basis review. *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012).

Playing varsity sports in high school is not a fundamental right. A fundamental right is one that is derived, either explicitly or implicitly, from the Constitution itself. *Plyler v. Doe*, 457 U.S. 202, 217 (1982). Education itself is not a fundamental right. *E.g.*, *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 458 (1988); *Plyler,* 457 U.S. at 223. Further, "Participation in interscholastic athletics is not a constitutionally protected civil right." *Albach v Odle*, 531 F.2d 983, 984–85 (10th Cir. 1976).

Students present in the U.S. pursuant to an F-1 Visa are not a suspect class. A suspect class is a "discrete and insular minority," *United States v. Carolene Prods.*

*Co.*, 304 U.S. 144, 152 n.4 (1938), that exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). These characteristics "bear[] no relation to [the] ability to perform or contribute to society." *Cleburne*, 473 U.S. at 441.

The F-1 Visa Rule does not facially discriminate on the basis of race, national origin, or alienage; rather, it makes classifications based on an alien's visa status. [App. 219.] The rule applies only to one subset of nonimmigrant aliens: F-1 Students. F-1 Students are not a suspect class and, therefore, statutes that restrict their rights should be subject to rational basis review. Neither is the broader class of aliens, nonimmigrants, a suspect class. The Supreme Court did not intend alienage classification to be inherently suspect unless the classification was motivated by invidious discrimination, and nonimmigrants are not subject to invidious discrimination since they are not victims of discrimination based on an obvious, immutable characteristic that does not affect the alien's ability to participate in society.

Nonimmigrants' (including F-1 Students) defining characteristic is their visa status, a status requested by the alien and conferred on them by the U.S. government—a status that does, in fact, affect (and restrict) their ability to participate in society. Indeed, many nonimmigrants have parents, siblings, or children who are

U.S. citizens: Visa status is merely a legal status, not a biological or otherwise immutable characteristic.

Race and national origin are immutable characteristics fixed at birth. Visa status is not. Visa status is a choice. The F-1 Visa Rule is not a rule that says no Chinese can operate a laundry or no Japanese can obtain a fishing license. It does not apply to all aliens or even to all nonimmigrant aliens. The restrictions of the F-1 Visa Rule apply only to one type of visa holder: F-1 Students.

## B.    The Supreme Court Has Never Held That All Classifications Based On Alienage Are Inherently Invalid Or Suspect.

The Supreme Court has "never suggested that such legislation [imposing restraints on aliens] is inherently invalid, nor [has it] held that all limitations on aliens are suspect." *Foley v. Connelie*, 435 U.S. 291, 294 (1978). Seven years after its ruling in *Graham v. Richardson*, 403 U.S. 365 (1971), the Court disavowed any presumption of strict scrutiny in matters regulating aliens: "It would be inappropriate . . . to require every statutory exclusion of aliens to clear the high hurdle of strict scrutiny because to do so would obliterate all the distinctions between citizens and aliens and thus depreciate the historic values of citizenship." *Foley*, 435 U.S. at 295. Accordingly, the Court has applied rational basis review to alienage classifications where it has found a legitimate purpose for the classification. *E.g.*, *Mathews v. Diaz*, 426 U.S. 67, 82–83 (1976) (Social Security benefits); *Foley*, 435

U.S. at 296, 297 (voting; seeking elective office, legislative, executive, or judicial positions; jury service; police service); *Ambach v. Norwick*, 441 US 68, 80 (1979) (employment as schoolteacher).

When given the opportunity to extend strict scrutiny to nonresident aliens, the Supreme Court declined to do so. In *Toll v. Moreno*, the Court addressed a policy that excluded nonimmigrants from obtaining in-state tuition at the University of Maryland. 458 U.S. 1, 3–4 (1982). The Court struck down the policy under the Supremacy Clause (on facts dissimilar to those) and did not address the equal protection issue raised by the parties. *Id.* at 17.

The Supreme Court has thus left open the question of whether nonimmigrants are a suspect class such that statutes that make classifications based on nonimmigrants' temporary status should be reviewed under strict scrutiny. The better-reasoned argument, consistent with the rationale of Supreme Court holdings, is that strict scrutiny should not be expanded to state action that disparately affects nonimmigrant aliens.

**C.      Supreme Court Precedent Does Not Support an Application of Strict Scrutiny Review to Laws Disparately Affecting Nonimmigrant Visa Holders or Holders of Specific Visas.**

1.      *The Supreme Court Has Not Extended Strict Scrutiny to Laws Disparately Affecting Nonimmigrant Visa Holders or Holders of Specific Visas.*

The appropriate level of scrutiny to apply to laws impacting nonimmigrant visa holders, let alone laws disparately impacting *one type* of visa holder, has not been decided by the Supreme Court. Where the Court has held that strict scrutiny should apply to alien classifications, the affected aliens were LPRs, not nonimmigrants. *E.g.*, *Graham*, 403 U.S. 365 (1971); *Sugarman v. Dougall*, 413 U.S. 634 (1973); *Application of Griffiths*, 413 U.S. 717 (1973) (employment rights of resident aliens); *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572 (1976) (right of legal, resident aliens to work as engineers); *Nyquist v. Mauclet*, 432 U.S. 1 (1977).

In *Graham,* the Court struck down denial of welfare benefits to resident aliens, noting their status as residents. 403 U.S. at 376 (striking down "a state statute that denies welfare benefits to resident aliens"). In *Nyquist,* the Court applied "close judicial scrutiny" to strike struck down a law that barred resident aliens from receiving state financial assistance for higher education, holding that resident aliens' payment of taxes justified their inclusion in tax-funded programs. *Nyquist*, 432 U.S. at 12. In so holding, the Court stated that the rule enjoined was "of practical

significance *only to resident aliens*." *Id.* at 4 (emphasis added). As the Court later explained in *Foley*, the state laws at issue in *Nyquist* and *Graham* were "inconsistent with the congressional determination to admit the alien to permanent *residence*." *Foley*, 435 U.S. at 295 (emphasis added); *cf. In re Griffiths*, 413 U.S. at 719–20 ("[A] lawfully admitted resident alien is a 'person' within the meaning of the Fourteenth Amendment's directive that a State must not 'deny to any person within its jurisdiction the equal protection of the laws.'" (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886))). It is an overly broad and unwarranted application of the holdings in those cases to suggest that they stand for the proposition that laws disparately affecting nonimmigrant aliens, or laws disparately affecting a subclass of nonimmigrant visa holders, must be subject to strict scrutiny.

Appellees argued in the court below that *Graham* demands strict scrutiny review of any law disparately affecting virtually every type of nonimmigrant alien, unless the law falls under a narrow exception, such as the government function exception discussed below. [App. 659–60.] This argument misreads *Graham* and the Supreme Court cases that follow. The rationale for applying strict scrutiny in cases involving LPRs simply does not apply to nonimmigrants who are in the United States only for a limited, temporary purpose. The F-1 Visa Rule need not fit within the government function or other exception because strict scrutiny has never been extended to temporary, nonimmigrant aliens—a class different from legal permanent

residents or even quasi-permanent residents—much less to a discrete subset of nonimmigrant aliens like F-1 Students. "[T]the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Plyler*, 457 U.S. at 216.

Appellees' argument would collapse the entire distinction between nonimmigrants and citizens/LPRs. The extensive statutory and regulatory regime that includes scores of nonimmigrant visa categories, each with its own burdens, restrictions, and permissions (*see* Glossary, *supra*), would be subject to the nearly always fatal strict scrutiny analysis, as every one of those restrictions disparately affect aliens. Yet, all would be subject to strict scrutiny under Appellees' reading of *Graham*.[7]

Finally, it is worth noting that Congress has determined that nonimmigrant aliens, with very limited exceptions, are not eligible for federal public benefits. 8 U.S.C.A. § 1611. Congress has further provided that a state is authorized to determine the eligibility of a nonimmigrant to receive state public benefits. *Id.* § 1611. It would be incongruous for the federal government or a state to be permitted

---

[7] One might ask: How could a regulatory scheme under which the spouse of an F-1 Student cannot work at McDonalds, while the spouse of a J-1 can, could survive strict scrutiny analysis under Equal Protection (as applied by the Fifth Amendment to the federal government)? Or a scheme under which the spouse of an E visa holder can work but a child cannot.

to deny welfare, health, disability, public or assisted housing, postsecondary education, food assistance, and unemployment benefits to aliens on the basis they are nonimmigrants but be precluded from restricting a subclass of nonimmigrants' ability to play high school varsity sports.

> 2.    Graham v. Richardson *was Premised on the Court's Desire to Root Out Invidious Discrimination that is Not Present in a Rule Where Discrimination is Based on Visa Status.*

In *Graham*, the Court evaluated an Arizona statute that denied welfare benefits to all aliens who had not resided in the United States for fifteen years and a Pennsylvania statute that denied welfare benefits to all aliens. 403 U.S. at 371–72. The Court held that classifications based on race, nationality, and alienage are inherently suspect and are thus subject to strict scrutiny. *Id.* The common factor among these groups is that they all have been the source for some irrational, "deep-seated prejudice," *Plyler*, 457 U.S. at 217 n.14, such as xenophobia or racism, that was based on some conspicuous and immutable characteristic, like skin color, that defined them as a class. *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); *Plyler*, 457 U.S. at 216 (classifications that disadvantage a suspect class "presumptively invidious").

The Court in *Graham* relied on its reasoning in *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 412 (1948). Takahashi was a Japanese immigrant trying to earn a living as a fisherman in California. 334 U.S. at 412–13. He emigrated from Japan in 1907. *Id.* at 412. After lawfully living in the United States for thirty-five

years, he was forced from his home and confined to an internment camp during World War II. *See id.* at 413; 422–24. By the time he returned home, California, acting under the anti-Japanese fervor that permeated the state at that time, enacted a law that denied fishing licenses to all Japanese immigrants. *Id.* Thus, because of anti-Japanese sentiment, Takahashi was dislocated, incarcerated, and deprived of his livelihood as a fisherman. *Id.* 413–14.

The *Graham* Court sought to ensure that statutes that treated people like Takahashi differently than everyone else would be reviewed under strict scrutiny— the same standard applied to statutes that make racial classifications. *See generally Graham*, 403 U.S. at 375–76. The Court applied this level of scrutiny to alienage classifications because it believed that treating groups differently based on the members' alienage was akin to discriminating against a group because of their race or color. *See id.* The Court also cited to *Yick Wo*, where the Court held that San Francisco's discrimination against Chinese persons violated the Equal Protection Clause because "no reason for [the discrimination] exist[ed] except hostility to the race and nationality to which the petitioners belong." *Id,* at 371, *citing Yick Wo*, 118 U.S. at 374.

Admittedly, in *Graham*, there were fewer overtly racist or xenophobic motivations behind the statute at issue than in *Takahashi* and *Yick Wo*. The Court struck down statutes that conditioned the qualification for welfare benefits on either

U.S. citizenship or residing in the state for fifteen years because aliens and citizens contributed equally to the tax revenues that supported those welfare benefits. *See* 403 U.S. at 374–76. The Court reasoned that because resident aliens and citizens contribute equally to the tax revenues for benefits, any unexplained statutory distinction between those aliens and citizens regarding the receipt of benefits is an invidious distinction. *Id.* at 374–75. Because neither Pennsylvania nor Arizona provided a reason for excluding aliens from welfare benefits, other than the state's "special public interest" in favoring its own citizens over aliens in the distribution of limited resources such as welfare benefits, the Court held that the statutes violated the Equal Protection Clause. *Id.* at 372; 375–76. The Court readily inferred a racist or xenophobic motivation for the distinction, given the absence of an otherwise legitimate purpose for excluding the aliens from welfare benefits, as the Court held in *Yick Wo*. *Id.*

In contrast, nonimmigrants' distinguishing characteristic is the possession of a temporary visa—and for F-1 Students, it is the possession of a specific type of temporary visa. This is not a conspicuous, obvious, or immutable characteristic. Accordingly, this purpose of applying strict scrutiny is absent. The fact that the Supreme Court has applied strict scrutiny to statutes that classify against aliens generally does not mean that strict scrutiny must apply to subgroups of aliens who have not been subject to xenophobic discrimination and whose defining

characteristic is the inconspicuous status conferred on them by the federal government.

### 3. *Post*-Graham *Decisions Have Not Applied Strict Scrutiny to All Laws Based on Alienage.*

Strict adherence to the *Graham* rule was first called into doubt in *Sugarman v. Dougall*, 413 U.S. 634, 644 (1973). Although the *Sugarman* Court struck down a New York statute that excluded all aliens from holding civil service positions by applying strict scrutiny, it noted that a state may exclude aliens from certain positions "where citizenship bears some rational relationship to the special demands of the particular position." *Id.* at 647. The Supreme Court, since *Sugarman*, has applied rational basis review to a number of laws that discriminate against aliens, as noted above.

In *Plyler,* the Court struck down a Texas statute that excluded the children of undocumented aliens from receiving public education; however, it held that "[u]ndocumented aliens cannot be treated as a suspect class." 457 U.S. at 223. Instead of strict scrutiny, the Court required the state to "demonstrate that the classification is reasonably adapted to the purposes for which the state desires to use it." *Id.* at 226 (internal citation omitted).

**D.** **This Court Should Follow the Fifth, Sixth, and Eleventh Circuits and Find that Rational Basis is the Appropriate Standard to Review the F-1 Visa Rule.**

The Circuits have split on whether statutes that place restrictions on nonimmigrant aliens should be reviewed under strict scrutiny. The Fifth Circuit, in *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005), found that nonimmigrants were not a suspect class and applied rational basis review to uphold a statute that excluded nonimmigrants from taking the bar exam. The Second Circuit, in *Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012), found that nonimmigrants as a whole are a suspect class and applied strict scrutiny to strike down a statute that excluded nonimmigrants from obtaining a pharmacist's license. The Sixth and Eleventh Circuits have followed the Fifth Circuit in holding that nonimmigrants are not a suspect class and applying rational basis review. The rationale of the Fifth, Sixth, and Eleventh Circuits is the better analysis.

1. *Legal Permanent Residents and Nonimmigrants Are Not Similarly Circumstanced, Nor Are Holders of F-1 Visas Similarly Circumstanced with Other Nonimmigrants.*

The Fifth Circuit was the first circuit to address the issue of whether nonimmigrants are a suspect class entitled to strict scrutiny protection. *LeClerc*, 419 F.3d 405. The challenged rule in *LeClerc* was a Louisiana Supreme Court Rule that required every applicant for admission to the Louisiana Bar be a citizen of the United States or a resident alien. *Id.* at 410. The plaintiffs were nonimmigrant aliens. *Id.*

35

Plaintiffs argued that nonimmigrants should be considered a suspect class. The Fifth

Circuit disagreed and held that rational basis review applied, examining Supreme

Court precedent in the process:

> To begin, nonimmigrant aliens are not a suspect class under *Griffiths*.
> The plaintiff in *Griffiths* was a permanent resident alien, who, but for a
> Connecticut law that conditioned bar admission on United States
> citizenship, would have been eligible to sit for the Connecticut bar
> exam. The instant plaintiffs, however, are *nonimmigrant aliens.* The
> distinction, far from being a constitutional irrelevancy, is paramount.
> [The challenged rule] only affects nonimmigrant aliens who are not
> entitled to live and work in the United States permanently. In contrast,
> the rule at issue in *Griffiths* effected a total exclusion of all aliens from
> the practice of law in Connecticut. It was this wholesale ban of aliens
> from the Connecticut Bar that the Supreme Court found constitutionally
> infirm. Moreover . . . the Court took pains to categorize the ways in
> which resident aliens share essential benefits and burdens of
> citizenship, in a way that aliens with lesser legal status do not.

419 F.3d at 415 (emphasis in original) (internal citations omitted).

The court explained that the Supreme Court had applied strict scrutiny only to

classifications involving LPRs. *Id.* at 415–16. The court examined distinctions

between resident aliens and nonimmigrants to justify its conclusion that

nonimmigrant aliens, unlike LPRs, are not a "'discrete' or 'insular'" class entitled to

have statutes affecting them reviewed under strict scrutiny. *Id.* at 417–18. These

distinctions include that nonimmigrant aliens may not serve in the U.S. military, are

subject to strict employment restrictions, incur differential tax treatment, may be

denied federal welfare benefits, and must stipulate, as a condition of their admission

to the United States, that they have "no intention of abandoning their countries of origin and do not intend to seek permanent residence in the United States." *Id.* (internal quotation marks omitted). Thus, the court concluded that "although aliens are a suspect class in general, they are not homogeneous and precedent does not support the proposition that nonimmigrant aliens are a suspect class entitled to have state legislative classifications concerning them subjected to strict scrutiny." *Id.*; *see also Griffiths*, 413 U.S. at 722 (listing obligations and contributions of *resident* aliens); *Graham*, 403 U.S. at 376 (recognizing the similarities between resident aliens and citizens).

In *Van Staden v. St. Martin*, 664 F.3d 56 (5th Cir. 2011), *cert. denied*, 568 U.S. 814 (2012), the court affirmed its commitment to *LeClerc* and applied rational basis review to a Louisiana statute that required either U.S. citizenship or LPR status to obtain a nursing license.

The Sixth Circuit was the next to address this issue. *League of United Latin American Citizens (LULAC) v. Bredesen*, 500 F.3d 523 (6th Cir. 2007). Applying rational basis review, the court upheld a Tennessee statute that conditioned the issuance of a driver license on either U.S. citizenship or LPR status. The Sixth Circuit agreed with the *LeClerc* court's analysis, finding: "There are abundant good reasons, both legal and pragmatic, why lawful permanent residents are the only subclass of aliens who have been treated as a suspect class." *Id.* at 533. These "good

reasons" included the same factual distinctions between LPRs and nonimmigrants articulated in *LeClerc* and by the Supreme Court. *Id.*

Seven years after the Second Circuit broke with the rationale of the Fifth and Sixth Circuits, the Eleventh Circuit recognized that Supreme Court cases applying strict scrutiny to laws affecting aliens did so based on laws that affected *resident* aliens and held: "We decline to extend the Supreme Court's decisions concerning resident aliens to different alien categories." *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019). In *Estrada*, the 11th Circuit reviewed the policy of the Georgia Regents which excluded DACA recipients from attending any school that did not admit all academically qualified applicants. *Id.* at 1301. The court found that rational basis was the appropriate standard of review, and the policy easily met that standard as it was a legitimate interest of the state to prioritize the admission of students who are more likely to stay in Georgia after graduation over transitory aliens. *Id.* at 1311–12.

Earlier this year, in *Yin v. Diaz,* No. 1:24-21129-CIV, 2025 WL 950952 (S.D. Fla. Mar. 28, 2025), the court rejected an equal protection challenge to a Florida statute that prohibited state colleges and universities from providing grants to persons who were not U.S. citizens or LPRs and who were domiciled in one of seven listed countries. In so doing, the court noted that the challenged law

does not facially discriminate on the basis of either race or national origin; it makes classifications based on where an alien is domiciled . . . [and] applies to any individual who is not a citizen or lawful permanent resident of the United States who is domiciled in any of seven countries of concern . . . regardless of that individual's race or country of origin. . . . [U]nlike race, ancestry, or national origin, which are immutable characteristics established at birth, domicile is not fixed at birth. Domicile is changeable over time and in many if not most cases reflects a person's active or passive choice. Indeed, a person can change their domicile many times during their lifetime; they cannot change their race, ancestry, or national origin.

2025 WL 950952, at *17. The court concluded: "[T]he rationale for applying strict scrutiny in cases involving lawful permanent residents simply does not apply to nonimmigrant students who are in the United States only for a limited, temporary purpose under an F-1 student visa." 2025 WL 950952, at *18.

Drawing a distinction between nonimmigrant aliens and LPRs is permissible and reasonable. "In short, it is unquestionably reasonable for Congress to make an alien's eligibility [for welfare benefits] depend on both the character and the duration of his residence." *Mathews,* 426 U.S. at 82–83 (upholding constitutionality of Social Security Act provision that grants eligibility for enrollment in Medicare to resident citizens who are 65 or older but denies eligibility to aliens unless they have been admitted for permanent residence and have also resided in the United States for at least five years).

      2.     *Second Circuit's Rationale in* Dandamudi *is Flawed, and the Facts are Inapposite to the F-1 Students Affected by the F-1 Visa Rule.*

The circuit court outlier, the Second Circuit, applied strict scrutiny to a statute that excluded nonimmigrants from becoming pharmacists. *Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012). The Second Circuit's reasoning should not be followed in this case for the following reasons:

***First***, the crux of the Second Circuit's disagreement with the Fifth and Sixth Circuits is with the argument that nonimmigrants' transience justifies their exclusion from a suspect classification *because the court found that the aliens affected by the New York statute were not transient. Id.* at 78. The *Dandamudi* court examined at length the non-transitory nature of the plaintiffs: "Even if this Court were to determine that the appropriate level of scrutiny by which to analyze the discrimination should be based on the nonimmigrant aliens' similarity (or proximity) to citizens, we would still apply strict scrutiny *in this case* because nonimmigrant aliens are sufficiently similar to citizens that discrimination against them *in the context presented here* must be strictly scrutinized." *Id.* at 75 (emphasis added). The court continued:

> The *aliens at issue here* are "transient" in name only. . . . A great number of these professionals remain in the United States for much longer than six years and many ultimately apply for, and obtain, permanent residence. These practicalities are not irrelevant. They demonstrate that there is little or no distinction between LPRs and the

lawfully admitted nonimmigrant plaintiffs *here*.

*Id.* at 78 (emphasis added). The plaintiffs all had visas that permitted stays of longer than six years. The Court noted that all the plaintiffs had been authorized to reside and work in the U.S. for more than six years, six plaintiffs had lived and worked in the U.S. for more than ten years, and 22 plaintiffs had applied for permanent resident status. *Id.* at 71.

The Second Circuit's emphasis on the fact that the nonimmigrant plaintiffs were transient in name only does not apply to F-1 Students who are admitted to the U.S. "temporarily and solely for the purpose of pursuing . . . a course of study . . . ." 8 U.S.C. § 1101(a)(15)(F)(i). The duration of a course of study may vary, but it is definite. And when it ends, or when the student stops "making normal progress toward" completion of the course, his or her status is terminated. 8 C.F.R. § 214.2(f)(5)(i). Indeed, one of the requirements of an alien present under an F-1 Visa is that, "The alien intends, and will be able, to depart upon termination of the student status." 22 C.F.R. § 41.61(b)(1)(iv). Accordingly, F-1 Students cannot transition to LPR, nor can they stay beyond a 60-day grace period after their conclusion of their course of study. Duration of stay, Immigr. Proc. Handbook § 2:2. There is no argument that an F-1 Student is in any way comparable to an LPR.

***Second***, the *Dandamudi* court misconstrued and misapplied the Supreme Court's decision in *Plyler v. Doe*, 457 U.S. 202 (1982). In *Plyler*, the Court employed

a rational basis/intermediate scrutiny to strike down a state law barring the children of illegal immigrants from attending public schools. *Id.* at 220. Based on that holding and ignoring the limiting statements of the Court in that case and those that follow, the Second Circuit reasoned that it would be "absurd" to review state action impacting lawful nonimmigrant aliens under a standard lower than or equal to that employed in *Plyler* to review state action impacting unlawful aliens. 686 F.3d at 78.

However, the Court in *Plyler* was very specific in its rationale for an intermediate level of scrutiny of a law that barred children of illegal immigrants from attending school. "[D]irecting the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice." 457 U.S. at 220. The Court emphasized that it was moved primarily by the injustice of denying children the opportunity to learn to read and write when the children did not choose their immigration status. *Id.* at 219–23 ("[The challenged law] imposes a lifetime hardship on a discrete class of children not accountable for their disabling status.").

In subsequent decisions—and in *Plyler* itself—the Court limited *Plyler*'s holding to its specific facts, referencing the "special" circumstances of that case. *Id.* at 226. Chief Justice Burger, in a dissent joined by White, J., O'Connor, J., and Rehnquist, J., stated that *Plyler* stands for "little more than that the level of scrutiny employed to strike down the Texas law applies only when illegal alien children are deprived of a public education." *Id.* at 244; *see also Kadrmas v. Dickinson Pub.*

42

*Schs*., 487 U.S. 450, 459 (1988) ("We have not extended [Plyler] beyond the unique circumstances that provoked its unique confluence of theories and rationales."). The Second Circuit simply ignored this language and the unique circumstances of *Plyler* in holding that anything less than strict scrutiny of a statute affecting lawful immigrants would be absurd.

**Third**, the Second Circuit's holding that *any* discrimination against aliens is subject to strict scrutiny except for two sharply defined exceptions oversimplifies, misinterprets, and fails to analyze the relevant Supreme Court precedent. As set forth above, the Court has never suggested that legislation impacting aliens is inherently invalid or suspect.

## II.    THE F-1 VISA RULE DOES NOT VIOLATE THE SUPREMACY CLAUSE.

Federal immigration regulations do not preempt the F-1 Visa Rule. The F-1 Visa Rule does nothing to limit students from pursuing a full course of study, as defined under the relevant F-1 Visa regulations. Specifically, the F-1 Visa Rule: (1) does not fall within the scope of federal law explicitly precluding state action; (2) does not regulate within a field in which federal law is so pervasive that it is reasonable to conclude that Congress has left no room for state action; and (3) does not conflict with federal law such that the rule precludes the accomplishment and execution of the full purposes and objectives of Congress.

The Supreme Court has clearly stated that courts are to apply a presumption against a finding of preemption. *E.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Given two equally plausible readings of a federal statute, courts have "a duty to accept the reading that disfavors pre-emption . . . Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (internal quotation marks omitted). This is particularly true in areas of traditional state regulation, where courts "assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Id.*; *see also* *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("In all pre-emption cases . . . [courts must] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."). "By and large, public education in our Nation is committed to the control of state and local authorities." *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1363 (10th Cir. 2000), *citing* *Epperson v. Arkansas,* 393 U.S. 97, 104 (1968). The F-1 Visa Rule, then, should not be invalidated by the Supremacy Clause unless the "clear and manifest" purpose of Congress was to preclude states from enacting any legislation affecting F-1 Students' ability to participate in high school interscholastic varsity competition. Congress has evidenced no such purpose.

Federal law preempts state law in three circumstances: First, when the state law falls within the scope of federal law explicitly precluding state action. Second, when federal law is so pervasive within a field that it is reasonable to conclude that Congress has left no room for state action. And third, when state law conflicts with federal law such that the state law precludes the accomplishment and execution of the full purposes and objectives of Congress. *See Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712–13 (1985). None of these circumstances is present here.

***First***, no federal law precludes UHSAA (as a state actor) from promulgating eligibility rules for participation by aliens in high school athletics. To find that federal law precludes a state enactment, state law must be preempted "in express terms," *Hillsborough Cnty.*, 471 U.S. at 713, by a "clear and manifest purpose of Congress." *Medtronic,* 518 U.S. at 471. There are no express terms in the F-1 Visa regulations, nor in any related regulations, stating that states cannot place any restrictions on F-1 Students' participation in high school extracurricular activities. Nor is there any expression of a clear and manifest purpose of Congress that F-1 Students be permitted to participate in varsity-level interscholastic competition. To the contrary, the regulations governing F-1 students say nothing whatsoever about an F-1 Student's right—or even permission—to compete in interscholastic athletics.

This stands in contrast to Congress's pronouncements for J-1 Visa students that specifically provide for their eligibility to participate in extracurricular activities and athletics. *See* 22 C.F.R. § 62.25(h). While both F-1 and J-1 students are admitted "for the purpose of pursuing a full course of study," only the regulations of J-1 visa students reference participation in extracurricular activities. *Compare* 22 C.F.R. § 41.61(b) (describing opportunities of F-1 Visa holders and including only "pursing a full course of study" language), *with* 22 C.F.R. § 62.25(c) and (h) (describing opportunities of H-1 visa holders and including both "participating in a full course of study" and "participat[ion] in . . . extra-curricular activities"). Congress's silence cannot be taken as *express terms* or a *clear and manifest purpose*, especially in light of the presumptions against preemption. Thus, there is no express preemption of the F-1 Visa Rule.

**Second**, the F-1 Visa Rule does not regulate within a field exclusively left to the federal government. Quite the opposite: The F-1 Visa Rule regulates within a field (education) that is squarely within state authority. But regardless of whether the "field" is defined as nonimmigrant visa students attending high school under an

F-1 Visa (as the district court suggested[8]) or high school education within the State of Utah, Congress has not preempted state action by occupying the field.

State action is subject to field preemption where the related "scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88, 98 (1992). While the regulation of immigration is a federal power, "standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) *superseded by statute on other grounds as recognized in* *Arizona v. United States*, 567 U.S. 387, 404 (2012). Indeed, the Supreme Court has "never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." *Id.*; *see also* *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 165 (1989) (noting that states are not prohibited from acting in areas that are subject to federal law, so long as state legislation does not impermissibly interfere with the federal scheme);

---

[8] Neither the October Order nor the January Order entered into a "traditional preemption analysis," and instead based its ruling on more general "overriding national policies in an area constitutionally entrusted to the Federal Government." [App. 625; 1524–25.]

*Elkins v. Moreno*, 435 U.S. 647, 666 (1978) (discussing Congress's meaningful decision "*not* [to] restrict every nonimmigrant class" and thus leave the field open for non-conflicting state regulation). The F-1 Visa Rule in no way conflicts with federal laws regarding who is admitted into the United States nor the conditions under which an alien may remain.

In *DeCanas*, a group of migrant farm workers challenged a California statute that prohibited employers from employing aliens, arguing that the INA preempted the statute. 424 U.S. at 352–53. The Court held that in enacting the INA Congress did *not* intend to "oust state authority to regulate" matters traditionally subject to the states, even if they overlap with matters of immigration. *Id.* at 356–63. Education is traditionally the subject of state authority, and the INA does not oust that state authority to regulate who can participate in high school athletics. "Only a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress would justify th[e] conclusion" that Congress intended the INA to oust state authority to regulate aliens. *DeCanas*, 424 U.S. at 357 (internal citations and quotations omitted).

Indeed, principles of federalism and the "promot[ion] of democracy" *require* a court not to "withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the [federal law]." *San Diego Bldg.*

*Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 243 (1959). *Cf., Capron v. Office of Att'y General of Massachusetts*, 944 F.3d 9, 24 (1st Cir. 2019)* ("[T]he mere fact that a state law implicates the interests of persons who are the subject of federal regulation, even with respect to immigration, does not alone provide a basis for inferring that the federal regulatory scheme was intended to preempt a field that encompasses such a state law . . . .")

UHSAA has promulgated a rule in a field that "is committed to the control of state and local authorities," public education and participation in high school extracurricular activities. *Epperson*, 393 U.S. at 104. The F-1 Visa Rule does not extend beyond varsity-level high school sports. Federal regulations do not evidence any intent of Congress to preempt states regulating within this field. In fact, where visa regulations do discuss a visa holder's access to public education, such regulations are deferential to state rulemaking authority. *E.g.* 22 C.F.R. § 62.25(h) (where, providing for J-1 exchange students' participation in school-sanctioned extracurricular activities, Congress still deferred to "the state authority responsible for determination of athletic eligibility").

The F-1 Visa Rule is not an immigration regulation (i.e., a regulation of who should or should not be admitted into the country or the conditions under which an alien may remain). *See DeCanas*, 424 U.S. at 355. But even insofar as the rule can be interpreted as regulating within the field of nonimmigrant student aliens,

49

Congressional regulation of that field has not been "so pervasive as to make reasonable the inference" that it left no room for UHSAA to supplement it with certain eligibility requirements. *Cf. Gade*, 505 U.S. at 98. Congress has not saturated the field of nonimmigrant student aliens with sufficiently pervasive regulations such that it could be reasonably inferred that states can no longer exercise rulemaking authority within that field. Unlike the field of alien registration, which the Supreme Court *has* determined to be entirely occupied by federal regulation (*Arizona v. United States*, 567 U.S. 387, 403 (2012)), there is no comprehensive federal program regulating nonimmigrant student visa holders, such that implicit preemption could be reasonably inferred.

**Third**, the F-1 Visa Rule does not conflict with federal regulations such that it precludes the accomplishment and execution of the purposes and objectives of Congress. Conflict preemption "arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough Cnty.*, 471 U.S. at 713 (internal citations and quotations omitted). "The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963).

Enforcing both the federal F-1 Visa regulations and the F-1 Visa Rule is not impossible (or even an impractical, given the absence of conflicting federal regulations). Nothing in the federal regulations requires F-1 Students to be permitted to participate in high school interscholastic varsity competition. Nor is the F-1 Visa Rule an obstacle to the *clear and manifest* purpose and objective of Congress. Instead, the regulations provide that F-1 Students are allowed to pursue a "full course of study." The regulations expressly state what is meant by a course of study: studies in liberal or fine arts, language, postgraduate and postdoctoral work; courses at a high school, university, or a religious seminary; and some narrowly defined employment opportunities. 8 C.F.R. § 214(f)(6)(i). Notably absent is any mention of athletics or extracurricular participation, unlike the J-1 Visa regulations. 22 C.F.R. § 62.25(h).

The lower court's reliance on *Toll v. Moreno*, 458 U.S. 1 (1982) was misplaced for three reasons. First, while the Court in *Toll* held that "State regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress," the Court states in the following sentence: "To be sure, when Congress has done nothing more than permit a class of aliens to enter the country *temporarily*, the proper application of the principle is likely to be a matter of some dispute." *Id.* at 12-13 (emphasis added). There is no dispute that that F-1 students are admitted to

the U.S. only temporarily. 8 U.S.C. § 1101(a)(15)(F)(1); *Elkins*, 435 U.S. at 666

("Congress has expressly conditioned admission [of individuals on F-1 Visas] . . . on

an intent not to abandon a foreign residence or, by implication, on an intent not to

seek domicile in the United States."); *Toll*, 458 U.S. at 6 n.8. There is no authority

for the broad reading of *Toll* that it precludes a state from enacting any regulation

that burdens an alien temporarily in the U.S. beyond what is set forth in federal

statutes.

Second, even a broad reading of *Toll* is circumscribed by the Court's

statement that state law cannot "impose[] additional burdens not contemplated by

Congress." Here, there is no additional burden not contemplated by Congress as

there is no indication, either explicit or implicit, that Congress ever intended for F-1

Students to participate in interscholastic athletics. The F-1 Visa Rule is not an

additional burden; rather, that F-1 Students compete at all is an additional privilege.

Third, *Toll* is inapposite because the Supreme Court found that the state action

in question directly conflicted with an *express* statement by Congress. The

challenged regulation in *Toll* was a policy adopted by the University of Maryland

that limited in-state tuition rates to citizens and resident aliens. 458 U.S. at 3–4.

Nonimmigrant aliens on G-4 visas challenged the policy as preempted by the INA.

*Id.* at 4. Congress expressly intended to allow G-4 visa holders to "adopt the United

States as their domicile." *Elkins*, 435 U.S. at 666. Thus, the plaintiffs in *Toll*, though

nonimmigrant aliens, were legal residents of Maryland. 458 U.S. at 17. Consequently, the university's policy was preempted "[i]n light of Congress's *explicit decision* not to bar G-4 aliens from acquiring domicile." *Id.* at 14 (emphasis added). The Court also cited the Federal Government's conferral of special tax privileges on G-4 aliens as inconsistent with the university's restrictive policy. *Id.* In contrast to the circumstances underlying the *Toll* decision, the regulations here do not evidence any congressional intent, explicit or otherwise, that F-1 students be allowed to participate in extracurricular activities generally or interscholastic competition specifically. *See also LeClerc v. Webb*, 419 F.3d 405, 424–26 (5th Cir. 2005) (distinguishing a similar case from *Toll*).

In short, the federal regulations governing F-1 students *and* the F-1 Visa Rule can both be enforced without impairing federal superintendence over immigration. The F-1 Visa Rule in no way limits students from pursuing a full course of study, as defined under the relevant regulations. 8 C.F.R. § 214.2(f)(6)(i)(E). Thus, "the full purposes and objectives of Congress" are undisturbed, and the F-1 Visa Rule is not subject to conflict preemption. *Hines*, 312 U.S. at 67.

CONCLUSION

For the foregoing reasons, this Court should determine that rational basis is the proper level of review of the constitutionality of the F-1 Visa Rule and that the rule does not violate the Supremacy Clause. The injunction that was based on the

strict scrutiny level of review and preemption should be dissolved, and the Court should then remand this case to the district court for findings consistent with this ruling.

### STATEMENT OF REASONS WHY ORAL ARGUMENT IS NECESSARY

Appellants request oral argument. This appeal raises fundamental constitutional issues with far-reaching implications that this Court has not yet addressed and on which other circuit courts are divided. Oral argument will assist the Court by giving counsel an opportunity to provide additional clarification and context and giving the Court an opportunity to further explore questions and issues of concern.

DATED: May 2, 2025

/s/ D. Craig Parry
**PARR BROWN GEE & LOVELESS**
D. Craig Parry
Chaunceton Bird
Daniel J. Nelson

**SAVAGE, YEATES & WALDRON**
Mark O. Van Wagoner

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 28(a)(10) and 32(g)(1) of the Federal Rules of Appellate Procedure, I certify that this brief complies with the type-volume limitation for proportionally spaced typeface—14-point Times New Roman—provided in Rule 32(a)(7)(B), and that, excluding the table of contents, table of authorities, glossary, and addendum, the number of words is 12,827, which is inclusive of headings, footnotes, and quotations, as required by Rule 32(f) and 10th Cir. R. 32(B).

Chaunceton Bird

# Addendum 1

The district court's order on the Motion for Temporary Restraining Order.

*Szymakowski v. Utah High School Activities Association, Inc.*, Case No. 2:24-cv-00751, Memorandum Decision and Order (D. Utah Oct. 17, 2024). [App. 607–44.]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ZACHARY SZYMAKOWSKI, an individual, on behalf of himself and a proposed class of similarly situated F-1 students, | **ORDER AND MEMORANDUM DECISION GRANTING TEMPORARY RESTRAINING ORDER** |
| Plaintiff, | |
| v. | 2:24-cv-00751-RJS |
| UTAH HIGH SCHOOL ACTIVITIES ASSOCIATION, INC., a Utah nonprofit corporation; ROBERT CUFF, an individual; MARILYN RICHARDS, an individual; AMBER SHILL, an individual; BURKE STAHELI, an individual; DAVID WARREN, an individual; DAVID LUND, an individual; ZACK MCKEE, an individual; PAUL SWEAT, an individual; LUKE RASMUSSEN, an individual; JERRE HOLMES, an individual; JASON SMITH, an individual; MIKE MEES, an individual; DEVIN SMITH, an individual; BRYAN DURST, an individual; PATRICK LAMBERT, an individual; and BRENT STRATE, an individual, | Judge Robert J. Shelby |
| Defendants. | |

        Plaintiff Zachary Szymakowski is a senior student at Juan Diego Catholic High School

(Juan Diego) in Draper, Utah.  He is an Australian citizen who currently resides in the United

States and attends high school on an F-1 visa.  Last spring, one of the Defendants in this action,

the Utah High School Activities Association, Inc. (UHSAA), adopted a rule stating that

international students on F-1 visas were only eligible for non-varsity level sports competition

unless the school attended by that student opted for an independent status or forfeited its

eligibility for postseason competition.  Mr. Szymakowski asserts that the rule violates the Equal

Protection Clause of the Fourteenth Amendment and asks the court for a preliminary injunction enjoining the rule's enforcement.  And because the final game of regular season play occurs tonight, Mr. Szymakowski has also moved the court to enter a temporary restraining order (TRO) immediately suspending any enforcement of the rule against him.  At a status hearing held on October 11, 2024, the Honorable Robert J. Shelby granted Mr. Szymakowski's motion for expedited briefing (ECF No. 3) and requested that the undersigned judge handle the TRO motion hearing while he was out of town.  The court then conducted an evidentiary hearing and heard oral argument on Mr. Szymakowski's motion for a TRO on October 16, 2024.

The court finds there is a strong likelihood that the Student Visa Eligibility Rule is unconstitutional.  And because the other factors the court considers all weigh in favor of granting the TRO, the court finds that Mr. Szymakowski should be allowed to play tonight's game without forfeiting his high school's eligibility for postseason competition.  The court therefore temporarily enjoins the enforcement of the Student Visa Eligibility Rule as it applies to Mr. Szymakowski and the remainder of his 2024 football season.

## BACKGROUND

Mr. Szymakowski is an eighteen-year-old senior high school student from Australia, who currently attends Juan Diego on an F-1 visa[1] that was lawfully issued by the United States. (Decl. Zachary Szymakowski ¶¶ 1–6, ECF No. 2-1.)  There is no evidence in the record that Mr. Szymakowski was recruited to play football at Juan Diego or that he was offered any financial incentives to attend the school.  Mr. Szymakowski states that he researched high schools across

---

[1] An F-1 visa "allows a noncitizen to enter the United States as a full-time student at a U.S. college, university, seminary, conservatory, academic high school, private elementary school, other academic institution, or in a language training program."  U.S. Citizenship & Immigration Servs. Policy Manual, Part F, Chapter 1.

SZYMAKOWSKI V. UHSAA, APPENDIX000608

the United States and chose Juan Diego both for the academic and athletic opportunities he could receive there, and because he wished to receive a Catholic-oriented education.  (Id. ¶¶ 8–9.)

Mr. Szymakowski is now in his second year at Juan Diego and resides with a host family.  (Id. ¶¶ 6, 13.)  He has taken several Advanced Placement (AP) classes and serves as one of eight Student Body Officers.  (Id. ¶¶ 15–17.)  During his junior year, he made the Juan Diego varsity football team and started as the team's punter in nine out of ten games during the 2023-2024 season.  (Id. ¶¶ 18–19.)

Juan Diego competes in the 3A North region under the auspices of the UHSAA, an organization that governs high school athletics and fine arts activities at 159 member schools.  (Decl. Rob Cuff ¶ 4, ECF No. 55.)  The UHSAA "operates through Region Boards of Managers, an Executive Committee, and a Board of Trustees."  (Id. ¶ 3.)

In addition to a declaration from Rob Cuff, the UHSAA's Executive Director, the UHSAA supplied a declaration and the court heard testimony from Craig Hammer, the Chair of the UHSAA Executive Committee and Chair of the UHSAA Constitution and Bylaws Committee.  Mr. Hammer states that recruitment of both local and international athletes has been a concern for twenty years, and that the UHSAA has especially noticed an increase in F-1 students coming to private Utah high schools during the last decade.  (Decl. Craig Hammer ¶¶ 3–4, ECF No. 57.)  Mr. Hammer cites the example of Wasatch Academy, a private school that was required to take independent status more than ten years ago due to an influx of F-1 students.  (Id. ¶ 5.)  Mr. Cuff asserts that "the overwhelming majority of F-1 visa students that come to Utah attend one of the private schools, primarily Judge Memorial Catholic High School, Juan Diego Catholic High School, St. Joseph High School, and Layton Christian Academy.  Hundreds have attended and played sports for these schools while only a handful have attended any public

SZYMAKOWSKI V. UHSAA, APPENDIX000609

school." (Cuff Decl. ¶ 14.) Mr. Cuff also notes that "[f]ederal law allows an F-1 visa student to choose his or her school and, if it is a private school, to remain at that school for up to four years. In contrast, if an F-1 visa student chooses to attend a public school, including charter schools, they may stay only one year." (Id.) An international student's ability to choose one's high school and remain for more than a year at a private school is "unique to F-1 visa students." (Id. ¶ 18.)

In fall 2023, the UHSAA held a hearing to consider testimony from an F-1 student basketball player who accused teachers and administrators at Juan Diego of mistreatment and alleged that he was bullied by Juan Diego's coaches. (Hammer Decl. ¶ 6.) Although he was failing classes, the school reported that his grades were high enough to make him eligible for competition. (Id.) The UHSAA panel granted the student's request to transfer to a different school. (Id.)

In January 2024, the UHSAA received a letter from a lawyer representing several basketball coaches alleging that Layton Christian Academy (LCA), another private school, was recruiting and mistreating international students. (Id. ¶ 7.) The letter stated that LCA's starting lineup consisted of students from Brazil, France, Serbia, Burundi, and Las Vegas. (Id.) Furthermore, the letter maintained that LCA associated with an entity in the United Kingdom called Ballers Heaven to recruit student athletes.[2] (Id.)

During the next three months, the UHSAA began a deeper investigation into the recruitment of foreign athletes and uncovered "irregularities in the guardianship and care of those players." (Id. ¶ 9.) Mr. Hammer included an email from two former educators and

---

[2] The Ballers Heaven website includes links to basketball camps and tournaments in Utah, including pictures of Wasatch Academy and LCA. Available at: ballersheaven.com (last accessed Oct. 16, 2024); (see also Ballers Heaven Website Postings, ECF No. 54-9).

coaches, who accused the head basketball coach at Juan Diego of recruitment practices.  (Id.

¶¶ 10–11.)  According to the email, current members of the basketball team were brought to the

coach's office "where he showed them a website with pictures and measurements

(height/wingspan) of potential players from Mali, Africa, asking their opinion on 'which one

they should try and get.'"  (Id. ¶ 11.)

> The UHSAA Handbook prohibits the recruitment of student athletes:
>
> Recruitment is a form of undue influence and is broadly defined as the use of
> undue influence or special inducement by anyone, on behalf or for the benefit of a
> member high school, who attempts to influence a student to enroll or transfer to a
> member school for the purpose of participating in athletics.
>
> …
>
> Recruiting shall include, but is not limited to, promising or inducing the
> expectation of an advantage over others for a particular team, playing time, of any
> athletic advantage, of employment of the student or a relative, of housing, of
> transportation, of specific tutoring, of scholarship or financial aid.

(UHSAA Handbook, Interps & Guidelines 1.10, ECF No. 54-19 at 40.)  The UHSAA may

impose a variety of penalties for violations of this rule, including probation, participation

restrictions, forfeitures, fines, and a suspension from UHSAA-sponsored activities.  (UHSAA

Handbook, Interps & Guidelines 7.8, ECF No. 54-19 at 56–57.)  But Mr. Cuff states that the

UHSAA has struggled to enforce the ban against recruitment:

> Because the UHSAA has no subpoena power, the UHSAA cannot compel
> students, parents, coaches, or administrators to provide information that could
> lead to findings of, or absolve from suspicion of, recruiting, undue influence,
> falsifying documents, or other bases for ruling a student athlete ineligible.  Thus,
> the UHSAA is largely powerless to police F-1 visa violations on a case-by-case
> basis, particularly if the member school administrators, coaches, and students do
> not voluntarily cooperate or self-report.

(Cuff Decl. ¶ 19.)

SZYMAKOWSKI V. UHSAA, APPENDIX000611

In response to concerns about the recruitment of international athletes, the UHSAA Constitution and Bylaws Committee met and determined that the rule about eligibility of F-1 student athletes should be examined.  (Hammer Decl. ¶ 13.)  The Committee looked at rules related to F-1 student eligibility from neighboring states and approved a draft bylaw on March 21, 2024.  (Id. ¶¶ 14–15.)  The Board of Trustees then discussed the proposed rule at a meeting on March 28, 2024.  (Id. ¶ 16.)  Finally, the UHSAA Executive Board discussed the rule at a meeting on April 24, 2024.  (Id. ¶ 17.)  Representatives from Juan Diego, LCA, and Judge Memorial Catholic High School were all present at the meeting.  (Id. ¶ 17.)

On May 1, 2024, the UHSAA adopted the Student Visa Eligibility Rule, which is published in UHSAA's handbook.  (See UHSAA Handbook, Inerps & Guidelines 1.9.3, ECF No. 54-19 at 38–40.)  The rule is introduced as follows:

> The UHSAA recognizes the concerns of its member school related to displacement of Utah students by students from foreign countries as well as recruiting of foreign players to be placed with Utah high school.  These rules are intended to preserve interscholastic competitive opportunities for Utah students and promote the unique competition fostered by the UHSAA.

(Id. at 38.)

The rule contains three parts.  Section A addresses foreign exchange students with a J-1 visa.[3]  These students need only meet academic eligibility requirements to be eligible to compete in varsity sports.  (Id.)  In addition, J-1 students need not comply with the UHSAA transfer rule—which applies to non-international students transferring from other schools—which would

---

[3] J-1 visas are issued to aliens "having a residence in a foreign country which he has no intention of abandoning who is a bona fide student … who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of … studying …."  8 U.S.C. § 1101(a)(15)(J).

SZYMAKOWSKI V. UHSAA, APPENDIX000612

otherwise render the student ineligible for varsity competition until after the first half of the

varsity season for any sports played prior to the transfer.  (Id.)

> Section B of the rule addresses international students who hold F-1 visas:
>
> An international student with an F-1 visa issued by the U.S. Immigration and
> Naturalization Service is a student who attends high school in the U.S.  An
> international student with an F-1 visa is only eligible for non-varsity level
> competition unless the following condition is met: a member school may choose
> to compete with an F1 student at the varsity level, but the member school is not
> eligible for post-season competition.  Such member school must declare the use of
> an F1 student at the varsity level prior to the competition start date for that given
> sport and receive approval from the UHSAA.

(Id. at 39.)  It is undisputed that the rule applies to Juan Diego and that Juan Diego would be

barred from postseason competition if Mr. Szymakowski competed at the varsity level.

Finally, Section C of the rule addresses international students with visas other than J-1

and F-1 visas.  These international students must follow the same UHSAA transfer procedures

that apply to any non-international students transferring schools.  (Id. at 39–40.)

After the UHSAA adopted this rule, Mr. Szymakowski avers that his football coach,

Coach Danny Larson, and his international student advisor told him that discussions were

underway to grant Mr. Szymakowski an exception from the rule.  (Second Decl. Zachary

Szymakowski ¶ 2, ECF No. 62.)  It was not until shortly before the beginning of the football

season that Mr. Szymakowski learned that the UHSAA had denied his requested exception.  (Id.

¶ 3.)  Mr. Szymakowski repeated these assertions under oath during cross examination at a

hearing on the motion for a TRO, and the court finds them credible.

Mr. Szymakowski and his parents then retained the law firm of Foley & Lardner on a pro

bono basis on August 28, 2024.  (Id. ¶¶ 4–5.)  Mr. Szymakowski's counsel sent a demand letter

by email to the UHSAA on September 10, 2024.  (ECF No. 2-3.)  The UHSAA replied on

September 18, 2024.  (ECF No. 2-4.)  Mr. Szymakowski then filed his complaint and motion for

SZYMAKOWSKI V. UHSAA, APPENDIX000613

a TRO on October 7, 2024.  (ECF Nos. 1–2.)  The court held a status hearing on October 11, 2024 (see Min. Entry, ECF No. 47) and set an expedited briefing schedule and hearing for the TRO motion.  (See Order dated Oct. 11, 2024, ECF No. 49.)  The court held a hearing on the motion on October 16, 2024, at which counsel for Mr. Szymakowski and for the UHSAA provided argument and cross-examined witnesses who had provided declarations either in support of or in opposition to the motion for a TRO.  (See Min. Entry, ECF No. 67.)

## LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure grants the court authority to issue a temporary restraining order or preliminary injunction.  "A temporary restraining order and preliminary injunction share the same standard."  Nunez v. Nunez, No. 1:13-cv-126-TS, 2013 WL 5230614, at *2 (D. Utah Sept. 12, 2013) (citation omitted).  A plaintiff "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.  Nken v. Holder, 556 U.S. 418, 434 (2009).

Because a TRO "is an extraordinary remedy, the movant's right to relief must be clear and unequivocal."  Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting Wilderness Workshop v. BLM, 531 F.3d 1220, 1224 (10th Cir. 2008)).  But the Tenth Circuit considers some injunctions disfavored, and "require[s] more of the parties who request them."  Free the Nipple-Fort Collins v. City of Fort Collins, Colo., 916 F.3d 792, 797 (10th Cir. 2019).  An injunction is disfavored if "(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party

SZYMAKOWSKI V. UHSAA, APPENDIX000614

could expect from a trial win." Id. When any of these three characteristics are present, "the

moving party faces a heavier burden on the likelihood-of-success-on-the-merits and balance-of-

harms factors: [it] must make a 'strong showing' that these tilt in [its] favor." Id. (quoting Fish

v. Kobach, 840 F.3d 710, 724 (10th Cir. 2016)).[4]

      The Tenth Circuit defines the "status quo" as "the last peaceable uncontested status

existing between the parties before the dispute developed." See id. at 798 n.3 (citing 11A

Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948 (3d ed. & Nov.

2018 update)). Further, the Tenth Circuit considers an injunction to "fall into the all-the-relief

category only if its effect, once complied with, cannot be undone." Free the Nipple-Fort Collins,

916 F.3d at 798 n.3 (citations and quotations omitted)). "[I]f the court 'probably can put the

toothpaste back in the tube,' then the heightened standard does not apply." Equitable Nat'l Life

Ins. Co., Inc. v. AXA Equitable Life Ins. Co., 434 F. Supp. 3d 1227, 1239 (D. Utah 2020)

(quoting Free the Nipple-Fort Collins, 916 F.3d at 798 n.3).

## ANALYSIS

      As a preliminary matter, the court is not persuaded that the requested TRO meets the

requirements of a disfavored injunction. First, the TRO is prohibitory, not mandatory. It

prohibits UHSAA from enforcing the Student Visa Eligibility Rule as it applies to Mr.

Szymakowski for the remainder of his 2024 football season; it does not require the UHSAA to

"affirmatively reinstate Plaintiff's eligibility, allow Plaintiff to compete in varsity football, and

then allow Juan Diego to compete in the post-season tournament." (ECF No. 53 at 13–14.)

---

[4] The Tenth Circuit does not require a moving party to demonstrate that each of the four
requirements for a TRO "weigh heavily and compellingly in [the movants'] favor." See Free the
Nipple-Fort Collins, 916 F.3d at 797 (rejecting the "heavily and compellingly" standard).

SZYMAKOWSKI V. UHSAA, APPENDIX000615

Second, the court has considered the parties' arguments about the proper way to consider the status quo. The court agrees with Mr. Szymakowski that the last moment at which the status quo existed is April 30, 2024—the day before the UHSAA adopted the Student Visa Eligibility Rule. The UHSAA argues the status quo is "the status under which Plaintiff has lived since passage of the rule on May 1, 2024" because "plaintiff took no issue with the rule for the first five months following its passage." (ECF No. 53 at 13.) But, as discussed further below in the court's analysis of irreparable harm, Mr. Szymakowski testified that he indeed objected to the rule as soon as he learned it would prevent him from playing varsity football and took reasonable steps to oppose it. In any event, Mr. Szymakowski contests the constitutionality of the Student Visa Eligibility Rule; in such instances, the status quo is generally the state of affairs prior to enactment of the rule at issue. See Free the Nipple-Fort Collins, 916 F.3d at 798 n.3 (opining that the status quo was the state of affairs "existing before Fort Collins enacted the challenged public-nudity ordinance"); Makindu v. Ill. High School Ass'n, 40 N.E.3d 182, 193 (Ill. App. Ct. 2015) (explaining that "to return the parties to where they would have been without the controversy, they must be returned to where they were before the bylaw was enacted").

Third, the TRO awarded here does not functionally award Mr. Szymakowski "all the relief" he could expect from a trial win. See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1154–55 (10th Cir. 2001). The UHSAA argues a TRO would permit Mr. Szymakowski "individual access to varsity sports and team access to postseason play." (ECF No. 53 at 14.) But the UHSAA's focus on the benefits the TRO affords Mr. Szymakowski misunderstands the "all-the-relief" issue outlined in Free The Nipple, 916 F.3d at 798 n.3. The Tenth Circuit does not consider an injunction disfavored "simply because 'the plaintiff would get no additional relief if he prevailed at the trial on the merits.'" Prairie Band Potawatomi Indians,

SZYMAKOWSKI V. UHSAA, APPENDIX000616

253 F.3d at 1247 (quoting Tom Doherty Assoc., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d

Cir. 1995)).  Rather, the Tenth Circuit looks to whether an injunction would "render a trial on the

merits largely or completely meaningless."  Id.  Following this rational, the TRO Mr.

Szymakowski seeks does not render a trial meaningless because it would provide him only

temporary relief from the Student Visa Eligibility Rule.  The UHSAA could still prevail at trial

and enforce the rule against Mr. Szymakowski and other F-1 visa students in subsequent athletic

seasons.  See, e.g., id. at 1248; Free the Nipple-Fort Collins, 916 F.3d at 798 n.3; Equitable Nat'l

Life Ins. Co., Inc., 434 F. Supp. 3d at 1239.

      The court now considers the four factors that Mr. Szymakowski must establish to

demonstrate that a TRO should issue in his favor.

## I.  Likelihood of Success on the Merits

### A.  The UHSAA Is a State Actor

      The parties do not dispute that the UHSAA is a state actor for purposes of the Fourteenth

Amendment and 42 U.S.C. § 1983.   The actions of a private association may qualify as state

action when "there is such a close nexus between the State and the challenged action that

seemingly private behavior may be fairly treated as that of the State itself."  Brentwood Acad. v.

Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (cleaned up).  The court

therefore considers the UHSAA as a state actor.

### B.  The Student Visa Eligibility Rule Differentiates on the Basis of Alienage

      The UHSAA argues that Mr. Szymakowski is not treated any differently from similarly

situated students because it maintains that the proper reference group for equal protection

analysis is the class of other F-1 students who are subject to similar requirements.  (ECF No. 53

at 20–21.)  But this reasoning is circular.  Courts would never find equal protection violations if

SZYMAKOWSKI V. UHSAA, APPENDIX000617

they only compared an individual member of a class to other members of the same class against which the state law was alleged to discriminate. Here, the Student Visa Eligibility Rule plainly applies restrictions to students who attend school under an F-1 visa that are not applicable to other students. The rule therefore treats Mr. Szymakowski differently on the basis of his alienage. And it does not change the analysis that some international students are unharmed or even afforded preferential treatment by the rule—for instance, J-1 visa holders who are not subject to the transfer rule that applies to students transferring from other schools in the United States. As the Supreme Court stated in <u>Nyquist v. Mauclet</u>, "[t]he important points are that [the regulation] is directed at aliens and that only aliens are harmed by it." 432 U.S. 1, 9 (1977). Section B of the Student Visa Eligibility Rule applies only to a certain class of aliens, and only Mr. Szymakowski and other students on F-1 visas are harmed by the application of the rule. The rule therefore differentiates on the basis of alienage. Indeed, the rule explicitly states that its purpose is "to preserve interscholastic competitive opportunities <u>for Utah students</u>" and the rule is motivated by concerns from member schools about "the displacement of Utah students by students from foreign countries." (UHSAA Handbook, <u>Interps & Guidelines</u> 1.9.3, ECF No. 54-19 at 38 (emphasis added).)

This differential treatment is not necessarily unconstitutional. But to make that finding, the court must first determine the appropriate level of scrutiny to apply to a state classification that differentiates on the basis of alienage.

### C. Level of Scrutiny for State Classifications Related to Alienage

Under the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of its laws." The Supreme Court's modern interpretation of the Equal Protection Clause derives in large part from a footnote written during the run-up to World

12

War II, in which Justice Harlan Fiske Stone questioned "whether prejudice against discrete and

insular minorities may be a special condition, which tends seriously to curtail the operation of

those political processes ordinarily to be relied upon to protect minorities, and which may call for

a correspondingly more searching judicial inquiry." United States v. Carolene Prods. Co., 304

U.S. 144, 152 n.4 (1938).  The Supreme Court has since focused on the class of persons affected

by differential treatment.  Ordinarily, a state law classification that "neither burdens a

fundamental right nor targets a suspect class" will be upheld "so long as it bears a rational

relation to some legitimate end." Vacco v. Quill, 521 U.S. 793, 799 (1997).

> The general rule gives way, however, when a statute classifies by race, alienage,
> or national origin.  These factors are so seldom relevant to the achievement of any
> legitimate state interest that laws grounded in such considerations are deemed to
> reflect prejudice and antipathy—a view that those in the burdened class are not as
> worthy or deserving as others.  For these reasons and because such discrimination
> is unlikely to be soon rectified by legislative means, these laws are subjected to
> strict scrutiny and will be sustained only if they are suitably tailored to serve a
> compelling state interest.

City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).

The Supreme Court has held that the Equal Protection Clause applies to aliens, not just

citizens. See, e.g., Plyler v. Doe, 457 U.S. 202, 215 (1982).  Indeed, the Supreme Court has

struck down multiple state laws on the grounds that those laws unlawfully discriminated against

aliens.  In Takahashi v. Fish and Game Commission, the Court held that a California statute

denying fishing licenses to any "person ineligible [for] citizenship" was unconstitutional.  334

U.S. 410, 413 (1948).  Although the law originally targeted Japanese fisherman, the amended

statute distinguished between groups solely based on immigration status, with no mention of race

or nationality.  Id.  The Court ruled that the Equal Protection Clause protected "aliens as well as

citizens" and held that "all persons lawfully in this country shall abide … on an equality of legal

SZYMAKOWSKI V. UHSAA, APPENDIX000619

privileges with all citizens." Id. at 419–20.  Accordingly, "the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits." Id. at 420.

In Graham v. Richardson, holding that classifications by a State that are based on alienage are "inherently suspect and subject to close judicial scrutiny[,]" 403 U.S. 365, 372 (1971), the Court found that states could not restrict public assistance benefits solely to citizens and longtime resident aliens.  Id. at 376.  And in Nyquist, the Court applied strict scrutiny to strike down a New York statute that barred certain resident aliens from state financial assistance for higher education.  432 U.S. at 12.  See also Sugarman v. Dougall, 413 U.S. 634, 642–43 (1973) (invalidating New York statute that prohibited immigrants from working in the civil service); In re Griffiths, 413 U.S. 717, 721–22 (1973) (striking down Connecticut statute that barred immigrants from sitting for the bar); Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 601–06 (invalidating Puerto Rico law that denied licenses to immigrant engineers).

But the Court has not applied this searching level of review to all classifications based on immigrant status.  First, the Court has distinguished classifications of aliens made by the federal government from those made by a State on the ground that "it is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens."  Mathews v. Diaz, 426 U.S. 67, 84 (1976).  Accordingly, and in contrast to the state residency requirement that the Court struck down in Graham, the Court upheld a requirement that noncitizens reside in the United States for at least five years to be eligible for certain parts of the federal Medicare insurance program.  Id. at 83.

SZYMAKOWSKI V. UHSAA, APPENDIX000620

Second, the Court has applied only rational basis review to state laws that exclude aliens from political and governmental functions.  See Foley v. Connelie, 435 U.S. 291, 295–96 (1978) (upholding New York statute that restricted aliens from working as police officers); Ambach v. Norwick, 441 U.S. 68, 81 (1979) (agreeing that New York may prohibit aliens who are eligible for citizenship but who refuse to seek naturalization from employment as an elementary or secondary school teacher); Cabell v. Chavez. Salido, 454 U.S. 432, 447 (holding that California may require probation officers to be citizens).  The Court has characterized this "political-function exception" as "narrow[.]"  Bernal v. Fainter, 467 U.S. 216, 220–21 (1984) (striking down Texas statute that required notaries public to be citizens on the ground that these positions were essentially clerical, that the political-function exception did not apply, and that the statute did not "further[] a compelling state interest by the least restrictive means practically available").

Finally, the Court has applied less searching review to state laws that deny opportunities and benefits to undocumented aliens.  See, e.g., Plyler, 457 U.S. at 219; see also De Canas v. Bica, 424 U.S. 351 (1976) (upholding a California Labor Code provision that prohibited employers from knowingly employing an alien who was not entitled to lawful residence in the United States if such employment would adversely affect lawful residents, but considering the provision under the Supremacy Clause, not the Equal Protection Clause), superseded by statute on other grounds as stated in Chamber of Com. v. Whiting, 563 U.S. 582, 587–92 (2011).  In Plyler, the Court declined to apply strict scrutiny review to a Texas statute that prohibited undocumented alien children from attending public school.  457 U.S. at 223.  But the Court nevertheless struck down the law, holding that the statute could "hardly be considered rational unless it furthers some substantial goal of the State."  Id. at 224.  The Second Circuit has

SZYMAKOWSKI V. UHSAA, APPENDIX000621

characterized the Court's decision in Plyler as an application of a "heightened rational basis standard …." Dandamudi v. Tisch, 686 F.3d 66, 74 (2d Cir. 2012).

The Fifth and Sixth Circuits[5] have identified an additional category of laws in which they have found that rational basis is the appropriate standard of review: state laws that regulate nonimmigrant aliens. In LeClerc v. Webb, the Fifth Circuit applied rational basis review to uphold a Louisiana law that prohibited anyone but citizens and lawful permanent residents from sitting for the Louisiana Bar. 419 F.3d 405, 410–11 (5th Cir. 2005). The court noted that the Supreme Court had "reviewed with strict scrutiny only state laws affecting permanent resident aliens." Id. at 415. And in League of United Latin American Citizens (LULAC) v. Bredesen, the Sixth Circuit upheld a Tennessee law that conditioned issuance of a driver's license on proof of citizenship or lawful permanent residence status. 500 F.3d 523, 526 (6th Cir. 2007). The Sixth Circuit followed the Fifth Circuit's opinion in LeClerc to determine that "lawful permanent residents are the only subclass of aliens who have been treated as a suspect class." Id. at 533. The court therefore held that the classification at issue was "subject only to rational basis scrutiny." Id.

The court does not find these cases persuasive and declines to adopt a rule whereby state law classifications that affect resident aliens are subject to the highest level of scrutiny, whereas

---

[5] The Defendants would include the Eleventh Circuit in this category, citing Estrada v. Becker, 917 F.3d 1298 (11th Cir. 2019). But that case concerns applicants who received deferred action under the Deferred Action for Childhood Arrivals (DACA) program and is more properly seen as a case about undocumented aliens. See id. at 1305 (noting that the appellants were subject to removal proceedings and that a reprieve from those proceedings did not mean they were "lawfully present" under the Immigration and Nationality Act). Indeed, the Eleventh Circuit found that the relevant policy (which required Georgia's three most selective colleges and universities to verify the "lawful presence" of the students they admitted) did not "classify applicants based on a suspect classification because '[u]ndocumented aliens cannot be treated as a suspect class.'" Id. at 1308–09 (quoting Plyler, 457 U.S. at 223).

SZYMAKOWSKI V. UHSAA, APPENDIX000622

state law classifications that affect nonresident or nonimmigrant aliens are subject to the lowest.

Although the court agrees with the statement by the Fifth Circuit that the Supreme Court has

applied strict scrutiny only to laws that affect permanent resident aliens, the court also agrees

with the Second Circuit (who expressly declined to follow LeClerc and LULAC) that the

Supreme Court has "never distinguished between classes of legal resident aliens."  Dandamudi,

686 F.3d at 74.  In other words, the Supreme Court has never addressed the question squarely.

But, as discussed above, the Supreme Court has considered laws that discriminate against

undocumented aliens.  Plyler, 457 U.S. at 219.  Indeed, the Fifth Circuit in LeClerc recognized

that "the Court employed a heightened level of rational basis review to invalidate a Texas law

that denied primary public education to children of illegal aliens."  419 F.3d at 416 (citing Plyler,

457 U.S. at 224).  But after characterizing the Plyler standard as a "sui generis level of rational

basis review," id., the Fifth Circuit declined to apply even a heightened level of rational basis

review to the Louisiana classification at issue, even though that classification affected lawful

temporary residents.  Id. at 420–21.  This court is not persuaded by the Fifth Circuit's suggestion

that the Plyler Court was simply "moved by the consequences and unfairness of enforcing such a

regulation against children."  Id. at 420.  Given that the Supreme Court has applied a heightened

level of review to classifications involving unlawful aliens, this court will apply at least some

form of heightened review to classifications involving persons who are legally permitted to be in

the United States.  See Dandamudi, 686 F.3d at 78 ("If statutes discriminating against lawfully

admitted nonimmigrant aliens were reviewed under a rational basis framework that would mean

that a class of unlawful aliens would receive greater protection against state discriminatory

statutes than those lawfully present.").

17

The court declines to follow LeClerc and LULAC for several additional reasons. First, both cases involve restrictions—relating to identification documents and the ability to become a lawyer—that are far more similar to the types of restrictions the Supreme Court considered in its political-function cases, such as restrictions on who could be become a police officer, probation officer, or primary school teacher. The restrictions on Mr. Szymakowski are not related to any political or governmental functions. Second, the distinction between resident and nonresident aliens is not always clear. The Internal Revenue Service, for instance, indicates that "foreign students in F-1, J-1, or M-1 nonimmigrant status who have been in the United States more than 5 calendar years become resident aliens for U.S. tax purpose if they meet the 'Substantial Presence Test' and are liable for Social Security and Medicare taxes."[6] While there is no suggestion that Mr. Szymakowski qualifies as a resident alien for tax purposes (nor would most international high school students), he might well become a resident alien if he attends college in the United States. And while F-1 visas are nonimmigrant visas in which an applicant must not evince an intent to remain permanently in the United States, the U.S. Citizenship and Immigration Services recognizes that holders of other nonimmigrant visas (such as holders of H-1B visas, K visas, L visas, and V visas) are allowed to enter the country and later apply for an adjustment of status to an immigrant visa.[7] The court is skeptical that the Supreme Court would apply widely divergent levels of scrutiny for classifications affecting different categories of aliens when those categories themselves are somewhat fluid.

---

[6] IRS, Foreign Student Liability for Social Security and Medicare Taxes, available at: www.irs.gov/individuals/international-taxpayers/foreign-student-liability-for-social-security-and-medicare-taxes (last accessed Oct. 17, 2024).

[7] See U.S. Citizenship & Immigration Services, Change My Nonimmigrant Status, available at: www.uscis.gov/visit-the-united-states/change-my-nonimmigrant-status (last accessed Oct. 17, 2024).

SZYMAKOWSKI V. UHSAA, APPENDIX000624

Most importantly, the majority opinions in <u>LeClerc</u> and <u>LULAC</u> do not adequately address an argument that has buttressed much of the Supreme Court's equal protection jurisprudence related to alienage classifications: namely, that the "National Government has 'broad constitutional powers in determining what aliens shall be admitted to the United States, the period they remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization.'" <u>Graham</u>, 403 U.S. at 377 (citing <u>Takahashi</u>, 334 U.S. at 419); <u>see also</u> <u>LeClerc v. Webb</u>, 444 F.3d 428, 429 (5th Cir. 2006) (Higginbotham, J., dissenting from the denial of a rehearing en banc and criticizing the majority for its "puzzling" silence in ignoring the doctrine of federal preemption). Finding that there was "[a]n additional reason why the state statutes at issue in these cases do not withstand constitutional scrutiny" in addition to equal protection concerns, the Supreme Court observed in <u>Graham</u> that "State laws that restrict the eligibility of aliens for welfare benefits merely because of their alienage conflict with these overriding national policies in an area constitutionally entrusted to the Federal Government." <u>Id.</u> at 378.

In <u>Toll v. Moreno</u>, the Supreme Court struck down a University of Maryland policy that denied in-state tuition status to the children of parents with nonimmigrant alien visas—in that case, parents with G-4 visas. 458 U.S. 1 (1982). But the Court declined to consider "whether the policy violate[d] the Due Process or Equal Protection Clauses" because it found that the policy ran afoul of the Supremacy Clause. Considering its previous equal protection jurisprudence, the Court stated: "Read together, <u>Takahashi</u> and <u>Graham</u> stand for the broad principle that 'state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress.'" <u>Id.</u> at 12–13 (citing <u>De Canas</u>, 424 U.S. at 358 n.6).

SZYMAKOWSKI V. UHSAA, APPENDIX000625

In <u>Toll</u>, the Court was presented with the exact question addressed in <u>LeClerc</u> and

<u>LULAC</u>—namely, how to consider an equal protection challenge to a statute that discriminated

against nonimmigrant aliens—but declined to create an exception to the strict scrutiny analysis it

had employed in other alienage cases.  <u>Id.</u> at 12–13.  In a vigorous dissent in the <u>LULAC</u> case,

the Honorable Ronald Lee Gilman noted that the <u>Toll</u> Court tacitly affirmed the lower court's

use of strict scrutiny review for laws affecting either immigrant or nonimmigrant aliens:

> In bypassing the equal-protection question in [<u>Toll</u>], moreover, the Supreme Court
> necessarily left undisturbed the district court's holding, later adopted without
> qualification by the Fourth Circuit, that all legal aliens "who maintain their place
> of general abode within the United States," whether "immigrant or
> nonimmigrant" aliens, are "wrapped … in the suspect classification blanket" and
> entitled to have laws that discriminate against them subjected to strict scrutiny.
> <u>Moreno v. Toll</u>, 489 F. Supp. 658, 663–64 (D. Md. 1980), <u>aff'd by</u> <u>Moreno v.
> Univ. of Md.</u>, 645 F.2d 217, 2024 (4th Cir. 1981) (per curiam) (affirming the
> district court's equal-protection holding "[f]or reasons sufficiently stated by the
> district court").  Reading <u>Plyler</u> and [<u>Toll</u>] in conjunction with <u>Graham</u> yields the
> inescapable conclusion that all lawfully admitted aliens—permanent and
> temporary alike—remain members of an inherently suspect class.

500 F.3d at 544 (Gilman, J., dissenting).

The Court has not issued a ruling on an analogous alienage equal protection case

since 1982—the year the Court decided both <u>Plyler</u> and <u>Toll</u>.  This court therefore looks to those

two cases for guidance and determines 1) that the court must apply a form of heightened scrutiny

to classifications affecting lawful temporary immigrants that is at least as searching as the

heightened rational basis review the Court applied to the policy affecting undocumented aliens in

<u>Plyler</u>; and 2) the court must determine whether any state rules affecting lawful temporary

immigrants run afoul of Congress's power to set the conditions, benefits, and restrictions of

immigrant aliens.

The court's legal analysis is consistent with the ruling from a federal district court in

South Dakota, which issued a preliminary injunction in a case with nearly identical facts.  See

Entwistle v. S. Dak. High Sch. Activities Ass'n, 2006 WL 8453556 (S. Dak. Mar. 24, 2006).  In

that case, the South Dakota High School Activities Association (SDHSAA) adopted a rule

barring students with an F-1 visa from participating in interscholastic athletics (a more restrictive

ban than the rule at issue here) unless the SDHSAA granted the student a waiver (a less

restrictive ban than the rule at issue here).  Id. at *3.  Citing a decision from the Eighth Circuit, in

which that court upheld a TRO enjoining a Nebraska high school from excluding a girl from the

cross-country running team, the South Dakota court held: "When the start of the season is

imminent and the plaintiff has alleged that exclusion from the team violates the Equal Protection

Clause, the court may grant a TRO to permit an athlete to take part in high school sports."  Id.

at *1 (citing Bednar v. Neb. Sch. Activities Ass'n, 531 F.2d 922 (8th Cir. 1976) (per curiam)).

The court found: "Under the plain language of the rule, it only applies to aliens and therefore

classifies students based on alienage."  Id. at *3.  The court also held that, "[b]ecause the

SDHSAA F-1 visa rule is a state classification based on alienage, it is subject to strict scrutiny."

Id. at *4.

        The South Dakota court's ruling is consistent with state courts who have considered

similar circumstances.  See Fusato v. Wash. Interscholastic Activities Ass'n, 970 P.2d 774, 769–

79 (Wash Ct. App. 1999) (applying strict scrutiny to rule forbidding alien students from playing

varsity sports); Makindu, 40 N.E.3d at 191 (declining to determine level of scrutiny but

upholding a preliminary injunction on the ground that the plaintiff "raised a fair question" that an

association's bylaw prohibiting certain international students from participating in interscholastic

sports would pass even rational basis review).  And in Monga v. National Endowment for the

Arts, a district court in Maine issued a TRO requiring the National Endowment for the Arts, a

federal administrative agency who had barred an immigrant student from a national poetry

SZYMAKOWSKI V. UHSAA, APPENDIX000627

competition, to allow the student to compete.  323 F. Supp. 3d 75, 96 (D. Me. 2018).  The court

determined that a "harder look than rational basis review is warranted," although the court found

it unnecessary to apply strict scrutiny to decide the case.  Id. at 93–94.

Reviewing the relevant caselaw, the court finds no reason to carve out an exception from

the Supreme Court's general rule that state classifications based on alienage are subject to strict

scrutiny.  In any event, the court finds that the Student Visa Eligibility Rule does not survive

even a more intermediate level of review, and therefore applies only a heightened level of

scrutiny for its analysis in this expedited review.

### D.  The Rule Does Not Survive Heightened Scrutiny

To survive heightened scrutiny, a law or rule must be "substantially related to a

sufficiently important government interest."  Fowler v. Stitt, 104 F.4th 770, 794 (2024).  The

UHSAA has cited two important government interests: first, an interest in preventing the

mistreatment of students on F-1 visas; and second, an interest in ensuring fair competitions for

high school students in Utah.

The court agrees that the prevention of student abuse is an important government interest

but finds that the adopted rule is not congruent with that result.  The record before the court

includes a declaration from Kirk Bengtzen, who hosted an international basketball player named

"David" while that student attended Juan Diego on an F-1 visa.  (Decl. Kirk Bengtzen ¶ 3, ECF

No. 59.)  Mr. Bengtzen alleges that David's F-1 visa form, which was countersigned by Juan

Diego's admissions director, contained falsehoods about the cost of tuition and the funds that

David would supply (id. ¶ 12), that David struggled academically at Juan Diego but was still

allowed to compete (id. ¶¶ 8, 15), that David was yelled at by the basketball coach (id. ¶ 17), and

that the school refused to provide David with health insurance (id. ¶ 22).  Mr. Bengtzen also

SZYMAKOWSKI V. UHSAA, APPENDIX000628

states that another coach swore at David and two other black basketball players for practicing in the gym (id. ¶ 23) and that a school administrator grabbed David and threw him to the ground for wearing a sweatshirt (id. ¶ 25).  And in a separate allegation against LCA, Mr. Hammer maintains that the UHSAA "received information about 6 F-1 visa basketball students sleeping on the floor of a host family home, some becoming homeless, or living on their own."  (Hammer Decl. ¶ 18.)

These allegations are deeply concerning.  But what is more concerning is that it does not appear that any of the coaches or school officials at Juan Diego or LCA have been disciplined for these acts.  The UHSAA argues that "permitting F-1 students to participate in varsity sports place[s] those students at significant risk of exploitation and abuse from some school administrators and coaches who care[] intensely about the students' athletic performance but seemingly not at all about their education, living conditions, or other basic needs."  (ECF No. 53 at 28.)  But the UHSAA's proposed solution—to bar international students on F-1 visas from postseason competition—penalizes the victim of this abuse more than the perpetrator.  The court recognizes the UHSAA's desire to destroy any incentives for abusive practices.  But the UHSAA has not disqualified any coaches, schools, or teams who have perpetrated this abuse—coaches who, if these allegations are true, have no business coaching either national or international students.  Instead, the UHSAA has limited the number and kind of athletic opportunities for international students in ways that these students would not necessarily choose.  David, for instance, transferred from Juan Diego and attended his senior year at Corner Canyon High School.  (Bengtzen Decl. ¶ 28.)  Presumably, he played basketball there, as he is now playing basketball at a college in Texas.  (Id.)  It is not at all clear that David would have opted for a rule barring him from varsity play (or at least from postseason play) during his senior year.

SZYMAKOWSKI V. UHSAA, APPENDIX000629

The second government interest that the UHSAA asserts is its interest in ensuring fair competition for students in Utah—or, according to the Student Visa Eligibility Rule, for "Utah students." The court is less convinced that this objective, as stated, qualifies as a sufficiently important governmental interest. First, it is unclear exactly who counts as Utah students. Must a student live with their parents or other close family members to fit this definition? Is a student a Utah student if they transfer from another state to live with an aunt, a cousin, or a grandmother?

Second, fairness is a concept that eludes easy definition, as it is often in the eye of the beholder. Certainly, the UHSAA has an important interest in ensuring that its member schools abide by the same set of rules. But the UHSAA also has an important interest in ensuring that all students can participate. According to its Handbook, "[e]qual opportunity shall exist for all students to participate in Association sponsored activities without regard to sex, religion, race or ethnic origin."[8] (UHSAA Handbook, By-Laws Article 9 Section 1, ECF No. 54-19 at 58.) It is not, of course, the role of a federal court to instruct the UHSAA how to achieve the balance between fairness and inclusion in every situation. But where the UHSAA categorically excludes students from opportunities on the basis of their alienage, the court has the power to review whether such a rule is substantially related to the goals the UHSAA wishes to achieve.

The court finds that it is not. Essentially, the UHSAA attempts to solve a flood with a drought. The court agrees that the UHSAA has identified a potential problem of real concern: the illegal recruitment of international student athletes in violation of the UHSAA rules. But the evidence currently in the record concentrates on three possible recruitment violations: the LCA soccer team (made up mostly of Brazilian players), the LCA basketball team (made up mostly of international students), and the Juan Diego basketball team (whose composition is unclear, but

---

[8] "National origin" is notably absent from this list.

SZYMAKOWSKI V. UHSAA, APPENDIX000630

whose coach is the subject of several allegations of abuse). It does not appear that the UHSAA has taken any specific action to discipline these infractions, in indeed these instances involve illegal recruitment.

The evidentiary record is necessarily sparser than the court would desire during an expedited TRO proceeding, a problem which will likely be lessened when the court considers whether it should issue a preliminary injunction. But on this record, the court is unaware of how many students on F-1 visas currently attend high school in Utah, how many are credibly the subject of recruiting violations, and how many are credibly the subject of abuse. The UHSAA may not yet have these answers either. At the hearing on the TRO motion, Mr. Hammer testified that the investigation into potential abuses was ongoing. The UHSAA suggests that the problem is extensive, but both Mr. Hammer and Coach Larson testified that poaching players—including the poaching of Utah players from one school by another—was also a widespread problem across Utah. If schools are violating the UHSAA recruitment rules, they may be recruiting students from other parts of the state and other parts of the country, not just from abroad.

The UHSAA has addressed this issue with a rule relating to transfer students—but rather than applying this rule equally to both national and international transfer students, the UHSAA also adopted the Student Visa Eligibility Rule that applies only to international students. While it may be more immediately obvious that a team is stacked with students from Brazil than with poached students from other schools in Utah, it is not clear on this record which problem is more extensive.

The UHSAA argues that it is difficult to police violations of its anti-recruitment policy because it lacks a subpoena power. But the UHSAA Handbook includes a duty to report and cooperate (ECF No. 54-19 at 55) and the UHSAA may institute a wide range of penalties for

SZYMAKOWSKI V. UHSAA, APPENDIX000631

failure to comply.  The court is unconvinced that the UHSAA is powerless to act against the source of the problem: specific violations of its existing rules, for which the UHSAA could issue penalties and disqualifications that would serve as a warning to other schools.  Notably, the letter cited by the UHSAA from a lawyer representing over a dozen coaches that complains about the recruitment of international basketball players by LCA does not ask for restrictions against F-1 visa holders.  Instead, the letter asks the UHSAA to "consider the issue of LCA's eligibility for the 2024 state basketball tournament based on violations of the UHSAA Bylaws against recruiting."  (ECF No. 54-2 at 4.)  While there is no silver bullet to this issue, a more targeted approach would alleviate the constitutional concerns raised by a blanket prohibition on certain kinds of participation that applies to all students who fit a specific category of alienage, regardless of whether those students have violated the anti-recruitment rules already in place.  Indeed, other aspects of the Student Visa Eligibility Rule, such as a prohibition on coaching staff from serving as the host family for a student on an F-1 visa, are more specifically directed at the abuse the UHSAA wishes to prevent.  And as discussed below, other states have more narrowly tailored their eligibility rules to target specific recruitment concerns.

Finally, the evidence presented primarily concerns two schools and two sports: basketball and soccer.  There are no complaints about students recruited for any football programs, or any of the numerous other sports regulated by the UHSAA, including tennis, swimming, lacrosse, and others.  Accordingly, and while the court finds several important government objectives at play, there is insufficient evidence on this record to show that the Student Visa Eligibility Rule is substantially related to achieving the goals of the UHSAA.

SZYMAKOWSKI V. UHSAA, APPENDIX000632

### E.  Other States' Eligibility Rules for F-1 Students

The UHSAA relies in part on its Executive Director's assessment that "[m]any state high school associations across the country have rules that restrict or prohibit the participation of F-1 visa students in high school athletics," including high school associations in "California, Arizona, Nevada, Montana, Alaska, Idaho, Washington, and Oregon."  (Cuff Decl. ¶ 10; see also Emails re F-1 Visa Rules, ECF No. 54-5 (attaching these states' athletic associations' eligibility rules)).[9]  But as a whole, these eligibility rules demonstrate a more tailored approach that buttresses the court's finding that the UHSAA's Student Visa Eligibility Rule is overly restrictive and unconstitutionally discriminates on the basis of alienage.

Indeed, every one of the state rules referenced is less restrictive than the UHSAA rule, with two exceptions: 1) Arizona's rule, which (to the court's knowledge) has never been upheld on a constitutional challenge; and 2) Nevada's rule, which, as discussed below, has been challenged and appears to have been amended in practice.

Specifically, the California, Montana, Alaska, Idaho, Washington, Oregon. Hawaii, and Wyoming state athletic associations do not categorically bar F-1 students from varsity athletics. And to the extent there are limits on participation by F-1 visa holders, many of the athletic associations make exceptions available, through an appeals process or "hardship waiver."  For example, the Montana High School Association (MHSA) permits F-1 students to participate in two consecutive semesters of varsity athletics (ECF No. 54-5 at 14), and offers a hardship waiver to be examined by the MHSA Executive Director.[10]  The Alaska School Activities Association

---

[9] Mr. Cuff also attaches to his declaration the F-1 eligibility rules for Hawaii and Wyoming. (See ECF No. 54-5.)

[10] MHSA 2024 By-Laws, available at: cdn1.sportngin.com/attachments/document/0088/8550/3-By-Laws_2024..pdf?_gl=1*jdgwl3*_ga*MjQ5MjYwODA1LjE3MjkwMzcyMTc.*_ga_PQ25JN

SZYMAKOWSKI V. UHSAA, APPENDIX000633

(ASAA) bans F-1 visa students from "varsity, state qualifying and state championship competition for <u>one calendar year</u> from the date of first attendance in the new school unless there has been a bona fide move of parents."[11]  Where schools lack junior varsity teams, Alaska's F-1 students can seek a waiver to participate on the varsity team during the regular season without jeopardizing their team's postseason eligibility.[12]   In California, international students are granted varsity eligibility at all levels if they did not play that sport at another club or school team in the 12 months prior to their transfer, but are otherwise limited to junior varsity for their first 12 months.  (ECF No. 54-5 at 10.)  In Idaho, F-1 students are eligible for varsity play after one year's attendance and participation in junior varsity athletics.  (<u>Id.</u> at 2–3.)   In Oregon, international students on F-1 visa programs are "treated like a transfer student, except as provided in Rule 8.6.3.(c) for students on CSIET [Council on Standards for International Educational Travel] approved program."  (<u>Id.</u> at 5–6.)  Accordingly, non-CSIET students are eligible to participate in varsity athletics so long as they transfer over the summer, while CSIET students are eligible for one year of varsity play.  (<u>Id.</u>)  Oregon also provides F-1 students an appeals process before the state board's Executive Director.  Hawaii requires F-1 students to complete one year's play at the junior varsity level before varsity eligibility.  (<u>Id.</u> at 15.)  In Wyoming, students on valid F-1 and J-1 visas are eligible for varsity athletics.  (<u>Id.</u> at 13.)

　　In stark contrast, the Arizona Interscholastic Association currently bars F-1 visa students from varsity-level competition in all circumstances.  But as far as the court knows, this rule has

---

9PJ8*MTcyOTAzNzIxOC4xLjEuMTcyOTAzNzNI2My4wLjAuMA..#_ga=2.65921582.1202440 139.1729037217-249260805.1729037217 (last accessed Oct. 17, 2024).

[11] ASAA 2024-2025 Handbook, available at: asaa.org/wp-content/uploads/handbook/2025handbook/asaa/complete/2024-2025-ASAA-Handbook.pdf (last accessed Oct. 17, 2024).

[12] <u>Id.</u>

SZYMAKOWSKI V. UHSAA, APPENDIX000634

never been subject to a constitutional challenge, and the absence of such a challenge in Arizona is in no way dispositive of the rule's constitutionality.

Indeed, the court notes that several of the state athletics associations' rules have been subject to successful constitutional challenges because they discriminate based on the students' national origin and immigration status.  For example, after the WIAA passed a regulation barring F-1 students from all varsity-level competition, a Washington state court granted a TRO on equal protection grounds, applying strict scrutiny.  See Fusato, 970 P.2d at 779 ("[F]or the WIAA to modify its rules to specifically discriminate against foreign exchange or I-20 VISA students in an attempt to make participation fairer for 'our students' establishes discriminatory purpose or intent"); ECF No. 54-5 at 12 (noting that, in Washington, F-1 visa students are considered transfer students for eligibility purposes).

And in Nevada, several students with F-1 visas sued the Nevada Interscholastic Activities Association (NIAA) on equal protection grounds after the NIAA barred F-1 visa students from varsity sports.  See Jutamas et al v. Nevada Interscholastic Activities Association, 3:20-cv-000288 (D. Nev. 2020).  The Jutamas plaintiffs voluntarily dismissed their case before a TRO was issued, but it is widely reported that a settlement was reached[13] in which the NIAA agreed to permit F-1 students to participate in varsity athletics and required the NIAA to rewrite its eligibility requirements.[14]

---

[13] McAndrew, Siobhan, Legal Battle To Allow International Students In Varsity Sports Not Over Despite Settlement, Reno Gazette Journal, February 20, 2020, available at: www.rgj.com/story/news/education/2020/02/20/niaa-excel-christian-athletes-nevada-high-school-international-students/4811374002/ (last accessed Oct. 17, 2024).  The NIAA rules available online have not been updated since 2021.

[14] The NIAA rules cited by Defendants and available on the NIAA website bar F-1 visa students, but not J-1 visa students, from participating in varsity athletics.  (ECF No. 54-5 at 11.)  But an Approved Regulation of the Nevada Legislature issued on June 8, 2020, and available on the Nevada State Legislature's website, appears to amend this rule, permitting participation by

SZYMAKOWSKI V. UHSAA, APPENDIX000635

As discussed above, the South Dakota District Court granted a preliminary injunction in a case concerning similar restrictions on the participation of students with an F-1 visa in varsity sports, finding a likelihood of success on the merits for a student's equal protection claim against the SDHSAA. Entwistle, 2006 WL 8453556, at *4–5. These outcomes involving similar athletic association rules bolster the strength of Mr. Szymakowski's claim.

Finally, the court notes that athletic associations in the western states of Oklahoma, Kansas, New Mexico, and Colorado do not effectively bar F-1 visa students from participating in varsity athletics. In Oklahoma, all students with J-1 and F-1 visas are eligible to play varsity athletics.[15] In Kansas, students on valid F-1 or J-1 visas in foreign exchange programs are eligible for full varsity-level participation for one year, and may apply for hardship exceptions beyond that.[16] In New Mexico, F-1 students on CSIET programs are eligible to participate in varsity sports for one year. F-1 students in New Mexico without a formal CSIET program are ineligible for varsity sports for their first year at the school.[17] In Colorado, F-1 students in CSIET programs "shall have no more than three consecutive semesters of varsity eligibility beginning with his/her/their first varsity season."[18] Colorado-based international students

---

students with F-1 visas in varsity athletics. See §1, NRS 385B.060, available at: www.leg.state.nv.us/Register/2020Register/R019-20AP.pdf (last accessed Oct. 17, 2024).

[15] Oklahoma Secondary School Athletics Association (OSSAA) 2024-2024 Athletic Eligibility Guidelines, available at: ossaaillustrated.com/wp-content/uploads/2024/06/MF_2024-25_HardshipWaiverManual.pdf (last accessed Oct. 17, 2024).

[16] Kansas State High School Athletics Association 2024-2025 Handbook, available at: www.kshsaa.org/publications/handbook.pdf (last accessed Oct. 17, 2024).

[17] New Mexico Activity Association's Eligibility Bylaws, Section VI, available at: www.nmact.org/file/Section_6.pdf (last accessed Oct. 17, 2024).

[18] Colorado High School Activities Association (CHSAA) 2022-2023 By-Laws, available at: static.chsaanow.com/custompages/!!-2022-2023_BylawBook_RevisedSept29_2022.pdf (last accessed Oct. 17, 2024).

SZYMAKOWSKI V. UHSAA, APPENDIX000636

outside CSIET or some other verifiable educational exchange programs are not eligible for varsity sports participation.[19]

And while the UHSAA asserts that the Student Visa Eligibility Rule does not ban international students on F-1 visas from playing varsity sports, it certainly comes close. First, it is undisputed that students on F-1 visas cannot play varsity sports in the postseason. And if a student wishes to play varsity sports during the regular season, the entire school must either forfeit its shot at the playoffs and a state championship—certainly an unpopular choice—or opt to take independent status. The court is therefore unpersuaded that the Student Visa Eligibility Rule is relevantly distinct from a ban on varsity participation.

In sum, these state athletic association rules—many of which the UHSAA reviewed in crafting its policy limiting F-1 visa students' participation in athletics—provide less restrictive regimes to achieve the school district's stated goal to ensure international students' well-being and discourage inappropriate recruiting activities.

**F. The Rule Poses Supremacy Clause Concerns**

In addition to the equal protection concerns described above, the court is concerned that the rule may "conflict with … overriding national policies in an area constitutionally entrusted to the Federal Government." Graham, 403 U.S. at 378. While F-1 visa holders are subject to many restrictions, it is for Congress and not the UHSAA to impose those restrictions. If recruitment of foreign students solely for athletic purposes is as large a problem as the UHSAA fears, it may be appropriate for Congress to reconsider whether F-1 students should be restricted from varsity athletics or whether it makes sense to allow F-1 students to attend a private school for multiple years when the same student may only attend a public school for one year. The federal court

_____

[19] Id.

31

must grant greater deference to congressional determinations about what restrictions are appropriate for various classes of immigrants and nonimmigrant aliens.

But the UHSAA's assertion that it is free to "impose[] additional burdens not contemplated by Congress," Toll, 458 U.S. at 13 (citation omitted), creates a slippery slope. Are schools free to impose other restrictions on international students, such as prioritizing citizens over non-citizens for admission to highly coveted AP courses? If an international student tries out for a school play, may that student play the role of Dorothy or are they limited to an appearance as a munchkin? Athletics is not the only field in which high schools compete with each other, and the court is wary of rules that deny opportunities to one class of students but not another on the grounds of the student's immigrant status—a determination that is more appropriately regulated by Congress.

### G.  Conclusion

Due to these concerns under both the Equal Protection Clause and the Supremacy Clause, the court finds that Mr. Szymakowski has demonstrated a substantial likelihood that he will succeed on the merits of his claim.

### II.    Threat of Irreparable Harm

To establish irreparable harm, a plaintiff must demonstrate "a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1210 (10th Cir. 2009). An ineffective monetary remedy is one in which "such damages would be inadequate or difficult to ascertain." Dominion Video Satellite, 269 F.3d at 1156. Mr. Szymakowski argues that he will suffer irreparable harm by being excluded from the remainder of his senior high school football season. While Mr.

SZYMAKOWSKI V. UHSAA, APPENDIX000638

Szymakowski has played some games this year at the junior varsity level, he is ineligible for postseason play under the Student Visa Eligibility Rule.

The Tenth Circuit has recognized that the deprivation of "individual rights" in violation of the Equal Protection Clause constitutes irreparable harm.  See Leachco, Inc. v. Consumer Prod. Safety Comm'n, 103 F.4th 748, 755 (10th Cir. 2024) (citing Free the Nipple-Fort Collins, 916 F.3d at 806); see also Elrod v. Burns, 427 U.S. 347, 373–74 (1976).  Because the court has found a substantial likelihood that the Student Visa Eligibility Rule poses an ongoing violation of Mr. Szymakowski's rights under the Equal Protection Clause, the court similarly finds that Mr. Szymakowski has made a strong showing of irreparable harm.

The court also finds that it would be difficult to determine appropriate monetary damages to compensate Mr. Szymakowski for the loss of his participation rights in postseason varsity athletics.  High school activities outside the four walls of the classroom, including activities as varied as sports, theater, language clubs, and student body government, are foundational parts of a high school experience.  Not every American high school offers the same activities and not every student chooses to pursue varsity sports.  But the freedom to join the activities offered by a high school on an equal footing with other students is a critical part of most Americans' secondary school experience.  Indeed, extracurricular activities build character, foster passion, require students to work together towards common goals, promote community, build friendships, and endow real world skills beyond what Mr. Szymakowski can learn in his AP chemistry class, even if those academic pursuits should be prioritized.

Further, as implicated here, a student's participation in many of these extracurricular activities, football especially, provides an undeniable leg-up in the college admissions process— in part because universities recognize that these programs provide well-rounded, well-adjusted

SZYMAKOWSKI V. UHSAA, APPENDIX000639

students, and in part because universities are permitted to recruit for athletics. Here, the evidence demonstrates that Mr. Szymakowski's failure to compete with his high school football team at the varsity level could affect his chances of admission to American universities. Coach Larson testified that, in his years of experience, a student athlete's game day performance on their high school team in varsity play is the single most critical factor for college scouts. (Second Decl. Danny Larson ¶¶ 2–3, 6–11, ECF No. 61-1.) The UHSAA provided no meaningful evidence or testimony to the contrary, instead insinuating that Mr. Szymakowski's self-promotion on social media and participation in football camps are possible alternative avenues for college recruitment. Even if those opportunities are helpful, it does not mean that varsity games are unimportant. Nor can Mr. Szymakowski's missed opportunity to play tonight be made up elsewhere at a later date. For Mr. Szymakowski, his varsity season is fleeting—he is a senior with just one game left in the regular season. Tonight's game and any postseason play are the last opportunities for Mr. Szymakowski to impress scouts in this singularly critical way.

In sum, the court recognizes that extracurricular experiences, including the right to participate in high school varsity football, provide a meaningful benefit to students through and beyond the college admissions process. Mr. Szymakowski's loss of his opportunity to play, and the potential loss of college opportunities as a result, constitutes irreparable harm.

Nevertheless, the UHSAA asserts that any harm suffered by Mr. Szymakowski is self-inflicted because he delayed his request for injunctive relief until the close of the regular football season. The Tenth Circuit has recognized that "delay in seeking preliminary relief cuts against finding irreparable injury." Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs., 31 F.3d 1536, 1543–44 (10th Cir. 1994).

SZYMAKOWSKI V. UHSAA, APPENDIX000640

The court has carefully considered the timeline of events and the reasons why Mr. Szymakowski first asked for relief on October 7, 2024, rather than sometime during the summer. The court finds Mr. Szymakowski's assertion credible that, while he was aware the new rule could prevent him from playing at the varsity level, he believed that his coach was working with the UHSAA on a grandfather clause or other exception that would exempt him from the rule's application. When the football season began and there was still no exemption, Mr. Szymakowski then retained the services of a law firm to pursue his claims.

Mr. Szymakowski's counsel sent a demand letter by email to the UHSAA on September 10, 2024; the UHSAA replied on September 18, 2024; Mr. Szymakowski then filed his complaint and motion for a TRO on October 7, 2024. Although Plaintiff's counsel could have filed a request for injunctive relief sooner,[20] the court finds no evidence on this record that Mr. Szymakowski's own actions contributed to any delays. If anything, the delay suggests the difficulties that international students face when attempting to vindicate their rights in a foreign country—which is precisely the reason why the Supreme Court has considered aliens as a class a "prime example" of a "discrete and insular minority for whom … heightened judicial solicitude is appropriate." Graham, 403 U.S. at 372 (citation omitted). As the lead plaintiff in this case, Mr. Szymakowski will likely face accusations of unfairness and ingratitude. Indeed, he has already been subjected to a cross-examination in open court, which is rarely a pleasant experience. The court finds it unsurprising that Mr. Szymakowski's decision was not made lightly and may have taken some time.

---

[20] During a status conference on October 11, 2024, the court expressed its frustration that Plaintiff's counsel took over two weeks to prepare its motion but asked the court to require expedited briefing—or to issue a TRO without briefing—from the UHSAA. (Oct. 11, 2024 Hr'g Tr., ECF No. 52.)

SYMAKOWSKI V. UHSAA, APPENDIX000641

Accordingly, the slight delay in this case does not obviate the court's finding that Mr. Szymakowski has demonstrated irreparable harm if the court does not enjoin the enforcement of the Student Visa Eligibility Rule as it applies to his participation on the varsity football team.

### III.  Balance of Equities

Having determined that Mr. Szymakowski will suffer irreparable injury absent the issuance of a TRO, the court now turns to a consideration of the harm that UHSAA will suffer if the court does issue the injunction.  The UHSAA argues that 1) the UHSAA would be harmed by the court's interference with its internal affairs; 2) other schools would be harmed if the court grants an exception to the rule solely for Mr. Szymakowski and Juan Diego; 3) the player that would be replaced on the field by Mr. Szymakowski would be harmed; and 4) the issuance of a TRO this late in the season would create a dangerous precedent encouraging other athletes to ask courts to make emergency eligibility determinations.

The court is unpersuaded by these arguments.  The UHSAA's first argument is merely an acknowledgment that any litigant appearing before the court may suffer harm from an adverse ruling.  Although a federal court does not step lightly into the affairs of a state organization, it is unequivocal that the federal court has the power to enjoin the enforcement of state laws and regulations that conflict with the Constitution.

The UHSAA's concern about fairness owed other schools is understandable and the court recognizes that a change to the rules issued mid-season will result in frustration and a feeling of unfairness.  But the UHSAA is free to mitigate the effects of the court's injunction.  Having now received a ruling from a federal court finding that the Student Visa Eligibility Rule suffers from serious constitutional defects, the UHSAA may voluntarily choose to enjoin the rule's application against all students and all schools until the court has resolved the conflict—in other

SZYMAKOWSKI V. UHSAA, APPENDIX000642

words, to continue this year's competitions as they would have been played last year, before the adoption of the new rule.

The court disregards the UHSAA's suggestion that it would be injured because Mr. Szymakowski would take the place of another punter.  This allegation is merely an acknowledgment that every game <u>is</u> important to the students who participate in that game, a corroboration of Mr. Szymakowski's assertion that he will suffer irreparable harm if he is not allowed to play.  But the decision about who should take the field should be based on the comparative merits of the participating students who are validly enrolled at a high school, not based on an athlete's country of origin or immigration status.

Finally, the court has already addressed the delay in this case and found that it was not caused by bad faith or an attempt to manipulate the court into a decision that it would not otherwise issue given more time to decide the issue with full briefing from the parties.  Any risk that the issuance of a TRO would encourage other student athletes to ask for eleventh-hour eligibility determinations is outweighed by the risk of a different kind of precedent: that of a court that finds a likely constitutional violation but does not have the courage of its convictions to issue a remedy.

**IV.  Public Interest**

For much the same reasons, the court finds that the public interest is best served by the issuance of a TRO.  Mr. Szymakowski asks to be treated the same as non-foreign students who attend Juan Diego and other high schools across the state.  The public is best served by a decision that upholds the equal protection of the laws to all persons who are lawfully within the state's jurisdiction.

SZYMAKOWSKI V. UHSAA, APPENDIX000643

**ORDER**

The court ORDERS as follows:

1.        The court GRANTS Mr. Szymakowski's Motion for a Temporary Restraining Order (ECF No. 2).

2.        The UHSAA is enjoined from enforcement of the Student Visa Eligibility Rule as it applies to Mr. Szymakowski during the remainder of the 2024 high school football season. Mr. Szymakowski may play in tonight's game without forfeiting Juan Diego's eligibility for postseason play.  The court finds no need for Mr. Szymakowski to provide security under Federal Rule of Civil Procedure 65(c).

3.        The court issues the following briefing schedule.  Any motion for a preliminary injunction must be filed by October 31, 2024.  Any response is due by November 13, 2024.  Any reply is due by November 20, 2024.

DATED this 17th day of October, 2024.

BY THE COURT:

Tena Campbell
United States District Judge

SZYMAKOWSKI V. UHSAA, APPENDIX000644

# Addendum 2

The district court's order on the Motion for Preliminary Injunction.

*Szymakowski v. Utah High School Activities Association, Inc.*, Case No. 2:24-cv-00751, Memorandum Decision and Order (D. Utah Jan. 2, 2025). [App. 1496–1530.]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ZACHARY SZYMAKOWSKI, an individual; and JOHANNA URIBE, on behalf of FELIPE URIBE, a minor; on behalf of themselves and a proposed class of similarly situated F-1 students, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | Case No. 2:24-cv-00751-RJS |
| v. | Chief Judge Robert J. Shelby |
| UTAH HIGH SCHOOL ACTIVITIES ASSOCIATION, INC., a Utah nonprofit corporation; ROBERT CUFF, an individual; MARILYN RICHARDS, an individual; AMBER SHILL, an individual; BURKE STAHELI, an individual; DAVID WARREN, an individual; DAVID LUND, an individual; ZACK MCKEE, an individual; PAUL SWEAT, an individual; LUKE RASMUSSEN, an individual; JERRE HOLMES, an individual; JASON SMITH, an individual; MIKE MEES, an individual; DEVIN SMITH, an individual; BRYAN DURST, an individual; and BRENT STRATE, an individual, | Magistrate Judge Cecilia M. Romero |
| Defendants. | |

Now before the court is Plaintiffs' Motion for Preliminary Injunction.[1]  Plaintiffs Zachary

Szymakowski and Felipe Uribe, through his mother Johana A. Uribe, and on behalf of a

proposed class of similarly situated individuals, ask the court to enjoin Defendant Utah High

School Activities Association (UHSAA) from enforcing a UHSAA rule limiting F-1 visa

---

[1] *See* Dkt. 79, *Motion for Preliminary Injunction* (*Motion*).

1

holders' eligibility for varsity athletics.[2]  For the following reasons, the court GRANTS

Plaintiffs' Motion.

**BACKGROUND**

**I.    UHSAA's Function and Authority**

UHSAA is the self-identified "Leadership Organization for Education-Based

Interscholastic Athletic and Performing Arts Activities" in the State of Utah.[3]  In this role,

UHSAA "administer[s] and supervise[s] interscholastic activities" among 159 public, charter,

and private member schools and more than 111,000 students.[4]  UHSAA promotes these activities

as "an essential part of the high school experience," and "a significant educational force in the

development of [the] skills needed to become a contributing member of society."[5]

UHSAA also promulgates "rules of eligibility" "to "create and maintain a unique variety

of high school sports competition."[6]  These rules govern student eligibility based on factors such

as "age, years of participation, academic progress, prohibition on the use of undue influence or

recruiting, initial enrollment, [and] transfers from one school to another."[7]  UHSAA does not

have subpoena power or an enforcement arm,[8] and the rules rest primary enforcement authority

---

[2] *Id.* at 1.

[3] *See* Dkt. 54-19, *Utah High School Activities Association 2024-2025 Handbook* (*UHSAA Handbook*) at 2.

[4] *Id.* at 2, 9, 60; Dkt. 55, *Declaration of Rob Cuff in Support of Opposition to Motion for TRO* (*Cuff Decl.*) ¶ 4.

[5] *UHSAA Handbook* at 2, 9.

[6] *Cuff Decl.* ¶ 6.

[7] *UHSAA Handbook* at 2, 9.

[8] Dkt. 95-2, *Declaration of Craig Hammer in Support of Opposition to Motion for Preliminary Injunction* (*Second Hammer Decl.*) ¶¶ 5–6.

2

with member school principals, athletic directors, coaches, and the like.[9]  But UHSAA is not

without enforcement authority.  "When [UHSAA] has information *suggesting* an infraction," it

may initiate an investigation or other "action as may be appropriate."[10]  And when UHSAA

"*determine[s]* that there has been a violation," it may "impose such penalties or fashion such

relief as may be proper."[11]  These penalties include, but are not limited to: issuing a reprimand

letter; placing a school, team, or individual's "continued participation" in UHSAA on

probationary status; suspending a school, team, or individual from participation in particular

activities; forfeiting a team or individual's "interscholastic athletic contest, title or

championship"; and imposing fines up to $1,500.00 per infraction.[12]  Additionally, the rules

require "[a]ll representatives and personnel of member schools" to "fully cooperate with the

Executive Director, [UHSAA's] Staff," and UHSAA's managing committees "to further the

objectives of the Association and its investigation and enforcement programs."[13]  UHSAA may

impose sanctions when a school fails "to report [an] infraction[] or respond fully and timely to

requests from [UHSAA] for information related to any enforcement matter or claimed [rule]

violation."[14]  These sanctions "may include suspension from participation by the school until

there is full compliance with the Association's requests."[15]

---

[9] *See UHSAA Handbook* at 54–55.  The rules make it the "duty" of school officials to "affirmatively . . . determine that all the participants under their jurisdiction who are to participate with and for the school are eligible."  *Id.* at 54. The rules likewise impose a "duty" on "[a]nyone who has knowledge or information that places in question the eligibility of any student" to "report such knowledge or information immediately to the principal or equivalent executive officer of the participant's school," and require the principal or equivalent executive officer to "immediately forward the information" to UHSAA's Executive Director.  *Id.*

[10] *Id.* at 55 (emphasis added).

[11] *Id.* (emphasis added).

[12] *Id.* at 55–56.

[13] *Id.* at 54.

[14] *Id.*

[15] *Id.*

SZYMAKOWSKI V. UHSAA, APPENDIX001498

UHSAA has never issued a penalty or taken any other enforcement actions against a player, coach, team, or school for recruiting violations involving a student on an F-1 visa.[16] However, UHSAA has a long record of using its enforcement authority to issue penalties for recruiting violations involving non-foreign students. As UHSAA's Executive Director Robert Cuff testified at an evidentiary hearing on the present Motion, UHSAA sanctioned six different public schools for violating its recruiting rules on seven different occasions between approximately 2008 and 2023. These sanctions took various forms—coach suspensions, vacated wins, and fines—but never involved sanctions against recruited students themselves.

## II. F-1 Visas

F-1 visas are a form of non-immigrant visa issued by the United States federal government that allow aliens who meet certain criteria to enter the United States as full-time students.[17] For example, aliens must be "bona fide students qualified to pursue a full course of study," "enter the United States temporarily and solely for the purpose of pursuing such a course of study," "have a foreign residence, which they have no intention of abandoning," and "[h]ave sufficient funds available for self-support during the entire proposed course of study."[18]

Aliens must also enroll at federally certified academic institutions.[19] The federal government certifies a wide variety of individual institutions for this purpose—elementary schools, secondary schools, colleges, universities, seminaries, conservatories, language training programs, and others.[20] But the federal government does not certify public elementary or middle

---

[16] *See* Dkt. 79-1, *Transcript of Excerpt from Utah State Legislature Rules Review and General Oversight Committee Meeting on October 23, 2024* (*Rules Committee Transcript*) at 35:23–36:11.

[17] 8 U.S.C. § 1101(a)(15)(F)(i).

[18] U.S. Citizenship & Immigr. Servs, *Policy Manual*, vol. 2, pt. F, ch. 2 (2024).

[19] *Id.*

[20] *Id.*

SZYMAKOWSKI V. UHSAA, APPENDIX001499

schools for F-1 attendance, and restricts F-1 attendance at public high schools.[21]  An F-1 visa

holder may not attend a public high school for an "aggregate period" of more than 12 months,

and must "reimburse[] the local educational agency that administers the school for the full,

unsubsidized per capita costs" of their education.[22]

### III.    Origins of the Student Visa Eligibility Rule

UHSAA's concerns about the practice of member schools recruiting international

students with F-1 visas to play on their varsity athletic teams arose in approximately 2014.[23]

Around that time, UHSAA observed "a concerning increase in F-1 students coming to private,

Utah high schools."[24]  Specifically, UHSAA observed an "influx of F-1 players" to UHSAA

member Wasatch Academy.[25]  The recruiting problem at Wasatch Academy was so substantial

that UHSAA required Wasatch Academy to take "independent status."[26]

However, the UHSAA rule limiting F-1 visa students' participation in varsity athletics is

the product of a more recent series of events.  In fall 2023, a UHSAA panel heard testimony

from an F-1 student describing abuse he suffered while attending UHSSA member Juan Diego

Catholic High School and playing on the Juan Diego varsity basketball team.[27]  The student

testified he struggled academically, but Juan Diego teachers and administrators did not provide

him help and artificially inflated his grades to maintain his academic eligibility for UHSAA

---

[21] *Id.* at vol. 2, pt. F, ch. 3.

[22] 8 U.S.C. § 1184(m)(1).

[23] *See* Dkt. 57, *Declaration of Craig Hammer in Support of Opposition to Motion for TRO* (*Hammer Decl.*) ¶ 4.

[24] *Id.*

[25] *Id.* ¶ 5. UHSAA believes this influx was due, at least in part, to the existence of "restriction on F-1 students in other western states." *Cuff Decl.* ¶ 10.

[26] *Id.* "Independent" member schools may compete against "full" member schools in pre-season and regular season competition, but "[a]re not post-season eligible" and do not have voting rights within UHSAA. *UHSAA Handbook* at 61–62.

[27] *See Hammer Decl.* ¶ 6.

SZYMAKOWSKI V. UHSAA, APPENDIX001500

competition.[28]  He also testified coaches bullied him and administrators unfairly admonished him for minor offenses.[29]

Even more recently, in January 2024, UHSAA received a letter from a lawyer representing basketball coaches at several UHSAA member schools.[30]  The letter alleged that UHSAA member Layton Christian Academy (LCA) was pervasively recruiting students, "typically from foreign countries," for its varsity basketball team in violation of UHSAA rules.[31] The lawyer wrote that, at the time, LCA's team included "15 players from 12 different countries," and its starting lineup "consiste[d] of players from Brazil, France, Serbia, Burundi East Africa, and Las Vegas."[32]  The lawyer also directed UHSAA to the website of a youth basketball organization in the United Kingdom called "Ballers Heaven."[33]  The lawyer reported the website advertised Ballers Heaven's relationship with LCA, including the availability of LCA scholarships to Ballers Heaven players.[34]  Finally, the letter asked UHSAA to convene a panel to discuss barring LCA's basketball team from participating in the upcoming state championship as a penalty for LCA's recruiting violations.[35]

Based on the Juan Diego student's testimony and the allegations contained in the letter, UHSAA commenced a broad investigation into the statewide practice of member schools

---

[28] *Id.*

[29] *Id.*  KSL News reported these allegations, as well as similar allegations concerning other F-1 students on Juan Diego's basketball team.  Dkt. 54-4, *Hosts Question 'Scholarships' for International Students Playing Utah Sports; UHSAA Investigating*.

[30] *Hammer Decl.*  ¶ 7.

[31] *See* Dkt. 54-2, *Letter Re: Layton Christian Academy Participation in 4A State Basketball Tournament* at 3.

[32] *Id.*

[33] *Id.*

[34] *Id.* at 3–4.

[35] *Id.* at 4.

SZYMAKOWSKI V. UHSAA, APPENDIX001501

recruiting and mistreating F-1 students.[36]  The investigation quickly revealed additional evidence

that certain member schools were recruiting international students for varsity athletics and failing

to care for those students when they arrived in the United States.[37]  For example, UHSAA

obtained an email from a former Juan Diego counselor alleging that Juan Diego staff directed her

to submit false information to UHSAA regarding an international student's academic

eligibility.[38]  UHSAA likewise obtained emails from two Juan Diego parents alleging

widespread "educational dysfunction" at Juan Diego.[39]  The parents reported several concerns

regarding Juan Diego's treatment of international student athletes.  First, they reported that

between 2018 and 2019, a Juan Diego basketball coach asked them to host an international

student who was coming to Juan Diego "to be a part of the basketball team and on full

scholarship."[40]  They reported that after they declined to host the student, the school enlisted

several other families to house him before eventually paying for the student, a minor, to live on

his own in an apartment.[41]  Second, the parents reported an incident in which the basketball

coach invited members of the basketball team to look at pictures of "potential players" from Mali

and asked the team members "which one they should try and get."[42]  Third, the parents reported

that when a student from Mali came to Juan Diego the following fall, the school did not offer

him any academic or personal support.[43]  Fourth, the parents reported facts consistent with the

---

[36] *Hammer Decl.* ¶¶ 7–8.

[37] *See id.* ¶¶ 9–12; *Cuff Decl.* ¶ 11.

[38] *See* Dkt. 54-3, *Email Re: UHSAA Letter.*

[39] *See* Dkt. 54-6, *Email Re: Juan Diego – Issues with International Student Athletes*.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

7

story of the F-1 student who testified at a UHSAA panel that Juan Diego mistreated him.[44]  And

fifth, the parents reported the basketball coach was generally aggressive, disrespectful, and

threatening towards international students, "treat[ing] them like property and dehumanize[ing]

them."[45]

As part of its investigation, UHSAA also obtained screenshots of websites and social

media posts wherein "Ballers Heaven," a Brazilian youth soccer organization called "Rio

Brazil," a Tahitian sports academy called "Tamari'I Maohi Sports Élite," a Chilean basketball

academy called "George Perez - Utah Basketball Academy," and several other youth sports

organizations advertised partnerships and scholarship opportunities with Wasatch Academy,

LCA, Juan Diego, and two additional UHSAA members—Judge Memorial Catholic High

School and St. Joseph's Catholic High School. [46]  UHSAA also observed that the numbers of F-1

students at certain schools were overwhelming.[47]  During the 2023–2024 school year, for

example, 37 out of 38 students on LCA's boys' soccer team were F-1 students.[48]

In spring 2024, UHSAA began studying ways to combat international recruiting, and the

related problem of international student athlete mistreatment.  Believing the issue to be unique to

students with F-1 visas, which allow students to attend the private high schools of their choice

---

[44] *Id.*

[45] *Id.*

[46] *Hammer Decl.* ¶ 12; *see also* Dkt. 54-1, *Email Re: LCA* (quoting Ballers Heaven's website); Dkt. 54-8 (compilation of evidence regarding George Perez Utah Basketball Academy); Dkt. 54-9 (Baller's Heaven statement regarding LCA's state championship win); Dkt. 54-12 (compilation of Evidence Regarding Tamari'I Maohi Sports Élite); Dkt. 54-13 (Baller's Heaven image promoting player's commitment); Dkt. 54-14 (compilation of Instagram posts promoting international players' commitments to LCA); Dkt. 54-15 (compilation of evidence regarding Rio Brazil); Dkt. 54-16 (further compilation of evidence regarding international recruiting); Dkt. 54-18 (testimonials from Baller's Heaven's website).

[47] *See Cuff Decl.* ¶¶ 13–14, 17.

[48] *See id.* ¶ 13.

SZYMAKOWSKI V. UHSAA, APPENDIX001503

for full four-year programs,[49] Cuff reached out to high school activities associations in

neighboring states about their eligibility rules for F-1 students.[50]  Cuff provided these rules to

UHSAA's Constitution and Bylaws Committee and the Committee, led by Chair Craig Hammer,

began drafting a rule of its own for F-1 students.[51]  The Committee approved the draft rule at a

March 21, 2024 meeting,[52] the UHSAA Board of Trustees discussed the proposed rule at a

March 28, 2024 meeting,[53] and the UHSAA Executive Committee heard public comment from

representatives of LCA, Juan Deigo, and Judge Memorial Catholic High School on the rule at an

April 24, 2024 meeting.[54]  The UHSAA Board of Trustees approved the rule at a May 1, 2024

meeting,[55] and UHSAA members subsequently ratified the rule by a 128 to 9 vote, with 19

schools not responding.[56]  This procedure made the rule, titled the Student Visa Eligibility Rule,

effective for the 2024–2024 school year.[57]

The challenged portion of the Student Visa Eligibility Rule appears in UHSAA's 2024–

2025 Handbook at *Interps & Guidelines 1.9.3(B)(1)* and reads as follows:

> An international student with an F-1 visa issued by the U.S. Immigration and
> Naturalization Service is a student who attends high school in the U.S.  An
> international student with an F-1 visa is only eligible for non-varsity level
> competition unless the following condition is met: a member school may choose to
> compete with an [F-1] student at the varsity level, but the member school is not

---

[49] *Hammer Decl.* ¶ 13; *Cuff Decl.* ¶¶ 10, 14–15, 35.  UHSAA is not concerned that other forms of student visas are contributing to the student recruiting and student mistreatment problems because other visas do not allow international students to attend the high school of their choice for four years.  *Cuff Decl.* ¶ 18.  For example, J-1 visas only allow international students participating in exchange programs to attend high school in the United States for up to one year.  *Id.*; *see also* U.S. Citizenship & Immigr. Servs., *Policy Manual*, vol. 2, pt. D, ch. 3 (2024).

[50] *Hammer Decl.* ¶¶ 13–14; Dkt. 54-5, *Email re: F1 Students*.

[51] *Hammer Decl.* ¶¶ 14–15; *Cuff Decl.* ¶¶ 22–23.

[52] *Hammer Decl.* ¶ 15; *Cuff Decl.* ¶ 23.

[53] *Hammer Decl.* ¶ 16; *Cuff Decl.* ¶ 24.

[54] *Hammer Decl.* ¶ 17; *Cuff Decl.* ¶¶ 25.

[55] *Cuff Decl.* ¶ 26.

[56] *Id.* ¶ 27.

[57] *Id.* ¶ 28.

SZYMAKOWSKI V. UHSAA, APPENDIX001504

> eligible for post-season competition.  Such member school must declare the use of
> an [F-1] student at the varsity level prior to the competition start date for that given
> sport and receive approval from the UHSAA.[58]

A forward to the Student Visa Eligibility Rule's text adds that the Rule seeks to address "the concerns of [UHSAA] member schools related to displacement of Utah students by students from foreign countries as well as recruiting of foreign players to be placed with Utah high schools," and is intended "to preserve interscholastic competitive opportunities for Utah students and promote the unique competition fostered by the UHSAA."[59]

## IV.    The Student Visa Eligibility Rule's Effect on Students

In the months the Student Visa Eligibility Rule has been in effect, it has tangibly impacted international students attending school in Utah on F-1 visas.  For example, Plaintiff Zachary Szymakowski is an 18-year-old Australian citizen, F-1 visa holder, and a senior at Juan Diego.[60]  He enrolled at Juan Diego in fall 2023—a year after choosing to attend the school based on its "excellent record of student success in both academic and athletic achievement," Catholic affiliation, and experience hosting international students.[61]  The school did not recruit him,[62] and he has realized considerable academic, extra-curricular, and social success in his time as a student.  He has received college credit in several subjects,[63] served as one of eight elected

---

[58] *Id.* ¶ 30; *see also UHSAA Handbook* at 37.  The Student Visa Eligibility Rule imposes several additional requirements on F-1 students' ability to participate in UHSAA-sponsored competition at *Interps & Guidelines 1.9.3(B)(2)–(7)*, but Plaintiffs do not challenge these requirements.  The Student Visa Eligibility Rule likewise permits J-1 visa holders to compete in varsity athletics if they satisfy UHSAA's standard eligibility requirements, excepting a UHSAA rule limiting a student's eligibility after a school-to-school transfer, at *Interps & Guidelines 1.9.3(A)*.  And permits other non-citizen students to compete in varsity athletics if they satisfy UHSAA's standard eligibility requirements at *Interps & Guidelines 1.9.3(C)*.  But Plaintiffs do not challenge these sections of the Rule.

[59] *UHSAA Handbook* at 37.

[60] Dkt. 2-1, *Declaration of Zachary Szymakowski* ¶¶ 1–6.

[61] *See id.* ¶¶ 8–11.

[62] *Id.* ¶ 7.

[63] *Id.* ¶¶ 15–16.

SZYMAKOWSKI V. UHSAA, APPENDIX001505

student body representatives,[64] and built positive relationships with members of the Juan Diego community.[65]

Szymakowski has also realized considerable athletic success.  During the 2023–2024 school year, he tried out and made Juan Diego's varsity football team, serving as the team's punter for nine out of ten games.[66]  He also tried out and made Juan Diego's varsity track and field team, competing in several events before he suffered a season-ending injury.[67]  However, the Student Visa Eligibility Rule made Szymakowski ineligible to compete for Juan Diego's varsity football team during the fall 2024 season,[68] and will make him ineligible to compete for Juan Diego's varsity lacrosse team during the spring 2025 season.[69]

As a second example, Plaintiffs allege Felipe Uribe is a 17-year-old Colombian citizen, F-1 visa holder, and junior at St. Joseph's Catholic High School in Ogden, Utah.[70]  Plaintiffs allege Uribe enrolled at St. Joseph's in fall 2023.[71]  Plaintiffs allege Uribe's parents sent him to St. Joseph's because "the educational curriculum and experiences" available to him in Utah were better than those in Colombia, he could live with extended family, and his sister had a positive

---

[64] *Id.* ¶ 17.

[65] *Id.* ¶¶ 11–12, 20.

[66] *Id.* ¶¶ 18–19.

[67] Dkt. 104–1, *Declaration of Zachary Szymakowski in Support of Plaintiffs' Motion for Preliminary Injunction* (*Third Szymakowski Decl.*) ¶¶ 3–6.

[68] Dkt. 2-2, *Declaration of Danny Larson* ¶¶ 6–11.  Danny Larson, Juan Diego's football coach, felt "[he] could not, in good conscience," allow Szymakowski to play when doing so "penalize[d] the other members of the football team by forfeiting their opportunity to compete in post-season play."  *Id.* ¶ 12.  However, as described in the following section, the court entered a Temporary Restraining Order enjoining the Student Visa Eligibility Rule such that Szymakowski was able to play in the final two varsity football games of the 2024 season without compromising Juan Diego's post-season eligibility.

[69] *See Third Szymakowski Decl.* ¶¶ 8–12.

[70] Dkt. 108, *Second Amended Complaint* ¶¶ 9, 78.

[71] *Id.* ¶ 85.

11

experience as a St. Joseph's student from 2012–2016.[72]  Plaintiffs allege he was not recruited to

St. Joseph's.[73]  Plaintiffs also allege Uribe has achieved considerable academic and athletic

success at St. Joseph's.  They allege he has a 3.9 grade point average and that he played on St.

Joseph's varsity basketball team during the 2023–2024 school year.[74]  Like Szymakowski,

however, Plaintiffs allege the Student Visa Eligibility Rule makes Uribe ineligible to compete for

St. Joseph's varsity basketball team during the winter 2024–2025 season,[75] and will make him

ineligible to compete for St. Joseph's varsity soccer team this spring.[76]

## PROCEDURAL BACKGROUND

### I.    Plaintiffs' Original Complaint and Motion for Temporary Restraining Order

Szymakowski initiated this lawsuit on October 7, 2024 when he filed a proposed class

action Complaint asserting three claims for relief: (1) alleging the Student Visa Eligibility Rule

violates the Fourteenth Amendment's Equal Protection Clause, (2) alleging the Rule

discriminates against F-1 students in violation of Title VI of the Civil Rights Act, and (3) seeking

a declaratory judgment that the Rule violates the Supremacy Clause.[77]  The same day, he moved

for a Temporary Restraining Order (TRO) enjoining UHSAA from enforcing the Rule against

---

[72] *Id.* ¶¶ 79–83.

[73] *Id.* ¶ 84.

[74] *Id.* ¶¶ 88, 91–92.

[75] *Id.* ¶¶ 93–95.

[76] *Id.* ¶ 4.  The foregoing allegations regarding Uribe are drawn from Plaintiffs' Second Amended Complaint.  The record does not contain any direct evidence supporting the allegations.  However, the allegations are generally consistent with the evidence regarding the Student Visa Eligibility Rule's impact on Szymakowski's inability to compete in varsity athletics, as well as UHSAA's representations regarding the Rule.  And UHSAA's Opposition to Plaintiffs' Motion neither disputes the allegations nor argues the court should decline to consider them for purposes of deciding the Motion.

[77] Dkt. 1, *Complaint* ¶¶ 101–128.  Prior to bringing suit, Szymakowski asked UHSAA to exempt him from the Student Visa Eligibility Rule, and Szymakowski's counsel sent UHSAA a demand letter explaining Szymakowski's concerns with the Rule.  *See* Dkt. 2-3, *Letter Re: UHSAA's Rule Restricting F-1 Visa Students from Participating in Varsity Sports* (*Demand Letter*).

12

him for the duration of his 2024 high school football season.[78]  Szymakowski argued he was

substantially likely to succeed on the merits of his Equal Protection Clause claim, he would

suffer irreparable harm absent a TRO, this harm outweighed any harm a TRO would cause

USHAA, and a TRO was in the public interest.[79]

Due to a scheduling conflict, the undersigned asked Judge Tena Campbell to preside over

the TRO Motion.[80]  Judge Campbell agreed and oversaw an October 16, 2024 evidentiary

hearing on the Motion.[81]  Judge Campbell also issued an October 17, 2024 Order and

Memorandum Decision granting Szymakowski's Motion and enjoining UHSAA from enforcing

the Student Visa Eligibility Rule as to Szymakowski for the remainder of the football season.[82]

Although Judge Campbell issued her TRO ruling on short notice, she provided a detailed and

comprehensive analysis of the issues before her.

## II.    Plaintiffs' Motion for Preliminary Injunction and Subsequent Developments

On October 31, 2024, Plaintiffs filed the present Motion—an effort to build on the TRO

by requesting an order enjoining UHSAA from enforcing the Rule as it relates to all F-1 students

across all sports for the remainder of this litigation.[83]  UHSAA filed an Opposition on November

13, 2024,[84] and Plaintiffs filed a Reply on November 20, 2024.[85]  The court heard evidence and

oral argument concerning the Motion at a November 27, 2024 hearing.[86]

---

[78] *See* Dkt. 2, *Motion for Temporary Restraining Order and Preliminary Injunction*.

[79] *Id.* at 6–17.

[80] *See* Dkt. 52, *Transcript of Zoom Status Conference held on October 11, 2024*.

[81] *See* Dkt. 67, *Minute Entry for Motion Hearing Held on 10/16/2024*.

[82] *See* Dkt. 69, *Order and Memorandum Decision Granting Temporary Restraining Order* (*TRO Decision*).

[83] *See Motion*.

[84] *See* Dkt. 95, *Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction* (*Opposition*).

[85] *See* Dkt. 104, *Reply in Support of Motion for Preliminary Injunction* (*Reply*).

[86] *See* Dkt. 110, *Minute Entry for Motion Hearing Held on 11/27/2024*.

SZYMAKOWSKI V. UHSAA, APPENDIX001508

Several noteworthy events occurred while briefing on Plaintiffs' Motion was underway. First, on November 1, 2024, Juan Diego lost in the UHSAA playoffs,[87] ending Szymakowski's 2024 high school football season and rendering the TRO moot. Second, on November 8, 2024, Plaintiffs filed their First Amended Complaint.[88] The First Amended Complaint was substantially similar to the original Complaint but added Uribe as a Plaintiff. And third, on November 12, 2024, Defendants filed a Motion to Dismiss the Amended Complaint.[89] Defendants argued the end of the football season mooted Szymakowski's claims, and Uribe lacked capacity to sue.[90] In an oral ruling delivered at the November 27, 2024 hearing, the court denied Defendants' Motion. Nevertheless, the court ordered Plaintiffs to file a Second Amended Complaint adding Uribe's mother, Johanna Uribe, as a named Plaintiff and legal representative of her minor son. Plaintiffs did so the same day.[91]

Plaintiffs' Motion for Preliminary Injunction is ripe for review.[92]

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 enables the court to issue a preliminary injunction. To obtain an injunction under Rule 65, a plaintiff must establish four elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

---

[87] Plaintiffs and Defendants discussed Juan Diego's loss at a November 4, 2024 status conference. *See* Dkt. 80, *Minute Entry for Status Conference Held on 11/4/2024*.

[88] *See* Dkt. 82, *First Amended Complaint*.

[89] *See* Dkt. 86, *Motion to Dismiss Plaintiffs' First Amended Complaint*.

[90] *Id.* at 4–6.

[91] *See* Dkt. 108, *Second Amended Complaint*.

[92] On November 18, 2024, Defendants Robert Cuff, Marilyn Richards, Amber Shill, Burke Staheli, David Warren, David Lund, Zack Mckee, Paul Sweat, Luke Rasmussen, Jerre Holmes, Jason Smith, Mike Mees, Devin Smith, Bryan Durst, and Brent Strate filed a Motion to Dismiss the Amended Complaint. *See* Dkt. 102, *Motion to Dismiss Individual Defendants*. The court will consider this Motion at a later date because Plaintiffs' Motion for Preliminary Injunction requests only injunctive relief with respect to Defendant UHSAA. *See Motion* at 1.

14

the public interest."[93]  The likelihood of success on the merits and irreparable harm factors are "the most critical" of the four.[94]

In every case, a preliminary injunction is "an extraordinary remedy" and a plaintiff's "right to relief must be clear and unequivocal."[95]  In certain cases, however, a plaintiff faces the additional burden of making a "strong showing" that the likelihood of success on the merits and balance-of-harms factors weigh in their favor.[96]  This heightened standard applies in the Tenth Circuit when a plaintiff seeks a "disfavored" injunction.[97]  A disfavored injunction is one that (1) "mandates action (rather than prohibiting it)," (2) "changes the status quo," or (3) "grants all the relief that the moving party could expect from a trial win."[98]  The Tenth Circuit defines the "status quo" as "the last peaceable uncontested status existing between the parties before the dispute developed."[99]  And the Tenth Circuit considers an injunction to "fall into the all-the-relief category only if its effect, once complied with, cannot be undone."[100]  "[I]f the court 'probably can put the toothpaste back in the tube,' then the heightened standard does not apply."[101]

---

[93] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[94] *Nken v. Holder*, 556 U.S. 418, 434 (2009).

[95] *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 752 (10th Cir. 2024) (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1258, 1258 (10th Cir. 2005)).

[96] *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016).

[97] *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019).

[98] *Id.*

[99] *Id.* at 798 n.3 (quoting 11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948 (3d. ed. & Nov. 2018 update)).

[100] *Id.* (citations and internal quotation marks omitted).

[101] *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239 (D. Utah 2020) (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3).

15

## ANALYSIS

Judge Campbell's Memorandum Decision provides a natural starting point for analyzing the present Motion for three reasons.  First, Judge Campbell's ruling and Plaintiffs' Motion engage the same principal legal issues: (1) whether a request for an injunction barring UHSAA from enforcing the Student Visa Eligibility Rule is a disfavored injunction; (2) whether it is substantially likely the Student Visa Eligibility Rule violates the Equal Protection and/or Supremacy Clause; (3) whether an aspiring varsity athlete subject to the Student Visa Eligibility Rule would suffer irreparable harm absent an injunction prohibiting UHSAA from enforcing the Student Visa Eligibility Rule; (4) whether this harm would outweigh any harm to UHSAA; and (5) whether an injunction prohibiting UHSAA from enforcing the Student Visa Eligibility Rule is in the public interest.  Second, Judge Campbell's ruling and Plaintiffs' Motion rely on an overwhelmingly common set of facts.  And third, upon review of the record and relevant legal authority, the court agrees with Judge Campbell's careful and persuasive analysis.

Accordingly, the court proceeds by adopting and incorporating Judge Campbell's analysis save only for UHSAA's offer of new or different legal authority, presentation of new or different evidence, and UHSAA's argument that Judge Campbell erred in her decisionmaking.  Ultimately, the court finds Plaintiffs have again established their right to preliminary injunctive relief.[102]

### I.    Applicable Legal Standard

The court finds the Motion does not request a disfavored injunction and is not subject to the heightened standard of review described above.  On this issue, Judge Campbell concluded an

---

[102] For the reasons articulated in the court's November 27, 2024 oral ruling, the court rejects UHSAA's argument that this case is moot, *see Opposition* at 14–15, and proceeds directly to the merits.

SZYMAKOWSKI V. UHSAA, APPENDIX001511

injunction barring UHSAA from enforcing the Student Visa Eligibility Rule was not disfavored because it was prohibitory in nature.[103]  She also determined an injunction preserved the status quo—properly defined as of the day before UHSAA adopted the Student Visa Eligibility Rule— and did not afford Szymakowski all the relief he could expect from a trial win because it would provide only temporary relief.[104]  Plaintiffs urge the instant Motion does not seek a disfavored injunction for the same reasons,[105] but UHSAA maintains the injunction is disfavored because it would provide Plaintiffs "substantially all the relief they could get at trial."[106]  In support of this argument, UHSAA reasons Szymakowski already "received substantially all the relief he could have obtained from a full trial" by being allowed to "play out his senior season" and "it is almost guaranteed that Uribe will graduate long before this case can be tried."[107]  UHSAA further reasons that among the proposed class, "even . . . freshmen are highly unlikely to see this case tried in their less-than-four years before graduation."[108]

UHSAA misapplies the "all-the-relief" category of disfavored injunctions.  As Judge Campbell explained in her TRO ruling, "[t]he Tenth Circuit does not consider an injunction disfavored 'simply because the plaintiff would get no additional relief if he prevailed at the trial on the merits.'  Rather, the Tenth Circuit looks to whether an injunction would 'render a trial on the merits largely or completely meaningless.'"[109]  And as was the case with Szymakowski's TRO, the requested preliminary injunction would not "render a trial meaningless because it

---

[103] *TRO Decision* at 9.

[104] *Id.* at 10–11.

[105] *Reply* at 2–3.

[106] *Opposition* at 36.

[107] *Id.*

[108] *Id.*

[109] *TRO Decision* at 10.

SZYMAKOWSKI V. UHSAA, APPENDIX001512

would provide [Plaintiffs] only *temporary* relief from the Student Visa Eligibility Rule."[110] "UHSAA could still prevail at trial and enforce the [R]ule . . . in subsequent athletic seasons."[111]

The potentially slow pace of federal litigation does not change the result. UHSAA's argument in this respect is that this case will inevitably become moot because any potential class representative will graduate before a trial can take place. But the court will not so speculate,[112] and it defies fairness to restrict Plaintiffs' access to preliminary relief based on the court's own potential docket limitations. Federal litigation sometimes moves slowly because courts are tasked with fully and fairly adjudicating the often-complex issues before them, while balancing heavy caseloads and numerous other responsibilities. These inconveniences are neither Plaintiffs' failing nor an excuse for UHSAA to evade judicial review of its allegedly unconstitutional policy.[113]

The court concludes Plaintiffs' requested injunction is not disfavored and, like Judge Campbell, reviews Plaintiffs' Motion under the ordinary preliminary injunction standard.

## II.    Likelihood of Success on the Merits

To begin, the court finds Plaintiffs have shown they are substantially likely to succeed on both their Equal Protection and Supremacy Clause claims.

---

[110] *Id.* at 10.

[111] *Id.*

[112] It is likely the court will resolve summary judgment motions, conduct a trial, and/or take up class certification within the next four years. It is also possible Plaintiffs will establish that the proposed class is exempt from the mootness doctrine under the "inherently transitory" exception to the general rule that an uncertified class's claims become moot when a named plaintiff's claims become moot. *See, e.g. Fisk v. Bd. Trs. of Cal. State Univ.*, No. 22-CV-173 TWR (MSB), 2023 WL 6051381, at *11 (S.D. Cal. Sept. 15, 2023) (citing *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011)) (explaining that the inherently transitory exception applies when the nature of a case is such that "the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires").

[113] *C.f. Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013) (explaining that one purpose of the inherently transitory exception is to avoid situations in which "the transitory nature of the conduct giving rise to [a] suit" enables a defendant to "effectively insulate [their] conduct from review").

18

### A. Equal Protection Clause

Judge Campbell found Szymakowski was substantially likely to succeed on the merits of his Equal Protection Clause Claim based on her conclusions that UHSAA is a state actor, the Student Visa Eligibility Rule treated Szymakowski differently based on his alienage, alienage classifications are unlawful unless they satisfy strict scrutiny, and UHSAA could not show the Student Visa Eligibility Rule survived any form of heightened scrutiny.[114]  Plaintiffs' Motion for Preliminary Injunction argues they are substantially likely to succeed on the merits of their Equal Protection Clause claim for substantially the same reasons,[115] and UHSAA does not dispute it is a state actor subject to the Equal Protection Clause.[116]  Arguing Judge Campbell erred in her assessment of what standard of review to apply, however, UHSAA contends Plaintiffs will not succeed on the merits of their Equal Protection Clause claim because the Student Visa Eligibility Rule treats Plaintiffs differently based only on a subset of alienage—nonimmigrant alien status— and classifications discriminating against nonimmigrant aliens vis-à-vis immigrant aliens and citizens are lawful if they satisfy rational basis review.[117]  UHSAA thus argues the facts in the record show Plaintiffs will not succeed on the merits of their Equal Protection Clause claim because the Student Visa Eligibility Rule withstands rational basis review, and in the alternative that the Rule survives even heightened and strict scrutiny.[118]

---

[114] *See TRO Decision* at 11–31.

[115] *See Motion* at 9–18.

[116] *See Opposition* at 16–25.

[117] *Id.* at 16–21.  "There are two categories of U.S. visas: immigrant and nonimmigrant.  Immigrant visas are issued to foreign nationals who intend to live permanently in the United States.  Nonimmigrant visas are for foreign nationals wishing to enter the United States on a temporary basis – for tourism, medical treatment, business, temporary work, study, or other similar reasons."  *Requirements for Immigrant and Nonimmigrant Visas*, U.S. Citizenship & Immigration Services (Mar. 14, 2024), https://www.cbp.gov/travel/international-visitors/visa-waiver-program/requirements-immigrant-and-nonimmigrant-visas.

[118] *Opposition* at 21–25.

SZYMAKOWSKI V. UHSAA, APPENDIX001514

### 1. Level of Review

As an initial matter, the court agrees with Judge Campbell that the Student Visa Eligibility Rule is subject to strict scrutiny. As Judge Campbell explained, the Equal Protection Clause of the Fourteenth Amendment provides that a state actor may not "deny to any person," including non-citizen aliens, "the equal protection of its laws.'"[119] And Supreme Court precedent presumes most state laws violate this provision when they "classify by race, alienage, or national origin."[120] Accordingly, the Court has long-subjected such laws to strict scrutiny, sustaining them "only if they are suitably tailored to serve a compelling state interest."[121]

As Judge Campbell also explained, Supreme Court precedent establishes two exceptions to this rule, and decisions from the Fifth and Sixth Circuits support a possible third exception. First, Supreme Court precedent contains a narrow exception for state laws that exclude aliens from civic roles involving political and governmental functions.[122] Such laws do not violate the Equal Protection Clause as long as they satisfy rational basis review.[123] Second, Supreme Court precedent contains an exception for state laws that deny certain opportunities and benefits to undocumented aliens.[124] Even so, in *Plyler v. Doe*, the Court subjected such a law to heightened scrutiny.[125] And third, in *LeClerc v. Webb* and *League of United Latin American Citizens*

---

[119] *TRO Decision* at 12–13 (first quoting U.S. Const. amend. XIV, § 1; then citing *Plyler v. Doe*, 457 U.S. 202, 215 (1982); and then citing *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 413 (1948)).

[120] *Id.* at 13–14 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); then citing *Graham v. Richardson*, 403 U.S. 365, 372 (1971); then citing *Nyquist v. Mauclet*, 432 U.S. 1, 12 (1977); then citing *Sugarman v. Dougall*, 413 U.S. 634, 642–43 (1973); then citing *In re Griffiths*, 413 U.S. 717, 721–22 (1973); and then citing *Examining Bd. Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 601–06 (1976)).

[121] *Id.*

[122] *Id.* at 15 (citing *Foley v. Connelie*, 435 U.S. 291, 295–96 (1978); then citing *Ambach v. Norwick*, 441 U.S. 68, 81 (1979); then citing *Cabell v. Chavez-Salido*, 454 U.S. 432, 447 (1982); and then citing *Bernal v. Fainter*, 467 U.S. 216, 220–21 (1984)).

[123] *Id.*

[124] *Id.* at 15–16 (citing *Plyler*, 457 U.S. at 219; then citing *De Canas v. Bica*, 424 U.S. 351 (1976)).

[125] *Id.*

20

SZYMAKOWSKI V. UHSAA, APPENDIX001515

*(LULAC) v. Bredesen*, the Fifth and Sixth Circuits recognized an exception for state laws that discriminate based on nonimmigrant alien status.[126]  Distinguishing nonimmigrant aliens, who are lawfully permitted to reside in the United States *temporarily*, from immigrant aliens, who are lawfully permitted to reside in the United States *permanently*, both courts held that such laws do not violate the Equal Protection Clause as long as they satisfy rational basis review.[127]  But, as Judge Campbell persuasively reasoned, a comprehensive assessment of the relevant law weighs against following the Fifth and Sixth Circuit's additional exception.[128]

UHSAA's challenge to Judge Campbell's conclusion that the Student Visa Eligibility Rule triggers strict scrutiny concerns this additional exception.  Specifically, UHSAA argues Judge Campbell improperly relied on the Second Circuit's competing decision in *Dandamudi v. Tisch*.[129]  In *Dandamudi*, the Second Circuit expressly declined to follow *LeClerc* and *LULAC*, reasoning the Supreme Court had "never distinguished between classes of *legal* resident aliens."[130]  The Second Circuit instead concluded strict scrutiny applied to a New York law

---

[126] *Id.* at 16 (citing *LeClerc v. Webb*, 419 F.3d 405, 410–11, 415 (5th Cir. 2005); then citing *League of United Latin Am. Citizens (LULAC) v. Bredesen*, 500 F.3d 523, 526, 533 (6th Cir. 2007)).

[127] *Id.*

[128] *Id.* at 16–22 (citing *Dandamudi v. Tisch*, 686 F.3d 66, 74, 78 (2d Cir. 2012); then citing *Plyler*, 457 U.S. at 219; then citing Graham, 403 U.S. at 377; then citing *LeClerc*, 444 F.3d at 429 (Higginbotham, J., dissenting); then citing *Toll v. Moreno*, 458 U.S. 1, 12–13 (1982); then citing *Entwistle v. S.D. High Sch. Activities Ass'n*, Civ. 06-4030-KES, 2006 WL 8453556, at *3–4 (S.D. March, 24, 2006); then citing *Fusato v. Wash. Interscholastic Activities Ass'n*, 970 P.2d 774, 769–79 (Wash. Ct. App. 1999); then citing *Makindu v. Ill. High Sch. Ass'n*, 40 N.E.3d 182, 191 (Ill. App. Ct. 2015); and then citing *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 96 (D. Me. 2018)).

[129] *Opposition* at 17–18.

[130] *Dandamudi*, 686 F.3d at 74–75.

SZYMAKOWSKI V. UHSAA, APPENDIX001516

prohibiting H1-B and TN visa holders—nonimmigrant aliens—from obtaining state licenses to practice as pharmacists.[131]

UHSAA's arguments regarding *Dandamudi* are unpersuasive.  UHSAA's first argument concerns *Dandamudi*'s conclusion that "it would be 'absurd' to review state action impacting *lawful* nonimmigrant aliens under a standard lower than or equal to that employed in [*Plyler v. Doe*] to review state action impacting *unlawful* aliens."[132]  UHSAA submits *Dandamudi*'s reliance on *Plyler* is misplaced because the Supreme Court "has gone to great lengths to limit *Plyler*'s holding to its specific facts," which concerned a state law that denied undocumented children access to public education.[133]  However, the case UHSAA cites for the proposition that the Supreme Court has limited *Plyer* to its specific facts, *Kadrmas v. Dickinson Public Schools*,[134] did not examine the straightforward, comparative principle *Dandamudi* applied—that "[u]ndocumented aliens cannot be treated as a suspect class."[135]  Likewise, *Kadrmas* did not concern an alienage classification.  The case concerned a generally-applicable state law that allowed school districts to charge families the cost of bus transportation, and the Court examined *Plyler* in determining the educational concerns at issue did not subject the law to heightened scrutiny.[136]  In any case, UHSAA overrepresents the Second Circuit's reliance on *Plyler* by failing to account for the independent justifications the Circuit offered in applying strict scrutiny.

---

[131] *Id.* at 69–70, 79.

[132] *Opposition* at 18 (quoting *Dandamudi*, 686 F.3d at 78); *see also Dandamudi*, 686 F.3d at 74 (explaining the *Plyler* plaintiffs' "unlawful status eliminated them from the suspect class of aliens generally").

[133] *Opposition* at 18.

[134] 487 U.S. 450 (1988).

[135] *Plyler*, 457 U.S. at 223; *see also id.* at 219 n.19 (explaining "undocumented status" is not a "constitutional irrelevancy").

[136] *Kadrmas*, 487 U.S. at 453–59.  The Court rejected this argument.  *Id.* at 459.

SZYMAKOWSKI V. UHSAA, APPENDIX001517

For example, UHSAA makes no note of the Second Circuit's substantial discussion of *Graham v. Richardson*, "the lodestar of the [Supreme] Court's alien discrimination doctrine."[137]

UHSAA's second argument is that it is overly "dogmatic" to interpret Supreme Court precedent to contain only "two sharply defined exceptions" to the general rule that alienage classifications are subject to strict scrutiny.[138]  Quoting the Court's opinion in *Foley v. Connelie*, UHSAA argues the Court has "never suggested . . . all limitations on aliens are suspect,"[139] and that "[i]t would be inappropriate . . . to require every statutory exclusion of aliens to clear the high hurdle of strict scrutiny."[140]  But UHSAA quotes *Foley* out of context.  *Foley* expressly concerns the political and government function exception to the general rule that alienage classifications are subject to strict scrutiny, and the quoted statements come from a portion of the decision describing the unique justifications for that exception.[141]  Subsequent Supreme Court precedent, *Bernal v. Fainter*, also describes the political and government function exception outlined in *Foley* as "a *narrow* exception to the rule that discrimination based on alienage triggers strict scrutiny."[142]

UHSAA's final argument urges *Dandamudi* is inapplicable to the present facts because F-1 visa holders "are far less similar to immigrant aliens than the *Dandamudi* plaintiffs."[143]  However, UHSAA points to no relevant precedent that "counsels us to 'judicially craft[] a subset

---

[137] *Dandamudi*, 686 F.3d at 72–78.  UHSAA's Opposition cites *Graham* only once, in reference to Plaintiffs' Supremacy Clause claim.  *Opposition* at 25.

[138] *Opposition* at 19.

[139] *Id.* (quoting *Foley v. Connelie*, 435 U.S. 291, 294 (1978)).

[140] *Id.* (quoting *Foley*, 435 U.S. at 295) (internal quotation marks omitted).

[141] *See Foley*, 435 U.S. at 294–95.

[142] *Bernal*, 467 U.S. at 220 (emphasis added) (citing *Foley*, 435 U.S. at 297).  Tellingly, *Dandamudi* cited *Foley* as the basis of the political and government function exception.  *See Dandamudi*, 686 F.3d at 73–74.

[143] *Opposition* at 19.

SZYMAKOWSKI V. UHSAA, APPENDIX001518

of aliens, scaled by how [we] perceive the aliens' proximity to citizenship.'"[144]  The court agrees with the Second Circuit that "[t]he Supreme Court has repeatedly announced a general rule that classifications based on alienage are suspect and subject to strict scrutiny review," and "we should take the Supreme Court at its word."[145]  If additional exceptions to this general rule are to be crafted, they will have to originate with a higher court than this one.

In any case, the court is doubtful the differences between F-1 visa holders, H1-B and TN visa holders, and immigrant aliens are as meaningful as UHSAA suggests.[146]  For example, although F-1 visa holders are admitted to the United States "temporarily and solely for the purpose of pursuing . . . a course of study,[147] there is no limit on how many years an individual can reside in the United States on an F-1 visa, nor a limit on how many academic programs an individual can complete.  An F-1 student who pursues a high school diploma, bachelor's degree, and graduate degree in the United States could easily spend more than a decade building a life in the United States.  Likewise, the Internal Revenue Service treats certain F-1 students who have been in the United States more than five calendar years as resident aliens for tax purposes.[148]

As Judge Campbell reflected, "the distinction[s] between resident and nonresident aliens [are] not always clear," and the "categories themselves are somewhat fluid."[149]  Accordingly, "the court is skeptical that the Supreme Court would apply widely divergent levels of scrutiny

---

[144] *Dandamudi*, 686 F.3d at 76 (quoting *LeClerc*, 444 F.3d at 429 (Higginbotham, J., dissenting)).

[145] *Id.* at 78 (quoting *LULAC*, 500 F.3d at 542 (Gilman, J., dissenting)).

[146] Per *Dandamudi*, both H1-B and TN visa holders are allowed to remain in the United States for an initial period of three years and apply for three-year extensions of the initial period. *Id.* at 70.  However, H1-B visa holders are only allowed to apply for one such extension. *Id.*  TN visa holders can apply for additional three-year extensions. *Id.* Both types of visa holders are also allowed to apply to become legal permanent residents and can receive visa extensions while the federal government considers their applications. *Id.* at 71.

[147] *Opposition* at 20 (quoting 8 U.S.C. § 1101(a)(15)(F)(i)).

[148] *TRO Decision* at 18.

[149] *Id.*

24

SZYMAKOWSKI V. UHSAA, APPENDIX001519

[to] categories of aliens" and joins Judge Campbell's assessment that classifications based on nonimmigrant alien status are alienage classifications subject to strict scrutiny.[150]

## 2. Scrutiny Analysis

Looking to the facts, the court agrees with Judge Campbell that the record does not show the Student Visa Eligibility Rule survives heightened scrutiny, let alone strict scrutiny. On this issue, Judge Campbell explained a law must advance a "sufficiently important government interest" and must be "substantially related" to that interest in order to survive heightened review.[151] Judge Campbell then weighed the two interests UHSAA cited in support of the Student Visa Eligibility Rule: (1) "preventing the mistreatment of students on F-1 visas" and (2) "ensuring fair competition for high school students in Utah."[152] Accepting UHSAA's argument that these interests were sufficiently important to justify some degree of discrimination under the Equal Protection Clause, Judge Campbell concluded the record did not show the Student Visa Eligibility Rule was substantially related to them.[153] Regarding the mistreatment of students on F-1 visa, Judge Campbell outlined her "deep[]" concern that UHSAA had not disciplined any of the accused coaches or school officials, instead choosing to "limit[] the number and kind of athletic opportunities for international students in ways that these students would not necessarily choose."[154] Regarding fair competition, Judge Campbell noted the record supported significant recruiting violations by the LCA soccer team, the LCA basketball team, and the Juan Diego

---

[150] *Id.*

[151] *Id.* at 22 (quoting *Fowler v. Stitt*, 104 F.4th 770, 794 (2024)). *See also Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 959–60 (10th Cir. 2003) (establishing it is a state actor's burden to demonstrate that a challenged law satisfies heightened scrutiny in a challenge to a gender-based city ordinance); *Free the Nipple-Fort Collins*, 916 F.3d at 803–05 (same).

[152] *TRO Decision* at 22–26.

[153] *Id.*

[154] *Id.* at 23.

SZYMAKOWSKI V. UHSAA, APPENDIX001520

basketball team.[155]  However, Judge Campbell explained the evidence did not show "UHSAA

ha[d] taken any specific action" to investigate or discipline those violations, and that the

evidence showed the recruiting issue seemed to involve foreign and non-foreign students

alike.[156]

Here, UHSAA proffers the same interests in support of the Student Visa Eligibility Rule

and does not point to any new evidence justifying a departure from Judge Campbell's well-

reasoned conclusion that they are not substantially related to the Student Visa Eligibility Rule.[157]

With respect to the issue of student mistreatment, for example, UHSAA has not offered any new

evidence establishing wider patterns and practices of abuse that the Student Visa Eligibility Rule

would remediate.  Nor has UHSAA offered evidence that it has taken any new action against the

coaches or school officials accused of engaging in abusive conduct toward F-1 students,[158] such

that the Student Visa Eligibility Rule would appear consistent with a wider effort to protect all

students.  UHSAA cites to declarations filed by Cuff and Hammer in support of the general

propositions that "policing . . . abuse is uniquely difficult for . . . UHSAA" and "[a]ttempts by []

UHSAA to investigate and discipline abuses have been met with legal objections and

lawsuits."[159]  But the declarations and attached exhibits establish only that on September 17,

2024, UHSAA sent inquiry letters to Juan Diego and LCA informing them that UHSAA was

---

[155] *Id.* at 24–25.

[156] *Id.* at 25.

[157] *Opposition* at 22–24.

[158] This deficiency is concerning given Plaintiffs' proffer of evidence that UHSAA recently testified before the Utah State Legislature's Rule and General Oversight Committee and admitted it had never reported any misconduct allegations to law enforcement or taken other non-discriminatory steps to protect students from the alleged perpetrators.  *Rules Committee Transcript* at 21:7–23:18.

[159] *Opposition* at 22–23.

26

investigating *recruiting* allegations and requesting related information.[160]  The declarations do not outline any efforts UHSAA has made to investigate and discipline member schools for *mistreatment* allegations.[161]

Furthermore, UHSAA has not provided evidence addressing Judge Campbell's concern that the Student Visa Eligibility Rule punishes the victims of abuse more than the perpetrators.[162] At oral argument, Plaintiffs compared UHSAA's decision to disincentivize abuse against F-1 students by banning them from competition, or at least post-season competition, to a decision to disincentivize abuse against female employees by banning them from the workplace.  The court thinks this analogy is apt and is not satisfied that a ban of this nature is substantially related to UHSAA's interest in preventing the mistreatment of students on F-1 visas.

With respect to the recruiting issue, UHSAA has provided some additional evidence of F-1 recruiting violations.  Specifically, it has provided a series of declarations from officials at small Utah high schools asserting LCA, Juan Diego, and Judge Memorial are upsetting the competitive balance in basketball and football by recruiting international students.[163]  But this evidence does not detract from Judge Campbell's assessment that F-1 recruiting is a small part of a bigger issue.  At the evidentiary hearing noted above, Cuff testified there are only one hundred

---

[160] *See* Dkt. 95-1, *Declaration of Rob Cuff in Support of Opposition to Motion for Preliminary Injunction* (*Second Cuff Decl.*) ¶¶ 5–6 (emphasis added); *id.* at Ex A, Ex. B; *Second Hammer Decl.* ¶ 10.

[161] Notably, the date of the letters reveals UHSAA took this action a week after counsel for Szymakowski sent a demand letter advising UHSAA of his position that the Student Visa Eligibility Rule was unlawful, *see Demand Letter* (dated September 10, 2024), and approximately a year after UHSAA first became of aware of the mistreatment allegations against the Juan Diego basketball program.  *See Hammer Decl.* ¶¶ 6–7.

[162] *TRO Decision* at 23.

[163] *See generally* Dkt. 95-3, *Declaration of Scott Mouritsen in Support of Opposition to Motion for PI*; Dkt. 95-4, *Declaration of Lora Nichols in Support of Opposition to Motion for PI*; Dkt. 95-5, *Declaration of Kena Rydalch in Support of Opposition to Motion for PI*; Dkt. 98, *Declaration of Anthony Mitchell in Support of Opposition to Motion for PI*; Dkt. 99, *Declaration of Marc Miller is Support of Opposition to Motion for PI*; Dkt. 100, *Declaration of Patrick Amico in Support of Opposition to Motion for PI*; Dkt. 101, *Declaration of Tyler Roberts in Support of Opposition to Motion for PI*.

SZYMAKOWSKI V. UHSAA, APPENDIX001522

or so F-1 students in Utah high schools,[164] and Hammer testified the practice of member schools

recruiting non-foreign players in violation of UHSAA rules is concerningly common.

UHSAA has also provided additional evidence that it struggles to investigate and

discipline recruiting violations without school cooperation by producing Juan Diego and LCA's

limited responses to the inquiry letters described in the preceding paragraph.[165]  However, the

court remains unpersuaded that UHSAA is "powerless" to enforce its universally-applicable

recruiting rules against offending schools.[166]  Beyond the inquiry letters, UHSAA has not

produced any evidence it has even tried to discipline F-1 recruiting violations and Cuff testified

at the evidentiary hearing that UHSAA has a long history of investigating and disciplining non-

foreign recruiting violations, including violations by uncooperative parties.[167]

Thus, although the court agrees with Judge Campbell that both the abuse and recruiting

allegations levied against several UHSAA members are troubling, the court finds the Student

Visa Eligibility is incongruent with these issues and fails heightened scrutiny.

### B.  Supremacy Clause

Although Szymakowski moved for a TRO based only on his Equal Protection Clause

claim, Judge Campbell found the Supreme Court's decision in *Toll v. Moreno* compelled her to

---

[164] The evidence available to Judge Campbell at the TRO stage indicates there were seven F-1 student athletes at
Juan Diego, six F-1 student athletes at Judge Memorial, eleven F-1 student athletes at St. Joseph's, and 138 F-1
student athletes at LCA during the 2023–2024 school year (162 total).  *See* Dkt. 54-7, *F-1 Students That Competed
in Sports at Juan Diego, Judge Memorial, St. Joseph, and LCA*.

[165] *See Second Cuff Decl.* at Ex. C, Ex. D.

[166] *TRO Decision* at 26.

[167] Cuff also testified that UHSAA has recently engaged in productive conversations with officials at LCA—the
overwhelming focus of the recruiting allegations at issue in this case—about moving several LCA teams to
independent status.

SZYMAKOWSKI V. UHSAA, APPENDIX001523

evaluate the Rule under both the Equal Protection Clause and the Supremacy Clause.[168]  On the

Supremacy Clause issue, she expressed concern that the Rule "conflict[ed] with . . . overriding

national policies in an area constitutionally entrusted to the Federal Government."[169]

Citing *Toll* and *Dandamudi*, Plaintiffs now argue this concern was well-placed and the Student

Visa Eligibility Rule imposes burdens on lawfully-admitted F-1 students that Congress did not

contemplate.[170]  UHSAA counters that this argument fails because Plaintiffs have presented no

evidence that "Congress preempted state regulation of every aspect of F-1 students'

extracurricular activities."[171]  However, UHSAA applies the wrong standard and the court agrees

with Plaintiffs.

As Judge Campbell explained, and UHSAA entirely fails to recognize, *Toll* reviewed the

federal government's primacy in the realm of immigration and announced a clear rule for

evaluating state regulations affecting specific classes of federal visa holders under the

Supremacy Clause: "state regulation not congressionally sanctioned that discriminates against

aliens lawfully admitted to the country is impermissible if it imposes additional burdens not

contemplated by Congress."[172]  The Court did not apply a more traditional preemption analysis,

---

[168] *Id.* at 19, 31–32.  As Judge Campbell explained, *Toll* provided the Court an opportunity to decide whether a state law that discriminated against nonimmigrant aliens was constitutionally valid under (1) the Equal Protection Clause and (2) the Supremacy Clause, and the Court elected to decide the issue under the Supremacy Clause only.  *Id.*

[169] *Id.* at 31.

[170] *Motion* at 18–21.

[171] *Opposition* at 25–27.

[172] *Toll*, 458 U.S. at 12; *id.* at 12–15 (finding a University of Maryland policy prohibiting G-4 visa holders from paying in-state tuition imposed burdens beyond those identified in the federal laws setting the terms and conditions of their lawful existence in the United States); *see also Dandamudi*, 686 F.3d at 79–81 (finding a New York law prohibiting nonimmigrant aliens from working as licensed pharmacists imposed burdens on those aliens in excess of those contemplated by Congress).  *Toll* suggested this rule might not apply in situations where "Congress has done nothing more than permit a class of aliens to enter the country temporarily," but provided the state law at issue, which denied in-state tuition benefits to noncitizens with G-4 visas, did not raise such an issue.  *Toll*, 458 U.S. at 13. And UHSAA does not raise a similar argument here.

SZYMAKOWSKI V. UHSAA, APPENDIX001524

evaluating first whether any relevant federal law expressly preempted the state law at issue, and then whether any relevant federal law impliedly preempted the state law at issue.[173]

Applying *Toll* here, the Student Visa Eligibility Rule violates the Supremacy Clause because it discriminates against lawfully admitted F-1 students and imposes burdens beyond those Congress contemplated.  The Immigration and Nationality Act (INA)—the "comprehensive and complete code covering all aspects of admission of aliens to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents"— requires F-1 students to maintain "a residence in a foreign country" and enter the United States "temporarily and solely for the purpose of pursing . . . a course of study" at a federally-sanctioned school.[174]  Related federal regulations impose additional terms, such as general requirements that F-1 students be proficient in English and have sufficient funds to support themselves in the United States.[175]  But nowhere does federal law "restrict F-1 students from engaging in interscholastic sports or any other aspect of school life."[176]  And at the TRO hearing before Judge Campbell, UHSAA answered "I think we did" when asked whether UHSAA had specifically "decided to impose different standards on [F-1 students] in Utah than the United States Government."[177]

Ignoring *Toll*, and applying a more traditional preemption analysis, UHSAA contends Plaintiffs have not shown they are likely to succeed on their Supremacy Clause claim because

---

[173] *See, e.g.*, *Pueblo of Pojoaque v. State*, 233 F. Supp. 3d 1021, 1095–1100 (D. N.M. 2017) (explaining (1) express preemption, (2) implied field preemption, (3) implied conflict preemption based on physical impossibility, and (4) implied conflict preemption based on the obstacles a state law poses to the accomplishment and executive of Congress' objectives).

[174] 8 U.S.C. § 110(a)(15)(F)(i).

[175] 22 C.F.R. § 41.61(b)(ii)–(iii).

[176] *Motion* at 20.

[177] Dkt. 72, *Transcript of Motion for Temporary Restraining Order Hearing Held of 10/16/2024* at 83:5–16.

SZYMAKOWSKI V. UHSAA, APPENDIX001525

they have only shown federal law "is silent about the topic of the Rule."[178]  UHSAA likewise

argues the Student Visa Eligibility Rule is "congruent" with federal law because an F-1 visa only

permits "a course of study," not "participation in post-season athletics."[179]  However, UHSAA

has given the court no reason to disregard *Toll*,[180] binding precedent that compels the court to

consider the Student Visa Eligibility Rule relative to the terms and conditions upon which

Congress granted F-1 students admission to the United States.[181]  Beyond granting F-1 students

permission to pursue a course of study, those terms grant F-1 students permission to attend the

approved American high schools of their choice.  Surely, this unique permission at least includes

permission to engage in those activities and experiences that are incidental to the American high

school experience.[182]

      Finally, as Judge Campbell explained, UHSAA's contention that states are free to

regulate the terms and conditions of an F-1 student's lawful existence in the United States

---

[178] *Opposition* at 27.

[179] *Id.*

[180] UHSAA cites to *DeCanas v. Bica* for the proposition that the Court "has never held that every state enactment which in any way deals with aliens . . . [is] per se pre-empted" by the federal authority over immigration. *Opposition* at 25–26 (quoting *DeCanas*, 424 U.S. at 355).  And the court does not disagree.  But UHSAA's reliance on *DeCanas* to suggest states have wide authority to impose burdens on legal immigrants beyond those contemplated by Congress is misplaced.  In *DeCanas*, the Court considered a Supremacy Clause challenge to a state regulation that prohibited employers from hiring undocumented aliens.  *DeCanas*, 424 U.S. at 353–54.  The Court, in turn, issued the quoted statement while distinguishing state policies *regulating immigration*—that is, policies concerning "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain"—from state policies *affecting immigrants*—that is, policies that merely deal with aliens.  *Id.* at 354–56.

[181] *Toll* qualified that the rule articulated above might not apply in situations where "Congress has done nothing more than permit a class of aliens to enter the country temporarily."  *Toll*, 458 U.S. at 12–13.  However, UHSAA does not advance a related argument and, "[i]n this case, Congress *has* done more than merely allow the nonimmigrant to enter temporarily."  *Dandamudi*, 686 F.3d at 80–81.  It has granted them permission to study in American high schools.

[182] At oral argument, USHAA identified federal regulations concerning J-1 students' participation in extracurricular activities and argued the absence of any comparable regulations concerning F-1 students evidenced Congress's intent to permit states to regulate the matter themselves.  *See* 22 C.F.R. § 62.25(h).  Absent any additional context, the court is not convinced.  The existence of these regulations might just as well evidence Congressional recognition that F-1 students who come to the United States for a full high school program are more like permanent-resident and citizen students than J-1 students, who come to the United States on exchange programs designed to "increase mutual understanding between the people of the United States and the people of other countries." *Id.* § 62.1(a).

SZYMAKOWSKI V. UHSAA, APPENDIX001526

beyond what Congress expressly contemplated presents a "slippery slope."[183]  May UHSAA preclude F-1 students from participating in co-curricular debate, music, and theater competitions?  May state-affiliated career and technical education organizations like DECA exclude F-1 students from competition?  May public schools require F-1 students to move furtively from classroom to classroom without socializing, eating lunch in the cafeteria, or attending school assemblies?  The likely answer to each question is no.  In turn, the court concludes Plaintiffs have shown they are substantially likely to succeed on both their Equal Protection Clause and Supremacy Clause claims.

**III.    Irreparable Harm**

Looking to the remaining preliminary injunction factors, the court finds Plaintiffs have demonstrated they will suffer irreparable harm absent a preliminary injunction because they have shown it is substantially likely the Student Visa Eligibility Rule violates the Equal Protection Clause.  In this respect, Judge Campbell likewise found Szymakowski would suffer irreparable harm absent a TRO because the Student Visa Eligibility Rule violated the Equal Protection Clause and denied him the distinctive opportunity to participate in varsity athletics.[184]  Plaintiffs' position reflects Judge Campbell's decision,[185] and UHSAA does not appear to dispute that a finding in Plaintiffs' favor on the Equal Protection Clause issue per se establishes Plaintiffs will

---

[183] *TRO Decision* at 32.

[184] *Id.* at 32–36.

[185] *Motion* at 6–8.

SZYMAKOWSKI V. UHSAA, APPENDIX001527

suffer irreparable harm absent an injunction.[186]  Instead, UHSAA argues the inability to

participate in varsity athletics, alone, does not constitute irreparable harm.[187]

UHSAA's argument misses the mark.  As Judge Campbell explained, "the deprivation of

'individual rights' in violation of the Equal Protection Clause" is per se irreparable and supports

a finding of irreparable harm on a motion for preliminary injunctive relief.[188]  And as outlined

above, Plaintiffs have shown it is substantially likely the Student Visa Eligibility Rule deprives

them of their constitutional right to equal protection.  The court need not consider whether the

loss of varsity opportunity supports a distinct finding of irreparable harm.

## IV.    Balance of Equities

The court also finds the loss of constitutional rights Plaintiffs will suffer absent a

preliminary injunction outweighs the harm a preliminary injunction poses to UHSAA and others.

On this issue, Judge Campbell found that (1) UHSAA was not harmed by the court's interference

with its internal affairs, as federal courts have the "unequivocal" power to enjoin unconstitutional

laws, (2) UHSAA could mitigate any harm arising from the court's decision to award injunctive

relief only to Szymakowski by voluntarily choosing to enjoin the rule's application against all

students pending the final resolution of this case; (3) an injunction would not harm other students

competing for the same athletic positions as an F-1 students insofar as the students competed for

playing time based on their "comparative merits," and (4) even if an injunction would encourage

"eleventh-hour eligibility determinations," it would prevent the likely violation of a

constitutional right.[189]  UHSAA abandons most of these arguments, but maintains an injunction

---

[186] *Opposition* at 27–28.

[187] *Id.*

[188] *TRO Decision* at 33 (quoting *Leachco, Inc.*, 103 F.4th at 755).

[189] *Id.* at 36–37.

SZYMAKOWSKI V. UHSAA, APPENDIX001528

would harm the Association and its members by interfering in their internal affairs, and adds an injunction would "adversely affect the competitive balance and fairness among the scores of member schools."[190]

Neither of UHSAA's arguments are persuasive. First, the court agrees with Plaintiffs and Judge Campbell that UHSAA's interest in managing its internal affairs and representing its members "is merely an acknowledgment that any litigant appearing before the court may suffer harm from an adverse ruling."[191] Second, the court agrees with Plaintiffs that their loss of equal protection under the law significantly outweighs any loss of competitive balance and fairness an injunction might cause. As the court already expressed, it shares UHSAA's concerns about the effect of recruiting on high school athletics. But the evidence shows UHSAA has other tools to combat recruiting, and Utah's recruiting problem is much bigger than the 100 or so F-1 students in the state. UHSAA can minimize any loss of competitive balance and fairness following from an injunction by using existing tools to address both the domestic and international aspects of Utah's recruiting problem.

**V.    Public Interest**

Finally, the court finds that the public interest favors a preliminary injunction. On this issue, UHSAA argues the Student Visa Eligibility Rule promotes the public interest in "*safe, fair, and reasonable* access to . . . interscholastic competition" and suggests an injunction would

---

[190] *Opposition* at 28–30.

[191] *Motion* at 21–23; *TRO Decision* at 36. The court is troubled by UHSAA's assertion that an injunction would "nullify the rights of every member school" who voted for the Student Visa Eligibility Rule when Plaintiffs have shown it is substantially likely the Student Visa Eligibility Rule "nullifies" F-1 students' rights under the United States Constitution. *Opposition* at 29. As Plaintiffs point out, a significant "purpose[] of the Equal Protection Clause is to protect 'discrete and insular' minorities against persecution from the majority." *Reply* at 10; *see also TRO Decision* at 12–13 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)); *TRO Decision* at 35 (quoting *Graham*, 403 U.S. at 372). The court may not disregard that purpose to satisfy the majority.

SZYMAKOWSKI V. UHSAA, APPENDIX001529

result in "unregulated participation."[192]  But Judge Campbell already weighed and rejected these arguments, and the court concurs with her analysis.[193]  As Szymakowski did at the TRO stage, Plaintiffs simply ask to be treated the same as non-foreign students, and the public interest "is best served by a decision that upholds the equal protection of the laws to all persons who are lawfully within the state's jurisdiction."[194]

## CONCLUSION

For these reasons, the court GRANTS Plaintiffs' Motion for Preliminary Injunction.[195]  UHSAA is enjoined from enforcing the challenged portion of the Student Visa Eligibility Rule, *Interps & Guidelines 1.9.3(B)(1)*, pending the final resolution of this case.  The court finds no need for Plaintiffs to pay a bond under Federal Rule of Civil Procedure 65(c).

SO ORDERED this 2nd of January 2025.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[192] *Opposition* at 30.

[193] *TRO Decision* at 37.

[194] *Id.* at 37.

[195] Dkt. 79.

35